**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEVIN LAQUAN TRICE, | Case No. 1:11-cv-00951-LJO-SKO-HC |
| Petitioner, | ORDER SUBSTITUTING WARDEN MARTIN BITER AS RESPONDENT TO PETITIONER |
| v. | TRICE'S PETITION AND WARDEN SCOTT FRAUENHEIM AS RESPONDENT TO |
| MARTIN BITER, Warden, | PETITIONER NICHOLS'S PETITION |
| Respondent. | FINDINGS AND RECOMMENDATIONS TO DENY PETITIONER TRICE'S REQUEST FOR AN EVIDENTIARY HEARING, DENY THE |
| ------------------------------ | PETITION FOR WRIT OF HABEAS CORPUS (DOC. 1), ENTER JUDGMENT FOR |
| TOMMY NICHOLS, | RESPONDENT, AND DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY |
| Petitioner, | FINDINGS AND RECOMMENDATIONS TO DENY PETITIONER NICHOLS'S PETITION |
| v. | FOR WRIT OF HABEAS CORPUS (DOC. 1), ENTER JUDGMENT FOR RESPONDENT, AND |
| SCOTT FRAUENHEIM, Warden, | DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY |
| Respondent. | **OBJECTIONS DEADLINE:** |
| | **THIRTY (30) DAYS** |

Petitioners Kevin Laquan Trice and Tommy Nichols are state prisoners proceeding pro se and in forma pauperis with petitions for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matters have been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 through 304.

1

Pending before the Court are two consolidated petitions for writ of habeas corpus brought by Petitioners who were tried together.

Petitioner Trice's petition was filed in case number 1:11-00951-LJO-SKO-HC on May 25, 2011, and transferred to this Court on June 10, 2011.  Respondent filed an answer on July 24, 2012, and Petitioner filed a traverse on September 21, 2012.

Petitioner Nichols's petition was filed in case number 1:13-cv-01561-AWI-BAM-HC on September 12, 2013.  An answer was filed on December 16, 2013; no traverse has been filed.

## I.   Jurisdiction and Order Substituting Respondents

Because the petitions were filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

The challenged judgment was rendered by the Superior Court of the State of California, County of Stanislaus (SCSC), which is located within the territorial jurisdiction of this Court.  28 U.S.C. §§ 84(b), 2254(a), 2241(a), (d).  Further, Petitioners claim that in the course of the proceedings resulting in their convictions, they suffered violations of their constitutional rights.  Accordingly, the Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 2254(a) and 2241(c)(3), which authorize a district court to entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United

2

States.  <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n.7 (2000); <u>Wilson v. Corcoran</u>, 562 U.S. - , -, 131 S.Ct. 13, 16 (2010) (per curiam).

As to Petitioner Trice, an answer was filed on behalf of Respondent Ron Barnes, who at the time the answer was filed was the warden of the High Desert State Prison (HDSP), where Petitioner Trice was incarcerated at the time of the filing of the petition and the answer.  Respondent sought to substitute Warden Barnes as the Respondent in place of Warden McDonald.  (Doc. 42.)

Petitioner initially named as a respondent a person who had custody of Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules).  <u>See</u>, <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994).  The fact that Petitioner was transferred to the Kern Valley State Prison (see doc. 51, filed April 17, 2013) after the petition was filed does not affect this Court's jurisdiction; jurisdiction attaches on the initial filing for habeas corpus relief, and it is not destroyed by a transfer of the petitioner and the accompanying custodial change.  <u>Francis v. Rison</u>, 894 F.2d 353, 354 (9th Cir. 1990) (citing <u>Smith v. Campbell</u>, 450 F.2d 829, 834 (9th Cir. 1971)).  Accordingly, the Court has jurisdiction over the person of the Respondent.

However, in view of the fact that the official website of the California Department of Corrections and Rehabilitation (CDCR) shows that the warden at KVSP is Martin Biter,[1] it is HEREBY ORDERED that

---

[1] The Court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, including undisputed information posted on official websites.  Fed. R. Evid. 201(b); <u>United States v. Bernal-Obeso</u>, 989 F.2d 331, 333 (9th Cir. 1993); <u>Daniels-Hall v. National Education Association</u>, 629 F.3d 992, 999 (9th Cir. 2010). The address of the official website for the CDCR is http://www.cdcr.ca.gov.

Martin Biter, Warden of the Kern Valley State Prison, be SUBSTITUTED as Respondent pursuant to Fed. R. Civ. P. 25.

As to Petitioner Nichols, an answer was filed on behalf of P.D. Brazelton, who was Petitioner Nichols's custodian at the Pleasant Valley State Prison (PVSP) when the answer was filed, and who sought to be substituted as Respondent.  Thus, Petitioner Nichols named a person with custody sufficient to give the Court jurisdiction over the person of the Respondent custodian.

However, in view of the fact that the official website of the CDCR shows that the warden at PVSP is now Scott Frauenheim, it is HEREBY ORDERED that Scott Frauenheim, Warden of the Pleasant Valley State Prison, be SUBSTITUTED as Respondent pursuant to Fed. R. Civ. P. 25.

II.   Procedural Summary

Petitioners Trice and Nichols were tried together with Jermaine Michael Dean in the SCSC from November 14, 2006 through March 16, 2007; Bobbie Blueblood was also charged but was tried separately. (3 CT 867, 5 CT 1230-39; LD 1-2.) [2]

Petitioners were convicted of the first degree murder of Jose Ruiz perpetrated on March 3, 2002, during the commission of a robbery with the personal use and discharge of a firearm; residential robbery of Tatum and Jose Ruiz with gang enhancements and with the personal use and discharge of a firearm; and false imprisonment of Roshyla and Ezra Ruiz involving the personal use of a firearm and with gang enhancements.  (LD 3, 1-2.)  Each crime was alleged to have been committed for the benefit of, at the direction

---

[2] "LD" refers to documents lodged by Respondent in Petitioner Trice's case.

of, or in association with the Pasadena Denver Lane Bloods (PDL), a criminal street gang, but the gang allegation was dismissed during trial as to the murder count.  Following an evidentiary hearing on a motion for new trial, all gang enhancements were stricken, but the new trial motion was otherwise denied.  (Id. at 2-3.)

Petitioner Trice was sentenced to life in prison without the possibility of parole plus determinate and indeterminate terms as well as restitution and fines.  (Id. at 2-3.)  On June 29, 2010, in People v. Nichols et al., case number F055572, the Court of Appeal of the State of California, Fifth Appellate District (CCA) modified the judgment with respect to a fine but otherwise affirmed the judgment as to Petitioner Trice.  (LD 3.)  Petitioner filed a petition for review in the California Supreme Court (CSC).  On October 13, 2010, in case number S184678, the CSC denied review without any statement of reasoning or citation of authority.  (LD 4, LD 5.)

Petitioner Nichols was found to have suffered two prior serious felony convictions that were also strikes (§ 667, subds.(a) & (d)) and to have served three prior prison terms (§ 667.5, subd. (b)).  Petitioner Nichols was sentenced to life without the possibility of parole on the murder, plus determinate and indeterminate terms.  On appeal, the CCA affirmed the convictions, but reversed the firearms enhancements pursuant to Cal. Pen. Code § 12022.53(c) and (d) for insufficiency of the evidence and ordered that sentence be imposed on the section 12022.53, subdivision (b) enhancements.  (LD 3, 118-19, 122.)  A petition for review filed in the California Supreme Court (CSC) was denied summarily on October 13, 2010, in case number S184678.  (LD 4, LD 5.)

1  Petitioner Nichols was resentenced, and he appealed from the
2  resentencing; on March 13, 2012, in People v. Nichols, case number
3  F061963, 2012 WL 832612 (March 13, 2012), the CCA affirmed the
4  judgment but ordered the abstract be modified to delete fines and
5  correctly reflect the term and custody credits.
6  The docket of the CCA and CSC[3] show that Petitioner Nichols
7  filed a petition for writ of habeas corpus in the CCA on September
8  2, 2011, which was denied on September 15, 2011.  In re Tommy J.
9  Nichols, case no. F063212.  On June 25, 2012, Petitioner Nichols
10 filed a petition for writ of habeas corpus in the CSC, which
11 summarily denied it on November 14, 2012.  In re Tommy J. Nichols,
12 case no. S203621.
13 III.  Factual Summary
14 In a habeas proceeding brought by a person in custody pursuant
15 to a judgment of a state court, a determination of a factual issue
16 made by a state court shall be presumed to be correct; the
17 petitioner has the burden of producing clear and convincing evidence
18 to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1);
19 Sanders v. Lamarque, 357 F.3d 943, 947-48 (9th Cir. 2004).  This
20 presumption applies to a statement of facts drawn from a state
21 appellate court's decision.  Moses v. Payne, 555 F.3d 742, 746 n.1
22 (9th Cir. 2009).  Here, Petitioner Trice expressly adopts the

_____

24 [3] The Court takes judicial notice of the docket as posted on the official website
   pursuant to Fed. R. Evid. 201(b).  United States v. Bernal-Obeso, 989 F.2d 331,
25 333 (9th Cir. 1993); Daniels-Hall v. National Education Association, 629 F.3d 992,
   999 (9th Cir. 2010).  It is appropriate to take judicial notice of the docket
26 sheet of a California court.  White v Martel, 601 F.3d 882, 885 (9th Cir. 2010),
   cert. denied, 131 S.Ct. 332 (2010).  The address of the official website of the
27 California state courts is www.courts.ca.gov.

28

6

statement of the case and statement of the facts set forth on pages
1 through 31 of the CCA's decision.  (Trav., doc. 47, 16.)
Accordingly, the following statement of the facts of the offenses
consists of a summary of the facts as recorded in the CCA's decision
in People v. Nichols et al., case number F055572, filed on June 29,
2010.

A.   Background

In March 2002, Tatum and Jose "JoJo" Ruiz, the homicide victim,
lived with their two children, eight-year-old Roshyla and five-year-
old Ezra, in a house on Montilla Lane, a small cul-de-sac in
Modesto.  Ruiz was known to law enforcement as a member of a Norteno
gang called the West Side Boyz, and as a major distributor of base
cocaine in west Modesto based on information from, and controlled
buys conducted by, confidential informant Phillip Collins, who was
Ruiz's friend and fellow drug dealer.  In the previous year or so,
Ruiz regularly bought cocaine by the kilo, cooked the cocaine and
turned it into rock form, and then sold the product mostly by the
ounce.  According to Tatum, Ruiz did not sell drugs from their
residence or keep more than small amounts of cocaine there; however,
he sometimes prepared, cooked, or packaged the drugs at the house;
customarily hid large sums of cash in different parts of the house;
and kept a Taurus nine-millimeter semi-automatic pistol in a safe
with an electronic lock in the master bedroom closet.

After having twice sold crack cocaine to an undercover officer
and informant, in July 2000 Collins sought to avoid eight to ten
years in prison by signing a contract with the Modesto Police
Department that was approved by the district attorney's office.
Pursuant to the agreement, Collins was required to 1) buy drugs from

7

Ruiz, Ruiz's brother Javier Ruiz, and another individual in controlled settings; 2) testify as needed; 3) obey all laws and make all court appearances; and 4) keep Modesto Police Sergeant Helton advised of his residence and whereabouts.  In return, Collins would plead guilty to one count of selling drugs, and he would be sentenced to local time and three years' probation.  Helton would contact Collins when a purchase was to be made and tell him from whom to make the buy.  Collins would then arrange the deal, buy the drugs, and give the drugs to the police.  He was wired for sound during the transactions, and the police gave him money to make the purchases.  Under the supervision of Helton and FBI Agent Tim Hammond, Collins made approximately twenty controlled buys from Ruiz or his associates in quantities ranging from an ounce to a quarter kilo.

As a result, federal authorities had planned to serve a search warrant on Ruiz's residence within a matter of days of the murder. Federal grand jury indictments were obtained in February 2002 and served in March, with the prosecution of Ruiz's associates concluding in late spring 2003, when they all pled guilty in federal court.  According to Helton, Collins would not have been privy to the status of the investigation and would not have been told when arrests and indictments were imminent; he was not to receive any consideration for his participation in the case concerning the Ruiz homicide.

Ultimately, Collins never pled guilty to anything or served time in jail, and he was told he would not be prosecuted on his case.  Collins likewise faced no federal charges, but instead was paid money by the federal agents, who when contacted by Helton in

8

the fall of 2000 were interested in pursuing Ruiz.

In 2002, Collins also knew Nichols (known as Bam or Bam Bam), and he came into contact with Dean (known as J Dogg).  Collins was acquainted with Trice (known to him as Roach) and Bobby Blueford, whom he got to know around 1995 when Collins served thirteen months in the California Rehabilitation Center (CRC) for felony offenses involving controlled substances.  At CRC Collins associated daily with Trice, who was from the PDL, had "Pasadena" and "DL" tattoos, mostly associated with those wearing red (Bloods) as distinct from blue (Crips), and was seen to have "thrownn a Blood sign with his hands.  Collins bragged to Trice and Blueford about his good drug connection in Modesto, whom he described as a Mexican partner. After release from CRC, Collins and Trice met up when Trice would come to Merced to visit family.  (See LD 3, 3-6.)

B.   <u>The Robbery and Homicide</u>

On March 1, 2002, the Friday of the weekend of the murder, Trice, who had called Collins the previous week, arrived at Collins's home in Atwater with Dean, Nichols, and Blueford in a rented silver Lincoln Town Car, seeking a quarter kilo of rock cocaine.  Trice asked several times for Collins to hook them up with Collins's "Mexican homeboy" and repeatedly sought to know the details of the transaction.  Collins knew that setting up the deal would violate the terms of his contract with the police department, so he put Trice off by telling him to call in the next day or so; nevertheless, Collins, who was drinking at the time, told Trice and his co-defendants the make and color of his connection's car and that his connection had a lot of drugs and money stashed.  According to Collins, he was not familiar with the address at which Ruiz lived

at the time.  Collins denied telling an investigator from the
Department of Justice that appellants had come to do a "lick," i.e.,
a robbery.  Trice and Blueford stayed at Collins's house all day,
while Dean and Nichols were there off and on.

Officer Helton had contact with Collins late Friday morning;
Collins said nothing about knowing of people who were trying to make
buys from Ruiz, even though he was under an obligation to notify
Helton anytime there was a possible sale of drugs involving Ruiz.
Likewise, Collins did not contact Hammond, his federal handler,
although he knew Hammond would be very interested.

On Saturday, Collins was at a wedding, but caller
identification records on his phone showed that Trice called several
times during the day.  Collins called him back at least once and
said he was busy that day and would call back.  Collins did not know
whether Trice called on Sunday; it was Collins's daughter's
birthday, and Collins was away from home all day.

On that Sunday evening, Jose Ruiz was away from home after
having received a lot of calls on his cell phone, including a call
from Tatum made around 8:00 p.m.  At the residence about fifteen
minutes later, while the children were in the bathroom and Tatum was
working in the kitchen, Tatum heard the front door open and close
and then heard Ruiz call to her in an urgent tone to get down.  She
observed Ruiz on the ground between the entryway and kitchen being
held by the back of his shirt by two men who were pointing guns at
him.  One was Dean.  A third person, Trice, came around the corner
with a black revolver pointed at Tatum and told her to get down.
Tatum then saw Nichols, who was holding a black gun that was the
biggest of the guns she saw.  Nichols pointed it at Ruiz.  Trice

10

continued to direct Tatum to keep her head down.  One or more of the
intruders said something to the effect that they just wanted the
stash.

At Dean's direction, Trice walked Tatum out of the kitchen and
through the dining room, where she saw two other persons, causing
her to believe there were four intruders.  Nichols pointed the gun
at Ruiz, and Trice went toward Ruiz, but Tatum did not see what
Trice did.

Roshyla testified that upon being told by Ezra that her
father's friends were there, she left the bathroom where the
children were going to bathe and went to see who they were.  She saw
around three African-American men coming through the door.  The
intruders were wearing black clothing and some were wearing beanies.
One of the men, whom she subsequently identified as Dean at a
photographic lineup and at trial, had black hair done in shoulder-
length braids, a skinny or bony face, a long and pointy nose, and
teeth protruding from his mouth.  After Roshyla returned to the
bathroom, Dean entered and then returned with Tatum, holding a gun
to the back of her head and holding both of her arms behind her
back.

At Dean's direction, Tatum and Dean left the room and returned
with clothing for the children that had been in the laundry room,
and Tatum hurriedly dressed the children.  Dean looked around the
bedroom and walked towards jewelry on the dresser; a watch was
subsequently found to be missing, as was Tatum's cell phone, which
was in her purse on the bed in the bedroom.

Tatum saw Trice and Nichols, who were both armed, force Ruiz at
gunpoint to walk through the bedroom to the walk-in closet.  The

11

safe was behind the half-open door of the closet, through which
Tatum could see the back of Nichols's light blue shirt.  She heard
gunshots, probably at least three initially, and then saw Dean go to
the closet door and start shooting inside the closet at a downward
angle, firing a few shots.  Tatum saw at least four shots go into
the closet door while other shots were heard still going off behind
the door.  Tatum screamed and cried, ran to the bathroom, opened a
window, broke off the screen, and boosted Roshyla up so she could
climb out, instructing her to run to the neighbor's house and tell
them to call 911.  Tatum testified that she tried to pick Ezra up
and put him through the window, but he was screaming and so scared
that he would not let her push him out.  She told him to stay where
he was, and by this time, the gunshots had stopped.  Tatum believed
she heard between five and ten shots.

     As she ran off, Roshyla saw two of the intruders trying to
leave by going over the chain-link fence next to the Ruiz house.
One said that they had to get out of there, and he called the man
with long braids a name that started with either R-A or R-O.
Another intruder ran out of the garage, and Ruiz crawled out of the
house as if he were chasing the man.  Roshyla kept running to the
neighbor's house across the street, telling the woman who answered
the door that she thought her dad got shot.  The neighbors then
called the police.

     After the gunshots stopped, Tatum saw no one in the bedroom or
closet, but she saw Ruiz's gun on the closet floor and blood
everywhere.  Although the gun appeared to have malfunctioned, she
grabbed it anyway and followed the blood trail through the bedroom,
down the hallway, and into the garage, where she found Ruiz on his

hands and knees, spitting out blood and gasping for air.  Tatum ran
inside to get Ezra and a telephone, and she was talking to the 911
operator when she returned to Ruiz, who was lying still.  Tatum
screamed to an arriving neighbor that Ruiz had been shot, and she
began performing CPR. (See LD 3, 6-11.)

> C.  Physical Evidence at and near the Scene

Dispatched to the Ruiz residence at approximately 8:14 p.m.,
Modesto police arrived within minutes to find Tatum performing CPR
on Ruiz, who had been shot, was down in the driveway, and was
bleeding profusely.  Blood was trailing from him down the driveway,
and it appeared that someone had made tracks through it.  Next to
Ruiz lay a Taurus nine-millimeter semi-automatic handgun, which had
a fifteen-round magazine in it and appeared to have malfunctioned,
as the slide was partially back and a round was sticking out of the
ejection port.  It was subsequently determined that the unfired
cartridge that was wedged in the chamber was a .40-caliber round,
which, although capable of being loaded into the magazine, was too
large for the gun barrel.  The remaining thirteen unexpended
cartridges in the magazine were the correct size.  There was an odor
of freshly burnt gunpowder in the house.

Police searched the area in and around the Ruiz home shortly
after the shooting.  Entry to the house did not appear to have been
forced; the front door was partially open and a set of keys was in
the lock.  In the hallway that led from the garage into the house
and ultimately to the master bedroom, officers found two aluminum-
colored CCI brand .380-caliber shell casings, bloodstains, and
bloody handprints on the carpet.  Inside the master bedroom itself
were three more of the expended .380 shell casings.  There were also

13

bullet holes in various places in the room, and several expended
copper-jacketed bullets were recovered.  From the four bullet holes
in the door of the master bedroom closet and associated gunshot
residue, it was possible to ascertain that those shots were fired
from the outside of the closet door inward.  All four were fired in
a downward, almost forty-five-degree angle.  In the closet was an
expended nine-millimeter shell casing that was believed to have been
associated with the gun found by Ruiz's body.  Also in the closet
was a small safe with an electronic lock.  The door was open and
some of the contents were spilled out onto the floor.  The
trajectory of the bullets shot through the closet door was toward
the general area of the safe.

There were bloodstains in various places in the room, and there
was also blood in the closet, although not a lot.  Bloodstain
samples taken from the master bedroom were Ruiz's blood.  The blood
evidence essentially traveled a path from the master bedroom closet,
through the area of the foot of the bed, down the hallway, to the
garage, and to where Ruiz's body was located.  Two dressers in the
room contained cash in the amounts of $8,083 and $8,400.  A box of
.40-caliber ammunition was found in the master bedroom.  It was the
only box of ammunition found in the house.  The box, which should
have contained fifty .40-caliber rounds, contained forty-nine .40-
caliber cartridges and one 9-millimeter round.

On the living room floor was a red and black knit cap, and on
the floor of the dining room were a Nokia cell phone in its holder
and four plastic zip ties that also seemed out of place.

The screen on the window of the master bedroom's bathroom was
partially torn, and a trail of items that appeared to have been

14

taken from the house led to a hole that had recently been cut in the chain-link fence on the property line.  Additional items and footprints led in a northerly direction.  In a field directly north of the Ruiz residence, close to Woodland Avenue, officers located a black High Standard .22-caliber nine-shot rimfire revolver, which at trial Tatum testified looked similar to the one Trice pointed at her.  Ruiz's blood was on the gun's cylinder.  Footprint impressions in the grass and weeds indicated someone had recently run across the corner of the property.  The direction of the footprints was northwest, toward Bennett Lane.  A black-colored Sturm Ruger .357 Magnum revolver containing six expended shell casings was found underneath a bush in the front yard of a house on Bennett; the lack of condensation, cobwebs, and dust on the gun indicated it had not been there long.  At trial, Tatum testified that this gun looked like the one that the fourth intruder (who was not present at trial) had carried.  The trail of evidence was consistent with a getaway car's being parked about a block from the Ruiz house.

On November 24, 2002, Herbert Brownlee, who lived on Walker Avenue approximately half a mile north of Woodland, reported finding a Lorcin .380 semiautomatic handgun underneath the empty engine compartment of a Mustang that he was preparing to take to the junkyard.  The Mustang had been in a field next to Brownlee's house for months. The gun, which was rusted, had an empty clip in it and a live round in the chamber.  At trial, Tatum testified that this gun was similar to the one Dean had carried.  (See LD 3, 11-14.)

D.  Ballistics and Forensic Evidence

Ruiz was shot at least nine times and sustained five fatal wounds.  Stippling indicated that at least two of the shots were

15

1  fired from close range.  Death resulted from shock and hemorrhage

2  due to multiple gunshot wounds.  Four .22-caliber bullets from

3  rimfire cartridges were recovered from his body during the autopsy.

4  Although there was insufficient individual detail to identify them

5  as having been fired from the same gun, test firing showed that they

6  could have been fired from the High Standard revolver recovered in

7  the field near the scene.

8        The nine-millimeter cartridge case found in the closet was

9  fired by the Taurus nine-millimeter pistol.  That pistol would not

10 shoot a .40-caliber bullet; as the bullet would be too big for the

11 chamber, the gun would not load itself and would jam.  A nine-

12 millimeter and .40-caliber cartridge are readily distinguishable

13 because of their different diameters and weights.  The condition of

14 the Lorcin .380-caliber semi-automatic pistol was consistent with

15 its being outside in a field for six to eight months or more, and

16 the chamber and barrel were very corroded.  The pistol was rusted

17 shut, and a CCI-brand live round had to be forcibly removed from the

18 chamber.  This unfired round was the same caliber, and from the same

19 manufacturer, as an expended cartridge from the homicide scene that

20 was submitted for comparison, but results were inconclusive as to

21 whether the expended cartridge had been fired from the Lorcin.  (LD

22 3, 20-21.)

23        E.  Other Evidence Revealed in Investigation

24        At the scene on the night of the shooting, Detective Brocchini

25 was told by Andre Ruiz that a third party, who was a neighbor, had

26 told Ruiz that he had heard the shooting and then saw an older Black

27 male adult with a short Afro haircut, in an orange, primered

28 minivan, begin to honk his horn.  The neighbor said he then saw two

16

Black subjects run from the area around the Ruiz residence to the
minivan, and then the minivan drove off.  The neighbor also
mentioned something about a black or new Lexus.  Brocchini's
attempts to track down the person who actually made the statements
were unsuccessful.

Collins testified that after he returned to his home in Atwater
sometime after dark on that Sunday, he was visited for ten to twenty
minutes by Nichols and Dean, who said that Trice had been shot
crossing the street across from the gas station near Collins's
house.  They said they had dropped him off down the street at some
girl's house.  Dean said they could not leave their homeboy and
asked how to get to the freeway.  Collins gave him directions.
Nichols, the more aggressive of the two, told Collins that they knew
where he lived, and that if anyone came by asking questions, Collins
was to say Trice got shot crossing the street.  Collins could see
the handle of a pistol tucked in the front of Nichols's pants.
Nichols and Dean then left, and Collins could not tell whether
anyone else was in their car.  While they were there, Helton
telephoned with the news that Ruiz had been shot.

Helton telephoned Collins at about 9:00 p.m.  He told Collins
to call him if Collins heard anything.  According to Helton, Collins
called him back about 11:00 that night and said he had received
several calls from people, advising him of Ruiz's death.  Collins
said nothing about anyone named Roach, Bam, or J Dogg.  Collins
denied having a second conversation with Helton that night.  Collins
did not tell Helton anything about his visitors or Trice's being
shot because he was not sure what was going on that night.

Brocchini telephoned Collins the morning after the shooting and

17

asked Collins, whom he knew to be acquainted with Ruiz and to be

working for Helton and the FBI, if he knew Trice, who had been found

in Atwater, the city where Collins lived.   Collins said no.

However, Collins contacted Helton later that morning and told him

that he thought something was going on.   As a result, Helton and

Hammond interviewed him that afternoon.   Collins provided

descriptions of Bam, Roach, and J Dogg and told the officer that the

men had come by.   He said they had told him they had $5,000 and

wanted to buy a quarter kilo, and that they would give him $500 to

set up the buy.   Collins later identified pictures of the three co-

defendants and Blueford from photographic lineups.

Brocchini attempted to develop a list of Trice's associates and

ultimately came up with Nichols as a possible suspect.   Pursuant to

Brocchini's directions, on March 5, Nichols was arrested in

Pasadena.   A black beanie was seized in a search of his house.

The next day, Brocchini sought help in identifying J Dogg and B

Dogg from an officer of the Pasadena Police Department who was known

to him as an expert in the Black criminal street gangs of Pasadena.

The officer's efforts and an anonymous telephone source resulted in

enough information to identify J Dogg as Dean and obtain a

photograph of him, which was incorporated in a photographic lineup;

the lineup was e-mailed to Modesto, where Tatum and Roshyla

identified Dean, who was then arrested at his home.

On March 14, Brocchini listened to a telephone call at the

Stanislaus County Jail in which Dean told his mother and sister to

telephone at a stated number a lady Dean identified as JP's sister,

and to make sure the lady said that Dean was dropped off at her

house on Friday and was not picked up until after the weekend.   As a

18

result of information contained in the call, Brocchini contacted Lisa Young, who declined to say whether Dean had been with her. Dean's sister telephoned Young and said there was a message from Dean that he wanted Young to say he was with her that weekend. Young subsequently testified that although Dean had telephoned her on the Friday of the weekend of the homicide, she had declined his request to visit her.  Young did not see Dean on the weekend of the homicide.

In an interview on the night of the homicide, a neighbor who lived across the street from the Ruiz home told law enforcement that one or two days before, a black, lowered Chevrolet pickup truck drove by slowly and stopped briefly, its occupants looking at the Ruiz house.  Later, a newer light-colored, grayish, or white Lincoln with tinted windows did the same thing and stopped around the corner instead of just driving on around the cul-de-sac.  Following a tip received after the homicide, Brocchini learned that a car rented to Tricia Lee was at a rental yard at the airport in Burbank. Examination of the car revealed what looked like blood in the car's back seat, which forensic testing showed was Trice's blood. Nichols's palm print was found on the driver's side hood.  At trial, the neighbor testified that a photograph of the Lincoln located by Brocchini looked similar to the car she saw before the shooting.

Tricia Lee rented the Lincoln on a Friday in February 2002 for the weekend only.  Trice, who was with her when she rented the car, asked to use the car on Friday.  Lee reported that the car was at Trice's mother's home in Altadena on Friday after work, and Trice had permission to use it on Saturday, when Lee expected to see Trice.  Unsuccessful in paging Trice over the weekend, she received

19

on Monday a call from Blueford, who said he had the car so that she
could return it.  Lee asked where Trice was, but Blueford said he
did not know.  (See LD 3, 14-20.)

<div align="center">F.  <u>Petitioner Trice's Injury and Medical Treatment</u></div>

In response to a report of shooting, Atwater Police Officer
Ridenour responded to an address in Atwater on March 3 just after
9:00 p.m.  The officer encountered Trice, who identified himself as
Keith (not Kevin) Trice, and who had gunshot wounds to his back and
lower abdomen that Trice said he sustained while he had been walking
to a store.  Trice expressed a strong desire not to go to the
indicated trauma center, which was in Modesto; however, on the way,
Trice told the officer that he did not know who shot him, but it was
a person or persons in a vehicle that could have been a car or a
truck; Trice did not answer some of the officer's questions.  The
name "Kevin Trout" was received by a paramedic, who observed
symptoms consistent with shock, and assessed the patient's physical
condition as being borderline critical.  Shock would be a possible
explanation for a lack of information being obtained from a patient.
However, the paramedic's assessment was that the patient had the
ability to answer questions, but was reluctant to do so.  Trice was
similarly vague when questioned by a doctor at the hospital, adding
little more than that he was from Los Angeles and had been down for
three days, visiting a Sonjia in Atwater or Merced.  Atwater police
were unable to find any witnesses to a shooting or any physical
evidence that a shooting had occurred in the area.

At about 1:40 p.m. on March 4, Modesto Police Detectives Grogan
and Blake interviewed Trice, who stated that he had been in Atwater
visiting a friend named Sonjia Girtman, and he was walking from her

<div align="center">20</div>

house to a store to purchase some alcohol when he was the victim of a drive-by shooting.  He said the car was dark and that he believed he was shot by someone sitting in the front passenger seat.  Trice said he was bleeding profusely, and it took him some time to gather the strength to walk back to the apartment.  Grogan subsequently obtained items of evidence from the Atwater Police Department and Sonjia Girtman's house, including an expired driver's license for Keith Lamont Trice (Petitioner Trice's twin brother) and a pair of brown pants that had Petitioner's blood on them. He measured the distance and travel time between the crime scene in Modesto and Girtman's residence in Atwater, and Grogan determined it was possible for Trice to have left the scene in Modesto and gone to the address in Atwater between the homicide and when he placed the call for assistance.

After the interview ended, Blake granted Trice's request and allowed Trice to use his cell phone to call his mother.  Once connected, Trice said, "Mom, I got shot yesterday in Modesto."  This was said as one complete sentence, without any gaps, although Grogan could not hear what, if anything, Trice's mother said or asked. According to Barbara Trice, Petitioner Trice's mother, Petitioner never said he was shot the previous day in Modesto.  She did not ask if he had been shot; she had already heard that he had been shot and that it had occurred in Atwater.  Because she had heard a number of things about his health and that he had been taken to an infirmary in the jail, she asked his location.  He said he was in Modesto. (See LD 3, 15-17.)

G.   Gang Evidence

A red baseball cap with a "P" on it in three different places

was seized at Nichols's house at the time of his arrest.  A letter
addressed to J Dogg from a PDL Blood in prison was found in Dean's
bedroom when he was arrested.  On April 1, 2002, several items
bearing symbols and a writing referring to Denver Lane were found in
the jail cell of Dean and Nichols.

Nichols had several tattoos.  One was "Lanes" with an X through
the A, which was a sign of disrespect to the Altadena Block Crips.
Another of Nichols's tattoos was "God Forgive, Lanes Don't."  Trice
had "Pasadena" tattooed across his back, with "D" on the back of his
left arm and "L" on the back of his right arm.  He also had "BIP"
("Blood in Peace") on an arm.  Dean had no tattoos. However,
Brocchini reviewed records for the cell phone attributed to Dean and
found calls made between February 25 and March 4, 2002, to the phone
of Trice's girlfriend, Trice's pager, and Blueford's phone.

Pasadena Police Officer Okamoto testified as an expert on
gangs, specifically the PDL, which he described as a large and very
violent gang that "pretty much controls all of Pasadena," although
he had received calls about PDL involvement in criminal activity in
areas outside Pasadena.  Okamoto testified the PDL's primary
activities were theft, robbery, drug sales, carjacking, assaults,
and murder; in March 2002, PDL had at least 50 members.  In
Okamoto's opinion, PDL was a criminal street gang as defined by the
Penal Code.

Okamoto explained that there are two sets of African-American
gangs, the Crips and the Bloods, which are rivals.  Although there
are numerous different gangs within those two, all are either a Crip
set or a Blood set.  Bloods' predominant favorite color is red;
Crips' is blue.  PDL is a Blood set.  Their main rivals are the

Altadena Block Crips and the Raymond Avenue Crips.  PDL members
often wear a Philadelphia Phillies hat, which is red with a white P
on the front.  The hat seized in the search of Nichols's residence
would signify someone was wearing gang attire, and "obviously" would
be the hat of someone who was representing Pasadena.

In addition to colors, gang members use hand signals to
identify each other. PDL members will make a P, an L, and a D with
their hands, or, if they happen to see a rival as they drive by,
they may throw up a quick L to signify they are from PDL.

Tattoos show fellow gang members that a person is really
involved with gang activity; common tattoos are PDL, WSB for West
Side Blood, DLB for Denver Lane Blood, or DL.  A Blood may also have
a CK tattoo, which stands for Crip Killer.  In their graffiti, they
will sometimes cross out the letter A so as to disrespect Altadena
Block Crips. If someone passes away, they will not use the R in rest
in peace, because that would be representing Raymond Avenue Crips.
Instead, they will put BIP for Blood in Peace.

Blood members also often call each other "Blood," both orally
or in writing, or will call each other by a moniker or "homey."

In Okamoto's experience, when gang members commit crimes with
other people, they normally commit those crimes with fellow gang
members they can trust.  A lot of PDL's activity is based on some
type of monetary gain, as well as respect and intimidation.

Based on his review of a variety of materials, Okamoto
concluded that Trice, Nichols, Dean, and Blueford were PDL members.
He further opined that they were active PDL criminal street gang
members on March 3, 2002.  In Okamoto's opinion, the co-defendants
and Blueford willfully promoted, furthered, or assisted felonious

23

criminal conduct by members of the gang by the actions alleged to
have occurred in this case.  The bragging rights they would bring
back to Pasadena would garner them a large amount of respect from
their fellow gang members, and would also bring a lot of respect to
the gang.  It was Okamoto's further opinion that each of the four
actively participated in a criminal street gang with knowledge that
its members engaged in a pattern of gang activity.  His opinion was
based on the intimidation factor they would bring back into the
neighborhood.  Whatever they would recover, such as narcotics, they
would bring back into Pasadena and sell for some type of monetary
gain, and then they could purchase more weapons, which would help
them in more criminal activity.  Furthermore, the crimes alleged
were committed at the direction of or in association with a criminal
street gang.  All four individuals were active PDL gang members who
would not want to take an associate or someone they could not trust,
so when recruiting in a case like this, they would definitely
recruit fellow gang members.

      Brocchini also testified as an expert in criminal street gangs,
and expressed opinions, and bases therefor, that were consistent
with those expressed by Okamoto.  In addition, Brocchini explained
that Crips call each other "Cuz," while Bloods call each other
"Dogg."  Brocchini opined that gang members would rob other gang
members because if someone breaks into a gang member's house, that
person will find drugs, guns, or money.  In addition, gang members
usually do not report robberies, but instead try to get their
belongings back on their own.  (See LD 3, 21-23.)

            H.  Defense Evidence
      A neighbor living across the street from the Ruiz family at the

24

time of the shooting testified regarding traffic and behavior
consistent with drug sales at the Ruiz residence, repeated
observations of a black Lexus in the area, and evidence of gang
attire.  A detective confirmed that he did not even check or follow
up on a list of license plate numbers of vehicles the neighbor
associated with the Ruiz residence that was given to the detective
shortly after the homicide.

A person who had been located in a park several blocks south of
Woodland Avenue and Montilla Lane at approximately 8:15 or 8:20 p.m.
on March 3, 2002, saw a male in a black hooded sweatshirt, running
very fast to the south along the park and repeatedly turning around
and looking back, as if maybe someone were after him.  This person
met up with two other individuals at the south end of the park.
They talked for 30 seconds to a minute, then ran father south.  The
person had reported what he had seen.

When Modesto Police Officer Wilcoxson interviewed Roshyla
shortly after the homicide, she said she saw four or five Black
males come through the garage door and force their way into the
house; one was approximately 20 to 30 years old, about five feet 10
inches, tall and thin, and wearing a black beanie on his head, as
well as a long-sleeved black shirt and black baggy jeans.  She was
unable to give any other descriptions.

In securing the homicide scene, Modesto Police Officer Sanchez
found in the exterior lock of the front door a set of keys that
appeared to have blood on them.

The jury received evidence concerning two photographic lineups
shown to Tatum on March 4 by Detective Owen.  As to one that
included Nichols's picture, Tatum remarked that the skin tones of

25

the suspect were lighter than those in the pictures.  After Owen asked whether any of the photographs looked similar aside from the skin tones, Tatum focused on the photograph of Nichols, said that the facial features were very similar, eliminated all the other photographs, and said she wanted to see the individual in person because she believed she could identify parts of his body, such as a fat gut, fat sides, and jiggling stomach.  After looking at the second photographic lineup, Tatum said none of the people looked familiar.  Owen noted, however, that she looked at Trice's picture several times, and when he asked why, Tatum said the complexion, forehead, and hairline were the same, but she was not sure and wanted to see the man in person; she could eliminate two of the photographs, but not the others.

On March 12, Detective Blake showed two photographic lineups to Tatum, one of which contained Blueford's picture.  Tatum did not see anyone she recognized, although she pointed to the photo of someone other than Blueford as resembling one of the suspects.

Dr. Mitchell Eisen, a psychologist who testified concerning eyewitness memory and suggestibility, explained that research shows people are better in general at making identifications within their own race than they are cross-race, which tend to result in higher rates of false identifications than same-race identifications.  Research also shows that the younger the child, the more suggestible, because the child tends to rely more on adults for cues as to what the adult is after and what really happened.  Children are not as skillful as adults in organizing information so that it can be recalled on demand.  Children are particularly influenced by their parents.

26

W. Jerry Chisum, a crime scene reconstructionist, examined photographs, crime scene videos, and other materials in connection with this case, and based on his review of the evidence, he concluded Ruiz was shot in the bedroom itself, not in the closet because of the absence of blood documented in the closet and the presence of blood spatter in the bedroom itself. Further, if someone other than Ruiz—-for example, Trice—-was shot inside the house and sustained a through-and-through wound, there would have been a bullet and some blood, which would have contained DNA. Chisum conceded that he could not exclude blood being in the closet; it could have been too small a spot to observe, or there could have been blood evidence that was not documented. He also conceded it was possible for someone to get shot and not have blood recovered from the location at which he or she was shot because someone could be shot and have internal, as opposed to external, bleeding; moreover, it was possible that clothing could catch external bleeding and prevent the blood from landing on the ground.

Chisum opined based on the jamming of the nine-millimeter pistol that someone had removed a nine-millimeter cartridge from the magazine and inserted a .40-caliber cartridge in its place. When the gun was fired once, the larger-caliber cartridge moved up, would not chamber properly, and jammed the weapon. In the photographs Chisum reviewed, the box of .40-caliber cartridges appeared to be closed. Chisum would have asked to have the weapon's magazine and the cartridges fingerprinted, particularly the .40-caliber cartridge causing the jam, the nine-millimeter shell that was in the box, and the box itself. No physical evidence Chisum saw showed Ruiz had the nine-millimeter pistol in his hand or fired it. As for the shots

fired through the closet door, the powder was still present.  None
of the physical evidence indicated when the shots were fired,
however. They could have been fired an hour or even two days before
the police arrived.

From a review of photographs of the bathroom window area,
Chisum opined that they were inconsistent with someone's going
through that window because of the way the window's screen was
dislodged, the lack of damage to the bush, and an absence of
footprints in the soil below the window.  The lawn appeared to be
about two feet from the window, however, so it was possible that if
someone landed on the grass and a photograph was taken several hours
later, there might be no evidence of the landing.

Trice testified in his own defense.  He drove the Lincoln
rented by his girlfriend, Tricia Lee, to Altadena where he lived
with his parents on what he believed to be Thursday, February 28.
He visited old friends Blueford, Dean, and Nichols, and proposed
driving to Madera, where Trice had lady friends and family,
including his Uncle Bernard, from whom Trice wanted to buy a quarter
kilo of cocaine for $5,000.  Trice arranged to return to pick up his
friends later.  They began the journey around 8:00 p.m. on Thursday,
stopping on several errands, including a visit to a gas station to
allow Trice to clean himself up after his nose started to bleed
while going over the Grapevine.  They spent the night in Madera.

On Friday, March 1, the four visited Collins, socialized, and
set up a purchase of a quarter kilo for $4,500 with a connection
that Collins would hook up.  They went to Merced, returned to
Madera, attended a party discovered by Trice while Trice was
unsuccessfully searching for Bernard, and spent the night in Madera.

28

Trice ended up spending Saturday night with Sonjia Girtman in Atwater, less than a mile from Collins's house.  Trice had entrusted the Lincoln to Blueford, who was accompanied by Nichols, so that Blueford could drive the car back to Lee.  Trice had arranged with Bernard to have Bernard drive Trice to Merced, but Bernard left without Trice, so Trice took a bus to Merced.  Girtman picked him up and drove him to her house in Atwater, where Trice spent Saturday night and Sunday.

On Sunday night, Trice told Girtman that he was going to the store, smoked a cigarette outside the residence, and then walked towards the store with his head down.  A car pulled up with two people in it who might have been Hispanic.  The passenger said something to him that Trice did not catch; he asked what was up, then saw the passenger pull out a gun and fire, hitting Trice. Trice fell, crawled off, lost his strength, but eventually made it back, bleeding and in pain, to Girtman's house, where paramedics were called.  He did not hear the car drive off and had no idea how long he had been hurt or what had happened to his money.  He denied giving his name as Kevin Trout or Keith Trice; Keith's license was found in Petitioner's pants because Keith, who was Petitioner's twin, had left it there when he had borrowed the pants from Petitioner.

With respect to gang evidence, the defense presented the testimony of Timothy Rhambo, a youth counselor for a group home for foster children in Pasadena and also a boxing coach for children in the community.  Rhambo was involved with PDL in the late 1980's.  In the 1990's and early 2000's, he got to know Nichols quite well.  He testified to Nichols' help in organizing events in aid of stopping

29

violence between older and younger PDL gang members in 2000 or 2001.
Nichols's involvement brought credibility to Rhambo and what he was
trying to do, as Nichols was more known as a gang member.  Rhambo
also testified that it was easy to get out of the PDL gang; a person
simply stops being "with that" and associating with the people he
was associating with before and starts doing his own thing, whatever
it is.  Rhambo was seeing this from Nichols during the summer of
2001, although Nichols had been in and out of jail a lot and had had
a reputation as being a hardcore gang member.

    Rhambo was also acquainted with Trice, with whom he had gone to
school.  In the late 1990's, Trice no longer dressed like he had in
the early 1980's, when he was a PDL member.

    Rhambo had also seen Dean before, and thought he was "probably"
an active gang member "back in the day," although he did not know.
He could not remember where or in what context he had seen Dean.
(See LD 3, 24-31.)

    IV.  <u>Brady Violation</u>[4]

    Petitioner[5] argues that he suffered a violation of his right to
due process of law and specifically to disclosure of material
information protected by the Fifth and Fourteenth Amendments when,
as the trial court found, Detective Brocchini testified falsely at
and after trial, withheld information, and attempted to mislead the
Court and jurors.  (Doc. 1, 4.)  Petitioner alleges that Brocchini
concealed evidence that Philip Collins was a gang member, and both
Brocchini and Collins falsely denied that Collins's tattoo was a

_____

[4] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).
[5] To reduce the length of this order, because Petitioner Trice raises many more
issues than Petitioner Nichols, the discussion portion of this order will refer to
Petitioner Trice as "Petitioner."

gang tattoo.  (Id. at 11.)  Petitioner contends that he suffered a
prejudicial denial of the opportunity to impeach both Collins and
Brocchini; if the jury had known that Collins was a gang member and
that Brocchini had lied to back him up, it would have made a
significant difference and could have persuaded the jury to
disbelieve the remainder of Collins's and Brocchini's testimony, and
it was sufficient to make it reasonably probable that at least one
juror would conclude differently as to Petitioner's guilt.
Petitioner also notes that the withheld material establishes that
Brocchini testified incorrectly on other factual matters pertinent
to Petitioner's guilt.  Petitioner immediately seeks an evidentiary
hearing on this issue and ultimately seeks the granting of his
petition.  (Doc. 47, 21-34.)

Petitioner Nichols also raises the Brady violation and argues
that it rendered Collins's statements and testimony unreliable.  He
contends that because Collins's information was the initial link
between the crimes and Petitioner Nichols, Collins's participation
in the identification process tainted the subsequent identifications
made in the course of photographic lineups, live lineups, and in-
court identifications.  (Doc. 1, 27-32.)

A.  Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on
behalf of a person in custody pursuant to the

judgment of a State court shall not be granted
with respect to any claim that was adjudicated
on the merits in State court proceedings unless
the adjudication of the claim—

(1) resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly

31

established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light
of the evidence presented in the State court
proceeding.

Clearly established federal law refers to the holdings, as
opposed to the dicta, of the decisions of the Supreme Court as of
the time of the relevant state court decision.  Cullen v.
Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v.
Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362,
412 (2000).

A state court's decision contravenes clearly established
Supreme Court precedent if it reaches a legal conclusion opposite
to, or substantially different from, the Supreme Court's or
concludes differently on a materially indistinguishable set of
facts.  Williams v. Taylor, 529 U.S. at 405-06.  The state court
need not have cited Supreme Court precedent or have been aware of
it, "so long as neither the reasoning nor the result of the state-
court decision contradicts [it]."  Early v. Packer, 537 U.S. 3, 8
(2002).

A state court unreasonably applies clearly established federal
law if it either 1) correctly identifies the governing rule but
applies it to a new set of facts in an objectively unreasonable
manner, or 2) extends or fails to extend a clearly established legal
principle to a new context in an objectively unreasonable manner.
Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see,

32

Williams, 529 U.S. at 407.  An unreasonable application of clearly established federal law under § 2254(d)(1) cannot be premised on an unreasonable failure to extend a governing legal principle to a new context where it should control.  White v. Woodall, - U.S. -, 134 S.Ct. 1697, 1706 (2014).  Therefore, "'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"  Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).  The Court in White v. Woodall reiterated the difference between extending a legal principle and applying rules that are squarely established by the Court's holdings to the facts of each case, which is required only if it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question.  White v. Woodall, 134 S.Ct. at 1706.

An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable.  Williams, 529 U.S. at 410.  A state court's determination that a claim lacks merit precludes federal habeas relief as long as fairminded jurists could disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011).  Even a strong case for relief does not render the state court's conclusions unreasonable.  Id.  To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well

33

understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.  The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof. Cullen v. Pinholster, 131 S.Ct. at 1398.  Habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA.  Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. at 1398.  Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1).  Id. at 1400. Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  A state court decision on the merits based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceedings.  Miller-El v. Cockrell, 537 U.S.

322, 340 (2003).

With respect to each claim, the last reasoned decision must be identified to analyze the state court decision pursuant to 28 U.S.C. § 2254(d)(1). <u>Barker v. Fleming</u>, 423 F.3d 1085, 1092 n.3 (9th Cir. 2005); <u>Bailey v. Rae</u>, 339 F.3d 1107, 1112-13 (9th Cir. 2003). Here, the last reasoned decision on all Petitioner's claims was the decision of the CCA.

B. <u>The Decision of the State Court on the Brady Claims</u>

The pertinent portion of the CCA's opinion (LD 3, 32-41) is as follows:

### DISCLOSURE ISSUES

A. **Collins's Gang Status**

Appellants contend the judgments must be reversed because the prosecution violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and its progeny by withholding evidence that Phillip Collins was a gang member, that he perjured himself on that point, and that Detective Brocchini and Sergeant Helton corroborated the perjury. We find no cause for reversal of the judgments.

1. **Background**

Collins's involvement in the case is summarized in the statement of facts, *ante.* During examination by the prosecutor, he testified that he "hung out" with Bloods while growing up on the west side of Modesto and bought drugs from them. He further testified that gang members use tattoos to signify what gang they are from, and that he had seen them use geographical tattoos such as the name of their town or "'West Side,'" "'North Side,'" or "'East Side.'" On cross-examination, Collins testified that he was never a gang member. He admitted having a "Westside Blood" tattoo, but, when asked whether that term had a gang connotation, he said he got it in CRC to fit in, and that there were no Westside Bloods in Modesto. When asked, "So you were just a Westside Blood in CRC?" Collins replied, "Yes."

35

Helton testified on cross-examination that, to his knowledge, Collins was never a member of a criminal street gang, and that Helton probably would have known had he been.FN25 When Brocchini was asked, "Is Phil Collins a gang member?" he replied, "No." Asked how he knew, Brocchini testified: "Because I worked in the gang unit for a long time and I knew Phil Collins, too. He was a drug dealer." FN26

    FN25. Helton was in the gang unit for the second time from 1996 through 2000.

    FN26. Brocchini was a gang detective from 1997 to 2000, and specialized in Black gangs, among others.

Appellants each filed a motion for new trial.FN27 Nichols asserted in part that Brocchini had prepared a report, dated February 10, 1998, in which Collins was included as a member of the Oak Street Posse (OSP), a known criminal street gang, and that this information was material to Collins's credibility, known by Brocchini, and not disclosed to the defense. A copy of the report, which identified "Collins, Phillip" as the person listed as "Philthy Phill" in the "105" column of the OSP roster, was attached as an exhibit.

    FN27. Early on in trial, all were deemed to be joining in each other's motions. It is clear from the record that the trial court also regarded them as joining in each other's objections. Accordingly, throughout the appeal we will treat an objection or motion made by one as having been made by all.

An evidentiary hearing was held. Brocchini testified that about a year after his trial testimony, he was reviewing the particular MPD case report number referenced on a subpoena he received from the defense when he found a report he had written as a gang deputy in 1998. The report concerned a handwritten list found by a deputy in the jail cell of Norval Williams. It was a then-current list of OSP gang members. In 1998, OSP, a Black criminal street gang operating in Stanislaus County, had both Crips and Bloods in it. The list was split into two halves, the 105 section and the 213 section, with those numbers being addresses on Oak Street. The 105 section was Blood gang members who claimed OSP, while the 213 section was Crip gang members who claimed OSP. After the list was found under a bunk in

36

the jail, Brocchini deciphered the identity of some of the people. He was able to do so from working in the gang unit for a long time and talking to them and hearing what they called each other. One of the names on the list was "Philthy Phill," whom Brocchini identified as the same Phillip Collins who testified at trial.FN28 In writing the report, Brocchini never said Collins was a Blood; Collins was listed by an OSP member as being in that gang as a Blood. When Brocchini heard Collins deny at trial that he was a gang member, Brocchini believed him because Brocchini had not come across any field identification cards with Collins's name on them.

    FN28. Brocchini did not recall how he linked the moniker "Philthy Phill" with Collins.

Brocchini further testified that at trial, because he was asked to render an opinion concerning whether appellants were criminal street gang members, he did a gang workup on them. He did not do anything similar with regard to Collins during the pendency of this matter. Moreover, he would not identify anyone as a gang member simply because the person's name was on the roster, because that alone would not meet a sufficient number of MPD's criteria. Collins had a gang tattoo, and Brocchini knew he associated with gang members and that he had been named by other people as a gang member at the time Collins testified. That fit three of the criteria used by MPD to establish who was a gang member. Even assuming Collins was a gang member in 1998, however, this would not necessarily mean he was still a gang member when he testified, as it is possible to get out of the gang. Brocchini did not know about Collins's tattoo until Collins testified about it, and he opined that Collins was not a gang member at the time Collins testified that he was not a gang member.

Brocchini did not tell anyone about the OSP roster or give a copy to the defense prior to trial because he did not remember it. The list was in a file regarding Norval Williams. Given the way MPD's database was set up, the only name entered in it would have been the one indexed on the front, i.e., Williams. The MPD gang unit did not keep an individual file for each suspected gang member; there was no file for Collins.

In its written ruling on the new trial motions, the trial court stated: "The Court finds Detective Brocchini's

37

testimony to be disingenuous. In 1998, Collins was associating with gang members, had a gang monicker [sic], a gang tattoo, and was listed on a gang roster. MPD's own criteria provide that a person isn't considered a 'drop-out' until there has been at least 5 years of no activity. In stating his opinion at trial, Brocchini did not state the many gang indicators that he was disregarding in reaching his fairly incredible opinion. Moreover, his opinion appears to have been made for the purpose of bolstering Collins['s] credibility in the eyes of the jury. The Court believes that Detective Brocchini withheld material information in testifying to this opinion." In examining this and other defense claims concerning the gang evidence, the court found "plentiful evidence of gang membership, but scant evidence of gang benefit," and that "[t]he only evidence which the jury could have relied on in reaching their decision was the opinions of the 2 experts [Brocchini and Okamoto]." The court concluded: "[T]aken individually, each of [the enumerated] problems with the gang testimony were [sic] not sufficient to raise a concern for the integrity of the process. However, when viewed in the aggregate, the Court does have a serious concern whether the proceedings leading to the jury's true finding[s] on the PC § 186.22(b)(1) gang enhancement were fundamentally fair. Accordingly, the Court orders the jury's finding on this enhancement stricken on each of the counts.... [¶] In all other respects, the motion is denied and the verdicts affirmed."

## 2. **Analysis**

"[T]he suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra*, 373 U.S. at p. 87.) FN29 The duty to disclose such evidence is wholly independent of the prosecutor's obligation under section 1054 et seq FN30 (*People v. Hayes* (1992) 3 Cal.App.4th 1238, 1244), exists even where there has been no request by the accused (*United States v. Agurs* (1976) 427 U.S. 97, 107), encompasses both impeachment and exculpatory evidence (*United States v. Bagley* (1985) 473 U.S. 667, 676), and extends to evidence known only to law enforcement investigators and not to the prosecutor (*Youngblood v. West Virginia* (2006) 547 U.S. 867, 869-870; *Kyles v. Whitley* (1995) 514 U.S. 419, 438; *In re Brown* (1998) 17 Cal.4th 873, 879). "In order to comply with *Brady*,

38

therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.' [Citations.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042, quoting *Kyles v. Whitley, supra*, 514 U.S. at p. 437; *In re Brown, supra*, 17 Cal.4th at p. 879.) Disclosure must be made at a time when it would be of value to the accused. (*People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 51.)

>    FN29. Although the good or bad faith of the prosecutor is not determinative (*Brady, supra*, 373 U.S. at p. 87; *In re Ferguson* (1971) 5 Cal.3d 525, 532), and suppression of materially favorable evidence violates due process regardless of whether it was intentional, negligent, or inadvertent (*In re Sodersten* (2007) 146 Cal.App.4th 1163, 1225), we nevertheless note that appellants do not accuse the prosecutor himself o[f] knowingly permitting perjured testimony (see *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1252-1253).

>    FN30. Section 1054.1 provides in part: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] ... [¶] (e) Any exculpatory evidence."

Although "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called '*Brady* material'—... there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." (*Strickler v. Greene* (1999) 527 U.S. 263, 281, fn. omitted.) Thus, to merit relief on due process grounds, "the evidence a prosecutor failed to disclose must have been both favorable to the defendant and material on either guilt or punishment. Evidence would have been favorable if it would have helped the defendant or hurt the prosecution, as by impeaching one of its witnesses. Evidence would have been material only if there is a

39

reasonable probability that, had it been disclosed to the defense, the result would have been different. The requisite reasonable probability is a probability sufficient to undermine confidence in the outcome on the part of the reviewing court. It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]" (*People v. Dickey* (2005) 35 Cal .4th 884, 907-908; *Kyles v. Whitley, supra*, 514 U.S. at pp. 434-435, 436; *In re Brown, supra*, 17 Cal.4th at pp. 886-887.) "A showing by the [defendant] of the favorableness and materiality of any evidence not disclosed by the prosecution necessarily establishes at one stroke what in other contexts are separately considered under the rubrics of 'error' and 'prejudice.' For, here, there is no 'error' unless there is also 'prejudice.' [Citations.] It follows that harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [(*Chapman*)], with its standard of 'harmless beyond a reasonable doubt,' is not implicated." (*In re Sassounian* (1995) 9 Cal.4th 535, 547, fn. 7; *Kyles v. Whitley*, *supra,* 14 U.S. at pp. 435-436; *In re Brown, supra*, 17 Cal.4th at p. 887.) "In sum, once there has been... error..., it cannot subsequently be found harmless...." (*Kyles v. Whitley, supra*, 514 U.S. at p. 436, fn. omitted.) Conclusions of law and mixed questions of law and fact, such as the elements of a Brady claim, are subject to independent review. (*People v. Salazar, supra*, 35 Cal.4th at p. 1042.)

We turn first to whether the undisclosed evidence would have been favorable to appellants. This was not the typical situation in which gang involvement provided a readily apparent bias or interest or motive to testify, as when a member of one gang testifies in favor of a member of the same or an allied gang, or when a witness is reluctant to testify for fear of retaliation. (See, e.g., *People v. Ayala* (2000) 23 Cal.4th 225, 276-277; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449-1450.) Nevertheless, we assume Collins's gang status was relevant to his credibility. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168.*)* This being the case, Brocchini's 1998 report should have been disclosed to the defense, if not before trial, then certainly once Collins testified that he was not a gang member. Instead of disclosing information he possessed to the contrary, however, Brocchini confirmed that Collins indeed was not a gang

member. Even if this was his honest opinion, the defense had the right—and should have had the opportunity—to challenge both him and Collins, especially in light of the fact Collins met several of MPD's gang criteria.FN31

> FN31. We need not address, at any length, Helton's testimony on the subject. Instead of testifying definitively on Collins's gang status, Helton testified only that Collins was not a gang member to his knowledge, and that he probably would have known if Collins was. Although Helton was in the gang unit at the time Brocchini wrote the report, nothing in the record before us suggests Helton knew of its existence, and Helton was not called to testify at the hearing on the new trial motions. On this record, it would be speculative for us to conclude that Helton withheld information or condoned or corroborated erroneous testimony. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 952.)

We turn now to the question of materiality. In making our assessment, we have undertaken the cumulative evaluation required (*Kyles v. Whitley, supra*, 514 U.S. at p. 441), and taken into consideration the effect of the nondisclosure on defense investigations and trial strategies (*United States v. Bagley, supra*, 473 U.S. at pp. 682-683; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1132-1133, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22). We conclude the suppressed evidence was not material under all the circumstances, as there is no reasonable probability its disclosure would have altered the trial result. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1132.) FN32

> FN32. Such a probability must be, "'as it were, "objective," based on an "assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision," and not dependent on the "idiosyncrasies of the particular decisionmaker," including the "possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." [Citation.]' [Citations.]" (*In re Sodersten, supra*, 146 Cal.App.4th at pp. 1226-1227.)

With respect to Collins, "'[i]n general, impeachment
evidence has been found to be material where the witness
at issue "supplied the only evidence linking the
defendant(s) to the crime," [citations], or where the
likely impact on the witness's credibility would have
undermined a critical element of the prosecution's case,
[citation]. In contrast, a new trial is generally not
required when the testimony of the witness is
"corroborated by other testimony," [citations].'
[Citation.]" (*People v. Salazar, supra*, 35 Cal.4th at p.
1050.) Here, the most important portions of Collins's
testimony—especially his identification of appellants as
the perpetrators—was corroborated by the testimony of
Tatum and, to a certain extent, Roshyla, as well as by
circumstantial evidence. Brocchini's undisclosed report
did not absolutely establish Collins was a gang member;
moreover, jurors were aware that Collins associated with
gang members and that he had a tattoo that Officer
Okamoto, one of the prosecution's gang experts, testified
was a common gang tattoo. Jurors knew from Brocchini's own
testimony that the existence of gang tattoos and
association with gang members were two matters that gang
experts found indicative of gang membership.

Most importantly, even assuming jurors would have
concluded Collins lied about his gang status, such a
conclusion would not have significantly altered the
picture jurors already had of Collins or the myriad
reasons to question his credibility on less collateral
matters. The evidence showed that Collins entered into a
deal with law enforcement authorities whereby he would set
up his best friend, a man he had known since childhood.
Under this deal, Collins was supposed to plead guilty to
selling drugs and serve a sentence in the local jail, but,
despite the fact he supposedly was not receiving any
consideration for his testimony in the homicide case, he
ended up not even being prosecuted in his case. When the
operation against Ruiz went federal, Collins was no longer
working off a case, but instead was working for monetary
compensation. Significantly, despite the fact the
agreement specifically targeted Ruiz and his drug
operation, Collins never alerted Helton or Hammond to
appellants' presence or desire to purchase a quarter kilo
of cocaine from Ruiz, nor did he ever truly explain why he
did not alert either of them. According to Helton, this
was a significant enough amount of drugs that he would

42

"[c]ertainly" have wanted to know about it. When Helton
first contacted Collins to notify him of Ruiz's death,
Collins said nothing about his knowledge or suspicions.
Similarly, he said nothing to Brocchini when Brocchini
contacted him the day after the shooting.

In light of the foregoing, the undisclosed evidence, while
favorable to appellants insofar as it tended to impeach
Collins's credibility, was not material "because it would
have added little to the cumulative impact of the other
impeachment evidence." (*People v. Dickey, supra*, 35
Cal.4th at p. 908.) Given the substantial impeachment to
which Collins's testimony was subjected at trial, we
conclude it is not reasonably probable "that whatever
confidence the jury placed in [his] testimony would have
been fatally undermined" (*ibid.)* by learning that a
moniker identified as referring to him was listed on a
years-old roster for a Modesto criminal street gang, or
even that Collins lied in denying he was a gang member.
While we do not take potential perjury lightly, this is
simply not a case in which the withheld information
painted a significantly different picture of Collins and
his credibility from the one placed before the jury.
(Contrast *In re Sodersten, supra*, 146 Cal.App.4th at pp.
1233-1235; *People v. Johnson* (2006) 142 Cal.App.4th 776,
783-786.)

Appellants point to the effect the withheld evidence would
have had on Brocchini's credibility. The bulk of
Brocchini's testimony concerned the gang enhancement
allegations, however, and those were stricken by the trial
court. Moreover, defense counsel attacked Brocchini's
credibility, ably and at length, and expressly suggested
none of his testimony could be trusted. Given the fact the
undisclosed report was written approximately eight years
before Brocchini testified at trial, it is not at all
certain jurors would have concluded Brocchini was lying,
as opposed to having a memory lapse, when he testified
that Collins was not a gang member.

There is no reasonable probability that, had the 1998
report been disclosed to the defense, appellants would
have been acquitted. Accordingly, because the undisclosed
evidence was not material, reversal is not warranted.

(LD 3, 32-41.)

43

1

2        C.   Analysis

3        The Due Process Clause of the Fourteenth Amendment imposes upon

4   the prosecution a duty to disclose evidence in its possession that

5   is favorable to an accused if it is material either to guilt of

6   punishment.   Brady v. Maryland, 373 U.S. 83, 87-88 (1963).   The

7   prosecution violates its constitutional duty to disclose to the

8   defense material exculpatory evidence where, regardless of whether

9   the defense requested the evidence, 1) the evidence was favorable to

10  the accused because it was either exculpatory or impeaching; 2) the

11  evidence was suppressed by the government either willfully or

12  inadvertently; and 3) prejudice results from the failure to

13  disclose.   Strickler v. Greene, 527 U.S. 263, 280 (1999).

14

15       Evidence is material if there is a reasonable probability that,

16  had the evidence been disclosed to the defense, the result of the

17  proceeding would have been different.   Kyles v. Whitley, 514 U.S.

18  419, 433-34 (1995).   However, a court may find a "reasonable

19  probability" where the remaining evidence would have been sufficient

20  to convict the defendant, Strickler, 527 U.S. at 290, and even

21  without finding that the outcome would more likely than not have

22  been different, Kyles v. Whitley, 514 U.S. 419, 434 (1995).

23  Instead, "[a] 'reasonable probability' of a different result [exists]

24  when the government's evidentiary suppression 'undermines confidence

25  in the outcome of the trial.'"   Kyles, 514 U.S. at 434 (quoting

26  Bagley v. United States, 473 U.S. at 678).   Although each item of

27  undisclosed evidence must be evaluated, the cumulative effect of all

28  suppressed evidence is evaluated for purposes of materiality.

44

Kyles, 514 U.S. at 436-37.

Here, the state court articulated the correct legal standards concerning the due process duty of disclosure of material evidence. As to Collins, the state court reviewed the evidence and reasonably determined that the defense should have had access to the gang roster listing Collins as an OSP member in 1998.  Further, the state court also reasonably applied clearly established federal law in its analysis of the materiality of the undisclosed information concerning Collins's tattoo and his having been listed in another inmate's gang roster.  The jury had before it similarly weighty evidence of Collins's gang ties and identity, including his having a tattoo of a type identified by expert opinion as a gang tattoo, his associating with gang members in the course of dealing drugs, his possible aiding and abetting the perpetrators by divulging to them information that effectively identified and/or located Ruiz, and his having been identified by others as a gang member.  Although the probative tendency of the undisclosed impeachment evidence was to contradict Collins's denial of gang membership, other evidence that provided essentially duplicate grounds for impeachment was also presented to the jury.  Thus, the undisclosed evidence tended to lack materiality.  See, Barker v. Fleming, 423 F.3d 1085, 1096-97 (9th Cir. 2005) (citing Silva v. Brown, 416 F.3d 980 (9th Cir. 2005)).  The state court could reasonably have concluded that with respect to its value in contradicting Collins's denial of gang membership, the roster and tattoo would not have affected the trier's determination.  Further, considering how remote in time the discovery of the roster was from Collins's more recent conduct and his continuing to display a gang tattoo, it cannot be said that no

fairminded jurist could reasonably agree with the state court's analysis of the materiality of the gang information.

With respect to the state court's consideration of the larger body of evidence in evaluating the materiality of the information in relation to impeaching Collins, the state court reasonably concluded that the undisclosed evidence would not have put the case in a different light or have precluded confidence in the proceedings. Although Collins was an important witness who tied Petitioner to the offenses, other evidence, including a detailed narrative of the facts of the offenses and repeated identifications by Tatum based on a substantial opportunity to perceive the intruders, identifications by Roshyla, physical and forensic evidence, and multiple sources of circumstantial evidence tied Petitioner and his co-defendants to the crime.  Further, the state court reasonably concluded that Collins's credibility was more directly challenged by the strong evidence of bias presented by his arrangement with law enforcement and his receipt of substantial benefits by way of compensation and avoidance of prosecution, and by Collins's lack of integrity and honesty with Helton and Hammond concerning Petitioner's offer to buy drugs or Collins's knowledge of the perpetrators, their whereabouts, and their conduct.  Likewise, Collins's willingness to work to the detriment of his old friend Ruiz provided the jury with a basis for inferring that Collins was motivated by a strong desire for personal gain.

In Smith v. Cain, - U.S. -, 132 S.Ct. 627 (2012), statements made by a witness on the evening of the offense and five days later were held to be material where the witness's testimony was the only evidence linking defendant to the crime, and his undisclosed

statements directly contradicted his trial testimony, in which he
had told the jury that he had "[n]o doubt" that defendant was the
gunman that he stood "face to face" with on the night of the crime,
but the officer's notes showed that witness said he "could not ID
anyone because [he] couldn't see faces" and "would not know them if
[he] saw them." Id. at 630.  Here, Collins was not the only
evidence linking Petitioner to the crime.  Further, the undisclosed
information did not bear directly on Collins's capacity to perceive
the perpetrators, but rather principally affected his credibility,
which had already suffered significant impeachment.

This case is also distinguishable from Banks v. Dretke, 540
U.S. 668 (2004), in which the prosecution failed to disclose that an
admittedly key prosecution witness in the penalty phase of a capital
trial was a paid government informant.  There, the Court concluded
that the undisclosed, favorable evidence could reasonably be taken
to put the whole case in such different light as to undermine
confidence in the verdict because the witness provided the sole
basis for an inference that the defendant would continue to commit
acts of violence, and there was no persuasive evidence in the record
that would serve to impeach the witness.  Id. at 701-03.

With respect to the materiality of the undisclosed evidence for
impeachment of Brocchini, Brocchini's evidence related primarily to
the gang enhancements, which were stricken.  Brocchini's testimony
concerning Collins's gang membership conflicted with the
prosecution's chief gang expert's testimony concerning gang tattoos
and association as indicia of gang membership.  Independent evidence
provided a basis for questioning Brocchini's reliability, including
Brocchini's failure to track down the informative neighbor, his

inability to remember how he obtained some information, and his
inability to provide documentation of some of his claims concerning
the evidence.  Further, the temporal remoteness of the discovery of
the gang roster vastly diluted any inference of dishonesty on the
part of Brocchini.  The state court reasonably concluded that the
undisclosed evidence concerning the gang roster was not material.

Petitioner cites to the record and points to other evidence he
alleges was withheld.  Some of his challenge centers on Brocchini's
testimony that there was information that Dupree Hull and Thomas
White were Blood gang members, and their telephone numbers were
linked to the victim's telephone number, whereas there was no basis
for such a connection between the victim and Hull or White.

The Court will defer a more complete factual and legal
discussion of the materiality of this evidence until a related
prosecutorial misconduct claim is analyzed because these claims are
set forth with more factual detail and are more fully analyzed in
the state court's decision concerning alleged prosecutorial
misconduct in withholding the information.  Nevertheless, with that
discussion in mind, the Court concludes that considering all the
information and its nature and position in the present case, it
cannot be said to be beyond fairminded disagreement that the state
court reasonably concluded that in light of the entire record, the
evidence was not material and thus the nondisclosure did not
constitute a violation of due process.  The state court reasonably
concluded that the evidence did not put the whole case in a
different light with respect to Brocchini's credibility or the
Petitioners' guilt.

Further, the state court decision was not based on an

unreasonable determination of fact.  Pursuant to § 2254(d)(2), a
habeas petition may be granted only if the state court's conclusion
was based on an unreasonable determination of the facts in light of
the evidence presented in the state court proceeding.  Section
2254(d)(2) applies where the challenge is based entirely on the
state court record or where the process of the state court is
claimed to have been defective.  Taylor v. Maddox, 366 F.3d 992,
999-1001 (9th Cir. 2004).  Such challenges include claims that a
finding is unsupported by sufficient evidence, the state court's
process was defective, or the state court failed to make any finding
at all.  Id. at 999.

    With respect to Petitioner's contention that the state court
adjudications was based on an unreasonable determination of fact
within the meaning of § 2254(d)(2), it is established that the state
court's determination must be not merely incorrect or erroneous, but
rather objectively unreasonable.  Id.  For relief to be granted, a
federal habeas court must find that the trial court's factual
determination was such that a reasonable fact finder could not have
made the finding; that reasonable minds might disagree with the
determination or have a basis to question the finding is not
sufficient.  Rice v. Collins, 546 U.S. 333, 340-42 (2006).  To
conclude that a state court finding is unsupported by substantial
evidence, a federal habeas court must be convinced that an appellate
panel, applying the normal standards of appellate review, could not
reasonably conclude that the finding is supported by the record.
Taylor v. Maddox, 366 F.3d at 1000.  To determine that a state
court's fact finding process is defective in some material way or
non-existent, a federal habeas court must be satisfied that any

49

1  appellate court to whom the defect is pointed out would be

2  unreasonable in holding that the state court's fact finding process

3  was adequate.  Id.

4       Here, as set forth above, the state court did not make any

5  objectively unreasonable findings of facts; rather the state court's

6  findings are supported by the record.  Further, Petitioner received

7  an evidentiary hearing in the trial court, and he has not shown or

8  even suggested any material defect in the state court's fact finding

9  process.

10      Petitioner Nichols argues that the withheld information would

11 have rendered all Collins's information unreliable.  However, the

12 state court evaluated the withheld evidence in light of the totality

13 of the evidence and came to the objectively reasonable conclusion

14 that in view of the numerous and compelling bases for discrediting

15 Collins that were already in evidence, the withheld evidence would

16 not have put the whole case a different light.  Although Collins

17 gave information that was used in the identification process, the

18 ensuing identifications were based on personal knowledge derived

19 from sources other than Collins.  Further, the Court's more detailed

20 discussion of the identifications in connection with Petitioners'

21 due process claims will show that the state court reasonably

22 concluded that there had been no impermissibly suggestive

23 identifications.

24      Accordingly, it will be recommended that Petitioners' Brady

25 claims be denied.

26      V.  Prosecutorial Misconduct involving Display of a Photograph

27      Petitioner argues that the prosecutor's displaying during trial

28 a photograph of co-defendant Nichols wearing a brightly colored,

striped jumpsuit and shackles constituted prosecutorial misconduct

and violated Petitioner's right to substantive and procedural due

process, equal protection, and a fundamentally fair trial guaranteed

by the Fifth and Fourteenth Amendments.  (Doc. 1, 4.)  Petitioner

notes that the trial court found that the prosecutor's conduct was a

deliberate attempt to portray the defendants in an unfavorable

light.  (Id. at 11.)  Petitioner asserts that the photograph was

within view of the jury for longer than five minutes and that

showing the evidence to the jury violated the court's order that

Petitioner and the co-defendants be allowed to wear civilian

clothing and proceed through trial without being shackled.  (Doc.

47, 36-37.)

A.  The State Court Decision

The pertinent portion of the CCA's decision is as follows (LD

3, 85-90):

**C. Prosecutorial Error**

Appellants contend their convictions cannot stand due to
what they perceive as numerous instances of prosecutorial
misconduct or other error. We conclude that while some
error occurred, reversal is not warranted.

1. Display of Jail Photograph

a. *Background*

Appellants appeared before the jury unshackled and in
street clothing. During Okamoto's gang testimony, the
prosecutor elicited that Okamoto had seen photographs of
Nichols's tattoos. People's exhibit 70-6 was then shown to
the witness and also displayed on a screen for the jury.
Counsel for Nichols objected to the display of the
photograph, and also asserted it had been sitting at
counsel table by the prosecutor, in view of the jury. The
photograph (which we have viewed) shows Nichols in a red-

51

and-white-striped jumpsuit, with his hands cuffed to the front. This ensued:

"THE COURT: Mr. Maner [prosecutor], is this a picture of a tattoo you're showing?

"MR. MANER: No. [¶] ... [¶] It shows who the tattoos belong to. The first picture is going to be a picture—

"THE COURT: Is this something you cleared with everybody before you showed to the jury?

"MR. CHASE [counsel for Nichols]: No.

"MR. MILLER [counsel for Dean]: No.

"MR. TRIMBLE [counsel for Trice]: No.

"MR. MANER: This is—I mean, we've discovered this and we've gone over this in advance, Judge.

"THE COURT: We have not—

"MR. MILLER: Not an answer to the Court's question.

"(Counsel speaking simultaneously.)

"THE COURT: Hang on just a second.

"MR. MANER: Okay, I'll minimize the screen, but here's my point, Judge—

"THE COURT: Just a second please.... [¶] ... [¶] But it is, I think, ... inappropriate, ... and I think you're aware it's inappropriate to show pictures to the jury that haven't been cleared by the Court, and none of those have been.

"MR. MANER: They—I'm sorry Judge.

"THE COURT: So I'm going to sustain the objection.

"MR. MANER: I'll show it to defense counsel now. We've marked it as exhibits previously, defense

52

1   counsel knew they were coming, and in my mind
    it's—shouldn't be a surprise. But if they need a
2   minute to—

3   "THE COURT: If something's not in evidence, Mr.
4   Maner, it shouldn't be shown to the jury.

5   "MR. MANER: Okay.

6   "THE COURT: So consider yourself chastised.
    Ladies and gentlemen, please disregard any
7   pictures you saw on the screen there that
    weren't—
8

9   "MR. CHASE: And also on his counsel table where
    he had it sitting there waving at the jury.
10

11  "MR. MANER: I didn't wave a thing at the jury.

12  "THE COURT: There was nothing being waved, but
    you do need to be aware of that and be careful
13  with that as well too."

14

15  Nichols's attorney stated he was not contesting that the
    photographs were of Nichols, and there was no objection to
16  the photographs of the tattoos themselves. He did,
    however, move for a mistrial based on what had happened.
17  The court deferred that matter and allowed the prosecutor
    to proceed with photographs of the tattoos.
18

19  Later, outside the presence of the jury, the prosecutor
    apologized, explaining that he had assumed there would be
20  no objection, because he had had the photographs marked as
    exhibits and defense counsel had seen them. The court
21  observed that "we're kind of going back to trial procedure
    101 here. And I think it's just a matter of common
22  courtesy and trial procedure that you don't show things to
    the jury that haven't either been cleared by counsel ...
23  or we need to talk about this first, or whatever." The
    court noted that the photograph was displayed on the
24  screen for five minutes or less, and concluded that any
    actual prejudice was de minimis, since "the fact that the
25  defendants are in custody is usually the worst kept secret
    during pretty much any trial," and custodial status
26  generally did not bother jurors one way or the other. The
    court warned, however, that it sent a subliminal message
27  when jurors saw defendants in chains or in custody, and
28

                        53

that "it just is simple trial procedure 101 that you have to be careful about what they can see and what they can't see."

Prior to the conclusion of trial, Nichols filed a written motion for dismissal or other sanctions due to prosecutorial misconduct. One of the grounds listed was the display of the photograph. In opposition, the prosecutor asserted that the defense's claim that the photograph had been displayed to the jury before it was admitted into evidence or shown to defense counsel was untrue, as the photographs were submitted and marked as exhibits and shown to defense counsel. FN59 The court denied the motion based on that issue alone, and also after considering the potential for cumulative prejudice.

> FN59. The record does not explain the prosecutor's apparent inability to appreciate the difference between having an exhibit marked for identification, and actually having the exhibit admitted into evidence.

The showing of the photograph was one of the grounds raised in the motions for new trial. In its ruling denying the motions, the court noted: "As stated by the Court at the time, the Court felt that the violation was de minimus [sic]. However, the Court believes that a prosecutor of Mr. Manor's [sic] skill level should have known better, and does believe that the incident was a deliberate attempt to portray the defendants in an unfavorable light. As such, the Court did chastise the DA in the presence of the jury. The Court believes that any taint from the incident was cured by the sanction and did not result in undue prejudice."

Nichols and Trice now contend the prosecutor's wrongful display of the photograph irreparably tainted the trial. We agree that the prosecutor erred, but find the incident not prejudicial in and of itself. (With respect to this and other claims of error, we will address cumulative prejudice later in this opinion.)

   b. *Analysis*

The United States and California Supreme Courts have long held that an accused may not be compelled, over objection, to stand trial before a jury while dressed in identifiable

54

prison/jail clothing. (*Estelle v. Williams* (1976) 425 U.S. 501, 512-513; *People v. Taylor* (1982) 31 Cal.3d 488, 494, 495; cf. *People v. Duran* (1976) 16 Cal.3d 282, 290-291 [defendant cannot be subjected to physical restraints in courtroom, while in jury's presence, absent showing of manifest need].) Such a practice violates due process by creating an intolerable risk of undermining the presumption of innocence, and also impinges upon tenets of equal protection. (*People v. Taylor, supra*, 31 Cal.3d at pp. 494, 495; see *Estelle v. Williams, supra*, 425 U.S. at pp. 504-506.) Accordingly, when such error occurs, its effect must be assessed against the "harmless-beyond-a-reasonable-doubt" standard of *Chapman, supra*, 386 U.S. at page 24 (*People v. Taylor, supra*, at pp. 499-500), and the error is not automatically cured by the giving of an instruction that the jury is not to be influenced by the fact of the defendant's arrest (*id.* at p. 501; cf. *People v. McDaniel* (2008) 159 Cal.App.4th 736, 746-747).

The foregoing cases, however, all deal with situations in which the defendant appeared in jail clothing (or shackles) before the jury throughout the trial. This fact is significant. As the United States Supreme Court stated: "[T]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that ... an unacceptable risk is presented of impermissible factors coming into play. [Citation.]" (*Estelle v. Williams, supra*, 425 U.S. at pp. 504-505, italics added.) In the present case, by contrast, while there can be no doubt that the prosecutor erred by displaying the photograph (see *People v. Bradford* (1997) 15 Cal.4th 1229, 1336-1337), the jury saw it for at most a few minutes. While we have not found (or been cited to) any California cases dealing with a jury's brief viewing of a defendant in jail garb, the California Supreme Court has held on a number of occasions that prejudicial error does not occur merely because jurors briefly see a defendant in shackles. (E.g., *People v. Ochoa, supra*, 19 Cal.4th at p. 417; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 584, affd. *sub nom. Tuilaepa v. California* (1994) 512 U.S. 967; *People v. Duran, supra*, 16 Cal.3d at p. 287, fn. 2.) The Ninth Circuit Court of Appeals has similarly so held. (E.g., *Ghent v. Woodford* (9th Cir.2002) 279 F.3d 1121, 1133.) Other states have found no prejudice arising from the brief sight of a defendant in jail garb. (E.g.,

55

*State v. Taylor* (Tenn.2007) 240 S.W.3d 789, 794–796; *State v. Schaller* (Wis.App.1995) 544 N.W.2d 247, 256–257; but see *Ex parte Clark* (Tex.Cr.App.1977) 545 S.W.2d 175, 176–177.)

We are at a loss to understand why a prosecutor would run the risk of showing such a photograph to the jury when it had not been admitted into evidence. Nevertheless, we have no trouble concluding the incident was not prejudicial in and of itself. Jurors saw the picture for a matter of minutes in a trial that lasted months. Jurors were instructed, both at the outset of trial and at the conclusion of evidence, on the presumption of innocence and that they were not to be biased against defendants because they had been arrested. Jurors are presumed to follow instructions (*Weeks v. Angelone* (2000) 528 U.S. 225, 234), and in light of the brevity of the incident here, we have no reason to conclude they did not (compare *People v. Taylor, supra*, 31 Cal.3d at p. 501; *People v. McDaniel, supra*, 159 Cal.App.4th at pp. 746–747). This is especially true since the trial court chastised the prosecutor in front of them. (See *People v. Kennedy*, supra, 36 Cal.4th at p. 625.) Significantly, by the time the photograph was shown, Nichols's and Trice's attorneys had already questioned Detective Blake about whether appellants were wearing red jumpsuits and shackles at the preliminary hearing. Even assuming, to the extent they gave it any thought at all, jurors would not have simply presumed appellants were in custody, given the severity of the charges against them—which seems unlikely—they would already have learned appellants were in custody at some point. Under the circumstances, a brief visual confirmation of that knowledge cannot have abridged appellants' constitutional rights or prejudiced them. (See *State v. Taylor, supra*, 240 S.W.3d at p. 796; *State v. Schaller, supra*, 544 N.W.2d at pp. 256–257.)

(LD 3, 85–90.)

        B.   Legal Sandards

    It is clearly established federal law within the meaning of § 2254(d)(1) that a prosecutor's improper conduct violates the Constitution only if it so infects the trial with unfairness as to

56

make the resulting conviction a denial of due process.  Parker v. Matthews, – U.S. –, 132 S.Ct. 2148, 2153 (2012) (per curiam); see, Darden v. Wainwright, 477 U.S. 168, 181 (1986); Comer v. Schriro, 480 F.3d 960, 988 (9th Cir. 2007).  Prosecutorial misconduct deprives the defendant of a fair trial as guaranteed by the Due Process Clause if it prejudicially affects the substantial rights of a defendant.  United States v. Yarbrough, 852 F.2d 1522, 1539 (9th Cir. 1988) (citing Smith v. Phillips, 455 U.S. 209, 219 (1982)).  The standard of review of claims concerning prosecutorial misconduct in proceedings pursuant to § 2254 is the narrow standard of due process, and not the broad exercise of supervisory power; improper argument does not, per se, violate a defendant's constitutional rights.  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)).  This Court must thus determine whether the alleged misconduct has rendered a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. at 183.  It must be determined whether the prosecutor's actions constituted misconduct, and whether the conduct violated Petitioner's right to due process of law.  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000).

       To grant habeas relief, this Court must conclude that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

57

disagreement." <u>Parker v. Matthews</u>, 132 S.Ct. at 2155 (quoting <u>Harrington v. Richter</u>, 131 S.Ct. at 767-87).   In addition, the standard of <u>Darden v. Wainwright</u> is a very general one that leaves courts with more leeway in reaching outcomes in case-by-case determinations.   <u>Parker v. Matthews</u>, 132 S.Ct. at 2155 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).

In determining whether remarks in argument rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding in order to determine whether the argument influenced the jury's decision. <u>Boyde v. California</u>, 494 U.S. 370, 385 (1990); <u>Darden v. Wainwright</u>, 477 U.S. at 179-82.   In <u>Darden</u>, the Court considered whether the prosecutor manipulated or misstated evidence, whether specific rights of the accused were implicated, the context of the remarks in light of both parties' arguments, the instructions given by the trial court, and the weight of the evidence. <u>Darden</u>, 477 U.S. at 179-82.

C.  <u>Analysis</u>

Here, the state court articulated legal standards that were consistent with clearly established federal law, and the state court reasonably concluded that it had been improper to display the photographs to the jury before the photographs were in evidence. However, the jury had already heard questioning by Petitioners' counsel concerning whether at the preliminary hearing the defendants had been wearing red jumpsuits and shackles.   It was thus likely

58

that the jury had already learned that at some point in the criminal proceedings, Petitioners had been in custody.   Additionally, the jury's exposure to the photographic evidence was brief, and the jury was clearly admonished.   Under these circumstances, the state court's rejection of the due process prosecutorial misconduct claim was not so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.   Further, there was no unreasonable determination of fact based on the record before the state court.

Accordingly, it will be recommended that Petitioner's claim of prosecutorial misconduct based on display of photographic evidence be denied.

### D.   Related Due Process and Equal Protection Claims

It is unclear whether Petitioner exhausted his state court remedies as to claims that the display of the photographs violated his rights to substantive due process of law and equal protection of the laws.   Generally a habeas petitioner will not be afforded relief in the courts unless he has exhausted available state judicial and administrative remedies.   Preiser v. Rodriguez, 411 U.S. 475, 494-95 (1973).   However, a court may reach the merits of a claim in the absence of exhaustion where it is clear that the claim is not colorable.   28 U.S.C. § 2254(b)(2) (an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State); Granberry v. Greer, 481 U.S. 129, 134-35 (1987); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).

59

1   Here, Petitioner's claims are without merit and should be

2   denied.  The substantive component of due process protects against

3   governmental interference with those rights  "implicit in the

4   concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319,

5   324-25 (1937).  It forbids the government to infringe fundamental

6   liberty interests, such as the right to liberty, no matter what

7   process is provided, unless the infringement is narrowly tailored to

8   serve a compelling state interest. Reno v. Flores, 507 U.S. 292,

9   301-02 (1993).

10   Here, the state court's ruling on the misconduct claim was

11   based on a weighing of the various relevant components of the case

12   that was within the state court's traditional and inherent powers to

13   control trial proceedings.  Further, the state court proceeded

14   pursuant to regular, adversary procedures whereby the parties could

15   advocate their interests and receive review.  Petitioner has not

16   shown that the procedures infringed a federally protected and

17   fundamental right or operated too broadly beyond the ambit of the

18   state's compelling interests.

19   The Fourteenth Amendment's Equal Protection Clause is

20   essentially a direction that all persons similarly situated should

21   be treated alike. City of Cleburne, Tex. v. Cleburne Living Center,

22   473 U.S. 432, 439 (1985).  Petitioner can establish an equal

23   protection claim by showing that he was intentionally discriminated

24   against based on his membership in a protected class. See, Lee v.

25   City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001).  Petitioner

26   can also establish an equal protection claim by showing that

27   similarly situated individuals were intentionally treated

28   differently without a rational basis for the difference in

60

treatment.  <u>See</u>, <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (per curiam); <u>Engquist v. Oregon Department of Agriculture</u>, 553 U.S. 591, 601-02 (2008).

Here, Petitioner has not shown or even suggested how he suffered a violation of equal protection.  Accordingly, Petitioner's substantive due process and equal protection claims should be denied.

VI. <u>Prosecutorial Misconduct concerning Presentation of Evidence that the Trial Court Had Ruled Would Be Excluded</u>

Petitioner argues that the prosecutor committed prejudicial misconduct and violated Petitioner's right to due process of law and a fundamentally fair trial guaranteed by the Fifth and Fourteenth Amendments when the prosecutor intentionally introduced a predicate acts chart and asked Petitioner on cross-examination if he had been convicted of attempted home invasion robbery in violation of the trial court's ruling that such a characterization of the prior offense would be excluded.  (Doc. 1 at 5, 11-12.)

A. <u>The State Court's Decision</u>

The CCA addressed Petitioner's claim as follows:

2. <u>Violation of Court Order</u>

a. *Background*

In connection with the gang allegations, the prosecutor elicited testimony from Okamoto regarding appellants' criminal records. While showing Okamoto court records regarding one of Trice's convictions, the prosecutor asked, without objection: "And does it also show that he pled guilty to a violation of Penal Code Section 664 slash 213(a)(1), attempted home invasion robbery, and that he pled guilty on February 26th, 1996, for a crime that

occurred exactly one year earlier, on February 26th,
1995?" (Italics added.) Okamoto responded affirmatively.
Later, the prosecutor brought up the admissibility of a
chart in which he had summarized Okamoto's opinion as it
related to predicate acts. Counsel for Trice objected to
use of the term "attempted home invasion robbery" and
argued that there was no such thing. Counsel for Nichols
asserted that the actual crime was called attempted first
degree robbery. The prosecutor agreed to reword the
reference and print out another chart. The court agreed,
and directed him to "stick with" what the code section
said, i.e., attempted first degree robbery. FN60 The court
subsequently confirmed, during a discussion of whether the
chart would be admitted into evidence so it could be used
in examination of the expert, that the conviction was to
be listed as attempted first degree robbery. The
prosecutor again agreed to submit a chart incorporating
the change.

> FN60. The court was concerned with the
> similarity of the prior conviction to the
> charged offenses. During the course of trial, at
> least two witnesses used the term "home
> invasion" in referring to the present incident.

As set out in the statement of facts, *ante*, Trice
testified on his own behalf. During cross-examination, the
prosecutor asked about his felony convictions. This
ensued:

> "Q. Were you convicted of attempted home
> invasion robbery or—
>
> "MR. TRIMBLE: Judge, I'm going to object to
> that. Mr. Maner knows better than that.
>
> "THE COURT: It's sustained. [¶] ... [¶]
>
> "MR. MANER: Q. Where you attempted to—
>
> "MR. TRIMBLE: Judge, I'm going to 352 this. He
> knows what he's entitled to ask and what he's
> not, and he's asking stuff he shouldn't go into.
>
> "MR. MANER: That's not true, Judge. I think I
> slipped on the home invasion but—

62

1    "MR. CHASE: He did it again, Your Honor.

2    "MR. TRIMBLE: Gee, that's too bad, he did it
3    again, Judge.

4    "THE COURT: The offense was 664/211, correct?

5    "MR. MANER: Yes, Judge—I think it's 213,
     actually.
6

7    "THE COURT: Let's go ahead and stick to that
     offense, then. And the jury's instructed to
8    disregard the question."

9    The prosecutor then elicited from Trice his conviction for
10   attempted first degree robbery. In his argument to the
     jury, the prosecutor referred to the current incident as
11   "a home invasion robbery, a murder, a murder during the
     course of a robbery...."
12

13   Trice raised the prosecutor's asserted violation of the
     court's order in his new trial motion. Nichols joined. In
14   its ruling denying the motions, the court concluded: "The
     matter was addressed at trial when it arose, and the
15   Prosecutor claimed that these [references] were
16   inadvertent, and the Court accepts this representation at
     face value. Viewing the trial process as a whole, the
17   Court does not believe that the term was repeated so much
     that it rendered the proceedings fundamentally unfair or
18   caused any confusion in the jury's mind between the prior
     and the charged offense."
19

20   Nichols and Trice now contend the prosecutor committed
     prejudicial misconduct by violating the court's order. We
21   again agree that error occurred, but again conclude the
     incident was not prejudicial in and of itself.
22

23            b. _Analysis_

24   Whether intentional or not, the prosecutor committed
     misconduct by violating the trial court's ruling that
25   Trice's prior offense should be referred to as attempted
     first degree robbery. (See _People v. Friend_ (2009) 47
26   Cal.4th 1, 33; accord, _People v. Crew_ (2003) 31 Cal.4th
     822, 839; _People v. Ochoa, supra_, 19 Cal.4th at p. 430.)
27   However, jurors had already heard unobjected-to testimony
28   that Trice pled guilty to attempted home invasion robbery;

                              63

the prosecutor's references were brief in a lengthy trial; the exchange between the court and counsel, which occurred in the jury's presence, made it clear the prosecutor's question was improper; and the jury was instructed to disregard the question. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 180; *People v. Montiel* (1993) 5 Cal.4th 877, 931; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250-1251.) Under the circumstances, no prejudice appears.

(LD 3, 90-93.)

### B.  Analysis

The state court reasonably applied the due process standards and properly concluded that the prosecutor's characterization and references did not render the proceedings fundamentally unfair.  The trial court did not find that the violations were intentional.  Further, it is undisputed that evidence of Petitioner's guilty plea to an offense expressly characterized as an attempted home invasion robbery was admitted without objection and was already before the jury.  Petitioner had testified, and his criminal history had been presented both as impeachment and as background concerning his connection with the co-defendants and Collins.  Given the state of the record, the limited mischaracterization of the prior offense was not so inflammatory as to infect the proceedings with unfairness.

The state court's decision was not an unreasonable application of clearly established federal law or an unreasonable determination of fact in light of the evidence before the state court. Accordingly, it will be recommended that Petitioner's claim of a due process violation from mischaracterization of Petitioner's prior

conviction be denied.

VII.   Violation of the Right to Present a Defense by Limiting
       Argument

Petitioner Trice argues that the trial court's prohibiting
Petitioner Nichols's counsel from arguing that innocent people are
sometimes convicted and from discussing literature and feelings
regarding such convictions violated Petitioner Trice's rights to
present a defense, to substantive and procedural due process of law,
and to a fundamentally fair trial protected by the Fifth, Sixth, and
Fourteenth Amendments.   (Doc. 1 at 5, 12.)

A.   The State Court's Decision

The CCA addressed Petitioner's claim as follows:

**D. Restriction on Nichols's Argument to the Jury**

Nichols and Trice contend the trial court committed
federal constitutional error by excluding a portion of
Nichols's argument to the jury. We conclude that any error
was harmless.

1. Background

During his examination of Dr. Eisen, the defense expert on
eyewitness memory and suggestibility, counsel for Nichols
elicited that Eisen was aware of case studies involving
situations in which people were convicted of crimes based
on eyewitness identification, then were subsequently
exonerated following DNA testing. Eisen described two
bodies of data on the subject.

Counsel for Nichols subsequently argued to the jury that
justice must be colorblind, and that jurors could not fill
in the blanks for the prosecutor simply because Nichols
might be a Black gang-banger from Pasadena. This ensued:

"[MR. CHASE:] People are convicted falsely. John
Gresham [ sic ] wrote a book—

"MR. MANER: Objection, this is improper
argument, judge.

1

2
      "THE COURT: Sounds like it, Mr. Chase.

3
      "MR. CHASE: No, it isn't, Your Honor. I can give
      you case authority, we're allowed to argue
4
      things that are relevant and before the people.
      And this is something that is common knowledge
5
      that the book is out—

6
      "MR. MANER: Oh, Judge, some, some fictional book
7
      that's—

8
      "MR. CHASE: It's not fictional, sir.

9
      "MR. MANER: Or that is not in evidence in this
10
      case, Judge, is inappropriate.

11
      "THE COURT: Mr. Chase, I'm going to sustain the
      objection. I don't think that novels are
12
      relevant.

13
      "MR. CHASE: It's not a novel, Your Honor.
14
      "THE COURT: Well, the objection is sustained.
15
      "MR. CHASE: This is not a novel.
16
      "THE COURT: It's sustained.
17

18
      "MR. CHASE: Innocent people are convicted.
      Oftentimes those convictions are caused when
19
      officers have arrived at a conclusion and do the
      investigation based on the conclusion and not
20
      the evidence. They oftentimes do this, but with
21
      people that aren't particularly likeable. Gang-
      bangers. People who have mental problems. These
22
      are the easy targets.

23
      People can come within—you know, you can have
24
      literally execution dates have been set—

25
      "MR. MANER: Again, Your Honor, this is another
      inappropriate argument.
26
      "THE COURT: That's sustained.
27

28
      "MR. CHASE: Innocent people are convicted. If

66

you have these toxic elements present a little
falsehood. Conclusion-based investigation. I
believe in this system. I really do. It is the
essence of what this country is all about. I was
raised that way. My father fought in two wars—

"MR. MANER: Objection, Judge, Counsel's personal
experiences, his family experiences, his
personal opinion, is all irrelevant in a closing
argument.

"THE COURT: I'm going to sustain that.

"MR. CHASE: This, ladies and gentlemen, is what
makes our country great and worth fighting for.
The quality [sic] under the law and the
opportunity to have each one of you decide this
case based on the law without prejudices."

Counsel for Nichols filed a written objection to the
restriction on his argument, citing case authority
supporting his claim that he should have been allowed to
discuss John Grisham's book The Innocent Man (2006). The
trial court declined to change its ruling.

2. <u>Analysis</u>

"[C]losing argument for the defense is a basic element of
the adversary factfinding process in a criminal trial" and
the complete denial of an opportunity to make a closing
argument is a violation of the constitutional right to
counsel. (*Herring v. New York* (1975) 422 U.S. 853, 858–
859, 863.) Similarly, a defendant's right to counsel is
denied where the court seriously limits defense closing
argument, as by precluding reference to an entire theory
of defense (*Conde v. Henry* (9th Cir.1999) 198 F.3d 734,
739) or not allowing counsel to argue the significance of
evidence critical to a theory of defense (*United States v.
Kellington* (9th Cir.2000) 217 F.3d 1084, 1099–1100). "This
is not to say that closing arguments in a criminal case
must be uncontrolled or even unrestrained. The presiding
judge must be and is given great latitude in controlling
the duration and limiting the scope of closing summations.
He may limit counsel to a reasonable time and may
terminate argument when continuation would be repetitive
or redundant. He may ensure that argument does not stray
unduly from the mark, or otherwise impede the fair and

67

orderly conduct of the trial. In all these respects he must have broad discretion. [Citations.]" (*Herring v. New York, supra*, 422 U.S. at p. 862; see *People v. Holloway* (2004) 33 Cal.4th 96, 137.)

It has been stated that "[c]ounsel's summation to the jury 'must be based solely upon those matters of fact of which evidence has already been introduced or of which no evidence need ever be introduced because of their notoriety as judicially noticed facts.' [Citations.] He may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature. [Citations.]" (*People v. Love* (1961) 56 Cal.2d 720, 730, disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2.) Appellants point to a number of cases that have found particular magazine and newspaper articles to be appropriate subjects for closing argument. (See, e.g ., *People v. West* (1983) 139 Cal.App.3d 606, 610–611; *People v. Guzman* (1975) 47 Cal.App.3d 380, 392, disapproved on other grounds in *People v. McDonald* (1984) 37 Cal.3d 351, 362, fn. 8; *People v. Woodson* (1964) 231 Cal.App.2d 10, 15–16; *People v. Travis* (1954) 129 Cal.App.2d 29, 37–39.) While reflecting particularized exercises of judicial discretion under specific circumstances, these decisions do not stand for the proposition that attorneys may always refer to such items in closing argument. The trial court still retains discretion pursuant to section 1044 to limit counsel's argument under the circumstances of each case.FN66 (See *People v. London* (1988) 206 Cal.App.3d 896, 909.) "Counsel's summation to the jury must be based upon facts shown by the evidence or known judicially. [Citation.] Counsel may refer the jury to nonevidentiary matters of common knowledge, or to illustrations drawn from common experience, history, or literature [citation], but he may not dwell on the particular facts of unrelated, unsubstantiated cases." (*People v. Mendoza* (1974) 37 Cal.App.3d 717, 725 [trial court properly precluded defense counsel from reading newspaper clipping about unrelated crimes, hearsay material that could only confuse jury with irrelevant facts]; see also *People v. Sanders, supra*, 11 Cal.4th at pp. 554–555 [trial court properly precluded references to "notorious but unrelated" Manson case, but allowed defense counsel to argue in general terms that there were "'worse cases'" than defendant's in terms of number of victims and nature of crime]; *People v. Pelayo* (1999) 69 Cal.App.4th 115, 122 [trial court

properly restricted defense counsel's closing argument by
prohibiting references to newspaper articles about
individual who was acquitted of sex crimes against
children when it was discovered children had fabricated
their stories].)

> FN66. Section 1044 provides: "It shall be the
> duty of the judge to control all proceedings
> during the trial, and to limit the introduction
> of evidence and the argument of counsel to
> relevant and material matters, with a view to
> the expeditious and effective ascertainment of
> the truth regarding the matters involved."

Here, the trial court precluded defense counsel from
citing to a particular book about an unrelated case and to
his father's personal experiences, but did not limit
counsel's argument on the crux of the defense theory: that
people are wrongly convicted, and that appellants were
equal under the law and had the right to a jury decision
based on the law and not on prejudices. Counsel was thus
allowed to fully address the relevant defense theory "in
his own words without reference to supporting
authorities." (*People v. Guzman, supra*, 47 Cal.App.3d at
p. 392.) We find no abuse of discretion or denial of the
right to counsel or to present a defense (see *People v.
Holloway, supra*, 33 Cal.4th at p. 137; *People v.. London,
supra*, 206 Cal.App.3d at p. 909); moreover, were we to
find error, it necessarily would be harmless (*People v.
Guzman, supra*, at p. 392).

(LD 3, 107-11.)

        B.  Analysis

    The Due Process Clause of the Fourteenth Amendment and the

Compulsory Process and Confrontation clauses of the Sixth Amendment

guarantee a criminal defendant a meaningful opportunity to present a

complete defense.  Crane v. Kentucky, 476 U.S. 683, 690 (1986).  The

opportunity to make a summation of the evidence before the rendition

of judgment is an essential component of the right to the effective

69

assistance of counsel guaranteed by the Sixth and Fourteenth

Amendments.  Herring v. New York, 422 U.S. 853, 862-63 (1975) (state

statute permitting a judge in a non-jury criminal trial to prohibit

counsel from making a summation of the evidence before the rendition

of judgment violated the right to the effective assistance of

counsel guaranteed by the Sixth and Fourteenth Amendments).

In Herring, the Court recognized that the right to the

assistance of counsel means that "there can be no restrictions upon

the function of counsel in defending a criminal prosecution in

accord with the traditions of the adversary factfinding process that

has been constitutionalized in the Sixth and Fourteenth Amendments."

Id. at 857.  The Court stated the following:

> The right to the assistance of counsel has thus been given
> a meaning that ensures to the defense in a criminal trial
> the opportunity to participate fully and fairly in the
> adversary factfinding process.
>
> There can be no doubt that closing argument for the
> defense is a basic element of the adversary factfinding
> process in a criminal trial. Accordingly, it has
> universally been held that counsel for the defense has a
> right to make a closing summation to the jury, no matter
> how strong the case for the prosecution may appear to the
> presiding judge. (Footnote omitted.) The issue has been
> considered less often in the context of a so-called bench
> trial. But the overwhelming weight of authority, in both
> federal and state courts, holds that a total denial of the
> opportunity for final argument in a nonjury criminal trial
> is a denial of the basic right of the accused to make his
> defense.  (Footnote omitted.)

Id. at 858-59.  The Court added the following qualification:

> This is not to say that closing arguments in a criminal
> case must be uncontrolled or even unrestrained. The

70

presiding judge must be and is given great latitude in
controlling the duration and limiting the scope of closing
summations. He may limit counsel to a reasonable time and
may terminate argument when continuation would be
repetitive or redundant. He may ensure that argument does
not stray unduly from the mark, or otherwise impede the
fair and orderly conduct of the trial. In all these
respects he must have broad discretion. See generally 5 R.
Anderson, Wharton's Criminal Law and Procedure s 2077
(1957). Cf. American Bar Association, Project on Standards
for Criminal Justice, The Prosecution Function s 5.8, pp.
126—129, and the Defense Function s 7.8, pp. 277—282
(App.Draft 1971).

(Id. at 862.)

Here, counsel for Petitioner Nichols had argued that Tatum had

perjured herself and that Brocchini had given perjured testimony as

to the source of some evidence; counsel then argued that perjury was

offensive in all circumstances.  (LD 39, 19 RT 4741-42.)  He then

reinforced that point by arguing that all defendants, regardless of

race, place of residence, or gang affiliation, were entitled to

justice and equal protection under the law.  He was permitted to

argue that innocent people are convicted often because of

investigations based not on evidence but rather on conclusions and

bias, particularly where the accused are gang-bangers, people with

mental problems, or other "easy targets."  (Id. at 4742-43.)  He

extolled the value of equality under the law and the opportunity to

have each juror decide the case based on "the law without

prejudices."  (Id. at 4744.)  It was only when counsel appeared to

refer to specific cases of innocently convicted persons, or to

counsel's belief and to his father's wartime service-—matters that

were not in evidence or directly relevant--that the trial court

foreclosed the argument.

///

71

Reference to the entirety of the parties' closing arguments shows that defense counsel argued that the process of determining the facts should be guided by the evidence and the applicable law and should not be driven or affected by bias, racism, or antipathy toward gang culture.  Petitioner's counsel's argument included the possibility of being falsely accused and the protection afforded by the requirement of proof beyond a reasonable doubt with respect to guilt of the crimes and reliance on circumstantial evidence.  (Id. at 4792-96.)  Petitioner's counsel emphasized the duty to judge Petitioner fairly, to "recognize biases and avoid making snap judgments," especially as to persons not in the jurors' immediate circles, and particularly with respect to Petitioner, who was a Black person with a history of selling drugs and having done some bad things in his life.  (Id. at 4796-97.)  Petitioner's counsel also referred to a seminar he had recently attended concerning race in the community, and he reminded the jury that there continued "to be an association, believe it or not, between black males and criminal behavior."  (Id. at 4798.)  The trial court ruled that this argument was proper and that counsel was entitled to some leeway. (Id.)  Petitioner's counsel emphasized that the association continued to be pervasive in the community, stating: "And whether conscious or unconscious, I wish you to put aside the color of Mr. Trice's skin and view him simply as another human being during your deliberations," and counsel quoted Frederick Douglas with respect to equality under the law.  (Id.)  Dean's counsel also argued extensively on the burden of proof (e.g., id. at 4817-18), referred to specific, notorious crimes where white perpetrators had falsely accused Black persons of having committed the crimes in question,

72

and noted how racism affected the investigation and trial of offenses (id. at 4915-18).

In sum, the state court articulated correct legal standards and reasonably concluded that the trial court's ruling was within the Court's considerable discretion to limit argument to the evidence and to avoid confusion.  Counsel were permitted to engage fully as advocates during argument.  The record shows that defense counsel challenged the sufficiency and accuracy of the investigation of the crimes and the credibility of prosecution witnesses, including law enforcement witnesses.  Defense counsel were permitted to engage in substantial argument regarding false accusation and biased investigation; counsel were not foreclosed from arguing any defense or defensive theory.  There was extensive and essentially unlimited defense argument regarding proof beyond a reasonable doubt and the presumption of innocence.

In light of the record, it cannot be said that the state court's conclusion was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  Likewise, it cannot be concluded the state court's decision was based on an unreasonable determination of fact.  Accordingly, it will be recommended that Petitioner's claim concerning limitation of defense argument be denied.

VIII.  The Trial Court's Failure to Grant the Defense Motion to Bifurcate the Gang Enhancements

Petitioner Trice argues that the trial court's denial of the defense motion to bifurcate the gang enhancements violated Petitioner's rights under the Fifth and Fourteenth Amendments.

73

Petitioner points to the trial court's later findings that it was questionable whether the prosecution had proved that the offenses were gang-related, the absence of evidence of gang signs or clothing and the location of the crimes outside of the gang's territory, and the prosecution's introduction of multiple items of inflammatory evidence, such as tattoos, crimes of which Petitioner Nichols had been acquitted, past convictions of various people, and parole proceedings, which were otherwise irrelevant and inadmissible. (Doc. 1 at 6, 12-13.)

A.   The State Court's Decision

The pertinent portion of the CCA's decision is as follows:

A. **Bifurcation of Gang Allegations**

Appellants contend the trial court abused its discretion by refusing to bifurcate the gang allegations. We conclude reversal is not warranted.

1. Background

Brocchini was the prosecution's gang expert at the preliminary hearing, although he conceded that he had no expertise specifically in Southern California gangs. Ruiz was known to Brocchini to be a member of the West Side Boyz, a criminal street gang whose primary activity was selling drugs. In Brocchini's opinion, Ruiz was a shot-caller for the gang.

Brocchini related that, upon receiving anonymous information giving the names Bam and Nichols and that the person was from Pasadena, he contacted Roger Roldan, a gang expert for the Pasadena Police Department. Roldan identified Nichols as Bam. Brocchini also gave Roldan the name J Dogg, which he got from Phil Collins, and asked Roldan to help put together a photographic lineup. Brocchini contacted Agent Mandenlian, a parole agent on the fugitive task force, and informed him of the

74

situation. Mandenlian said he would arrest Nichols for
Brocchini. Brocchini then went to Pasadena and, Roldan
having figured out J Dogg's identity, a photographic
lineup containing Dean's picture was put together. This
was transmitted to Detective Blake, who obtained a
positive identification of Dean as one of the
perpetrators.

After getting anonymous information that the perpetrators
were Pasadena Denver Lane Blood members, Brocchini spoke
to Roldan and Mandenlian about that gang, and also
researched it through the Cal Gang Network, a system that
allows agencies throughout California to input information
about gangs. He spoke to Nichols's parole officer and
learned that Nichols had identified himself as a PDL
member. He also spoke to Carla Galbreath when he was
looking for Dean; she said she associated with PDL
members, and identified Dean and Trice as PDL members.
Brocchini also spoke with Trisha Lee, Trice's girlfriend.
She stated that Trice had been a PDL member for as long as
she had known him, and that she gave him money each month
so that he did not have to commit crimes with other gang
members.

Based on information he obtained, Brocchini opined that
PDL was a criminal street gang as of the date of the Ruiz
homicide, and that appellants were PDL members. He further
opined that the primary activities of PDL were selling
narcotics, assault with firearms, robbery, and murder.
With respect to the present case, Brocchini opined that
the crimes were committed for the benefit of PDL. He based
his opinion on experience talking with gang members; the
only way they can gain weapons is by stealing them, and
any other stolen property, such as cocaine, they could
sell in their own territory to make money, which would
benefit the gang. The fact the perpetrators came into town
unmasked and armed, then committed a violent act in
another town, would benefit PDL's reputation. Brocchini
conceded that, in order to create the perception in
people's minds that a gang is expanding its sphere of
influence and is to be feared, the gang members would have
to identify themselves as belonging to that particular
gang so people will know who committed the crime. He was
unaware of anything in the facts of the present case in
which any of the participants identified themselves as
gang members to the victims.

75

At the conclusion of the preliminary hearing, the magistrate found "strong evidence" to sustain the gang enhancement allegations. Appellants were held to answer accordingly.

Prior to trial, appellants moved to have the gang enhancement allegations bifurcated, on the ground the gang evidence would have a prejudicial effect and would deprive them of due process and a fair trial. The People opposed the motion, arguing bifurcation was unwarranted because the gang enhancements were inextricably intertwined with the charged offenses and evidence of appellants' gang activities and membership was important to demonstrate their motive for the robbery. The trial court denied the motion.

In ruling on appellants' motions for new trial, the trial court found various problems with respect to the gang testimony. In light of these problems, which included the fact that "there was plentiful evidence of gang membership, but scant evidence of gang benefit," the court ordered the jury's true findings on the section 186.22, subdivision (b) enhancements stricken as to each count.

   2. <u>Analysis</u>

In *People v. Hernandez* (2004) 33 Cal.4th 1040, the California Supreme Court held that a trial court has discretion to bifurcate trial on a gang enhancement. (*Id.* at p. 1049.) The court cautioned that bifurcation will sometimes be appropriate: "The predicate offenses offered to establish a 'pattern of criminal gang activity' (§ 186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Hernandez*, at p. 1049.)

In cases where a gang enhancement has not been alleged, the state high court has "held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the

76

defendant's gang affiliation—including evidence of the
gang's territory, membership, signs, symbols, beliefs and
practices, criminal enterprises, rivalries, and the like—
can help prove identity, motive, modus operandi, specific
intent, means of applying force or fear, or other issues
pertinent to guilt of the charged crime. [Citations.] To
the extent the evidence supporting the gang enhancement
would be admissible at a trial of guilt, any inference of
prejudice would be dispelled, and bifurcation would not be
necessary. [Citation.] [¶] Even if some of the evidence
offered to prove the gang enhancement would be
inadmissible at a trial of the substantive crime itself—
for example, if some of it might be excluded under
Evidence Code section 352 as unduly prejudicial when no
gang enhancement is charged—a court may still deny
bifurcation." (*People v. Hernandez, supra*, 33 Cal.4th at
pp. 1049–1050.) In sum, "the trial court's discretion to
deny bifurcation of a charged gang enhancement is ...
broader than its discretion to admit gang evidence when
the gang enhancement is not charged. [Citation.]" (*Id.* at
p. 1050.)

Gang evidence has an inherent potential for prejudice; it
"creates a risk that the jury will infer that the
defendant has a criminal disposition and is therefore
guilty of the charged offense...." (*People v. Samaniego,
supra*, 172 Cal.App.4th at p. 1167.) Yet, an allegation
under section 186.22, subdivision (b) is a separate
enhancement allegation, not a substantive crime. The
extent to which a crime is committed to benefit a gang
does not bear, in and of itself, on the issue of guilt or
innocence of the underlying offense. Similarly, whether a
defendant belongs to a gang does not prove guilt.
"Nonetheless, evidence related to gang membership is not
insulated from the general rule that all relevant evidence
is admissible if it is relevant to a material issue in the
case other than character, is not more prejudicial than
probative, and is not cumulative. [Citations.]" (*People v.
Samaniego, supra*, 172 Cal.App.4th at p. 1167.)

In our view, because of the potential for prejudice
inherent in gang evidence, absent some showing the gang
evidence is probative as it pertains to the issue of guilt
of the underlying crime, failure to bifurcate is
necessarily error. If the gang evidence (whether it be the
defendant's association with a gang or some other aspect)
is not at least minimally probative with respect to a

77

charged offense, bifurcation should be granted. There must be something more than guilt by association or propensity.

The basic issues thus are relevance and prejudice, and they are inextricably intertwined. Questions the trial court should consider in determining the need for bifurcation include: Does anything about the crime reasonably suggest gang involvement or motive, even without a gang expert's interpretation? If the gang enhancement allegations were to be bifurcated, would at least some gang-related evidence likely be admitted in the trial of the substantive offense(s) anyway? If bifurcation is not ordered, what kind of evidence is likely to be admitted in support of the gang enhancements that is not probative of the charged crimes themselves, and how potentially inflammatory will that evidence likely be? For example, will evidence of the predicate acts or pattern of criminal gang activity involve crimes of violence much greater than any involved in the charged offenses, such that the jury will be likely to use it as bad character evidence against the defendant(s)?

Turning to the case before us, "[w]e review the correctness of the trial court's ruling at the time it was made,... and not by reference to evidence produced at a later date. [Citations.]" (*People v. Welch* (1999) 20 Cal.4th 701, 739; *see People v. Turner* (1984) 37 Cal.3d 302, 312 [addressing ruling on severance motion], overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149.) Here, it was apparent from the evidence adduced at the preliminary hearing that, although there were no overt signs of gang involvement such as the flashing of signs or saying of a gang's name during commission of the charged offenses, some gang-related evidence would be admissible even in the event of bifurcation—for example, to explain how appellants were developed as suspects. There would also be evidence of more than one perpetrator acting in concert. The trial court reasonably could also have concluded the evidence related only to the gang enhancement allegations would not likely be more inflammatory than the facts of the charged offenses themselves. Under the circumstances, we cannot say the trial court's refusal to bifurcate "exceed[ed] the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.) Accordingly, the trial court acted within its discretion in denying the motions for bifurcation.

78

(*People v. Hernandez, supra*, 33 Cal.4th at p. 1051.) FN36

> FN36. Two points warrant addressing. First, Dean cites *People v. Partida* (2005) 37 Cal.4th 428, 437 for the proposition that "[i]t is a violation of constitutional due process to erroneously introduce evidence of gang affiliation." *Partida* says no such thing. At issue in that case was "when, if ever, a trial objection on Evidence Code section 352 grounds preserves the appellate argument that admitting the evidence violated a defendant's federal due process rights and, if the argument is preserved, under what circumstances error of this nature does violate due process." (*Partida*, at p. 431.) At the page cited by Dean, the opinion discusses when an objection under Evidence Code section 352 is sufficient to preserve a due process argument for appeal. (*Partida,* at p. 437.) In fact, the California Supreme Court ultimately upheld the Court of Appeal's finding of no due process violation resulting from the erroneous admission of some of the challenged gang evidence. (*Id.* at p. 439.)

Second, Nichols appears to suggest that if the trial court abused its discretion, then its ruling necessarily violated the federal Constitution's guarantee of substantive due process. Even if we were to find an abuse of discretion, it would not necessarily follow that the error was of federal constitutional magnitude, and the authorities cited by Nichols do not hold otherwise.

This does not end our inquiry, however, since, by analogy to the law concerning severance (see *People v. Hernandez, supra*, 33 Cal .4th at p. 1050), even if the ruling denying bifurcation was correct when made, "[a]fter trial,... the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law. [Citation.]" (*People v. Turner, supra*, 37 Cal.3d at p. 313.) Appellants argue that admission of the gang evidence resulted in such a level of unfairness here, thus violating due process.FN37

> FN37. Appellants raised a due process objection

79

to the evidence during trial.

The record before us leaves no doubt that evidence came
before the jury that was unnecessary and had a high
potential for being inflammatory and prejudicing
appellants. For instance, evidence of numerous criminal
acts, committed or allegedly committed by appellants and
other PDL members, was admitted to establish that PDL was
a criminal street gang within the meaning of section
186.22, and that appellants were associated with the
gang.FN38 While we recognize that the prosecutor had to
prove beyond a reasonable doubt that PDL was a criminal
street gang since appellants apparently would not
stipulate to that fact, PDL's status as such was never
seriously contested. Thus, there was no need for the
prosecutor to introduce evidence of numerous predicate
acts simply because subdivision (e) of section 186.22
refers to two or more offenses. Prosecutors have no right
to overprove their case or put on every bit of evidence
they have (*People v. Williams* (2009) 170 Cal.App.4th 587,
610), and the prosecutor's tactics here verged on
overkill. While we cannot fault the introduction of
evidence supporting the testimony of Officer Okamoto
concerning what constitute PDL's primary activities, there
is a fine line between evidence that constitutes
legitimate proof of statutory elements or that
demonstrates the basis for an expert's testimony, and
evidence that constitutes illegitimate proof of guilt by
association and bad character. It bears emphasizing that
trial courts must be careful to use their powers under
Evidence Code section 352 to limit the evidence to its
proper purpose—establishing the existence of a criminal
street gang—and not to permit a prosecutor, through the
guise of establishing that fact, to seek to imply
improperly to the jury that the gang is violent, therefore
the defendant is violent, therefore the defendant likely
committed the charged crime(s).FN39

> FN38. The trial court instructed the jury on 10
> specific instances of criminal conduct
> (including the charged robbery and murder) with
> respect to what constitutes a pattern of
> criminal gang activity.

> FN39. That the prosecutor here paid scant, if
> any, attention to the line between legitimate
> and illegitimate proof is demonstrated by his

80

repeated attempts to present evidence of
Nichols's and Trice's alleged involvement in the
robbery and murder of a drug dealer in Madera.
When the trial court denied his request to
present the evidence on the issue of guilt
pursuant to Evidence Code section 1101,
subdivision (b), the prosecutor attempted to
bring it in as a predicate act—despite the fact
numerous predicate acts had already been
introduced—and to show appellants were active
gang members, associated with each other, and
committed a crime for the benefit of a gang. In
light of the obviously high potential for
prejudice, the trial court again excluded
evidence of the facts of the offenses, this time
pursuant to Evidence Code section 352, and only
allowed evidence of the resulting attempted
robbery and assault convictions. This did not
stop the prosecutor from trying to place before
the jury evidence that Nichols was suspected of
involvement in another homicide, again
ostensibly to show that Nichols was associating
with other criminal gang members committing
crimes. After commenting, "This isn't just to
show—to try and make him out to be a bad
character, I take it," the court sustained the
defense objections.

Although we will discuss the prosecutor's conduct
elsewhere in this opinion, perhaps the single most
egregious example of his behavior occurred in connection
with the gang evidence. Counsel for Nichols was cross-
examining Okamoto concerning his reliance on an offense of
which Nichols was acquitted. When Okamoto stated that the
type of activity was very consistent with gang activity,
counsel responded, "I see. Even if he didn't do it and was
found not guilty because he wasn't the one." The
prosecutor then stated: "Objection, that misstates the
evidence. Just because he's found not guilty doesn't mean
he didn't do it." (Italics added.) Regardless of the
accuracy of the statement, to have made such a statement
in front of the jury is unconscionable.

Despite the foregoing, we conclude that the erroneously
admitted evidence was not, in light of all the
circumstances and the record as a whole, so inflammatory
and so lacking in probative value as to violate

81

appellants' right to due process, even given the trial
court's comments about the sufficiency of the evidence in
its ruling on the motions for new trial.FN40 The trial
court was clearly aware of, and exercised, its authority
to exclude cumulative and inflammatory evidence. (See
*People v. Williams, supra*, 170 Cal.App.4th at pp. 610-
611.) The court also required the prosecutor to have
Brocchini testify regarding different areas than Okamoto
and not simply go over the same ground. Brocchini
acknowledged that gang members can commit crimes that are
not for the benefit of the gang, and he gave an example
from personal experience of a gang member who had been
selling drugs for his own benefit, an offense that (unlike
the domestic violence example Brocchini also gave) would
often be perceived as benefitting the gang. He also
testified that it is not a crime simply to be a gang
member.

> FN40. It necessarily follows that there was no
> prejudice under the state law standard of *People
> v. Watson* (1956) 46 Cal.2d 818, 836.

Significantly, Ruiz was himself shown to be a senior
member of a gang and a large-scale drug dealer who cooked
his product in, and apparently conducted at least some of
his business from, the house in which his children lived.
This served to neutralize at least some of the
inflammatory effect of the gang evidence. (See *People v.
Sandoval* (1992) 4 Cal.4th 155, 173, affd. sub nom. *Victor
v. Nebraska* (1994) 511 U.S. 1.) Also neutralizing were the
circumstances of the charged offenses themselves—a
callous, violent, home-invasion robbery and murder in the
presence of young children who were lucky not to have been
injured or killed themselves. Although some of the
predicate acts were violent, so were the charged offenses.
Additionally, in light of the total absence of physical
evidence of a shooting in Atwater, admission of the gang
evidence had little or no effect on Trice's account of
events. (Contrast *People v. Avitia* (2005) 127 Cal.App.4th
185, 194-195.) Appellants' arguments to the contrary
notwithstanding, evidence of their guilt was very strong,
and the gang-violence evidence was not pervasive.
(Contrast *People v. Maestas* (1993) 20 Cal.App.4th 1482,
1498.) Moreover, the trial court instructed the jury that
it could consider the evidence of gang activity only for
the limited purpose of deciding whether a defendant acted
with the intent, purpose, and knowledge required to prove

82

the gang-related crime and enhancement and special
circumstance allegations that were charged, and it
cautioned jurors that they could not conclude from the
evidence that a defendant was a person of bad character or
had a disposition to commit crimes. (See *People v.
Gutierrez* (2009) 45 Cal.4th 789, 820.) "Jurors are
routinely instructed to make... fine distinctions
concerning the purposes for which evidence may be
considered.... [Citation.]" (*People v. Yeoman* (2003) 31
Cal.4th 93, 139.) Even where gang evidence is concerned,
"[i]t is, of course, presumed the jury understood and
followed the court's instruction in the absence of any
showing to the contrary. [Citation.]" (*People v. Williams,
supra*, 170 Cal.App.4th at p. 613.) The record contains no
such showing here.

Appellants cite *People v. Albarran* (2007) 149 Cal.App.4th
214 (*Albarran*), in which the appellate court found that
the admission of gang evidence violated due process and
rendered the trial fundamentally unfair. (*Id.* at p. 232.)
The court summarized the law applicable to a due process
claim as follows: "To prove a deprivation of federal due
process rights, [a defendant] must satisfy a high
constitutional standard to show that the erroneous
admission of evidence resulted in an unfair trial. 'Only
if there are no permissible inferences the jury may draw
from the evidence can its admission violate due process.
Even then, the evidence must "be of such quality as
necessarily prevents a fair trial." [Citation.] Only under
such circumstances can it be inferred that the jury must
have used the evidence for an improper purpose.'
[Citation.] 'The dispositive issue is... whether the trial
court committed an error which rendered the trial "so
'arbitrary and fundamentally unfair' that it violated
federal due process." [Citations.]' [Citation.]" (*Id.* at
pp. 229-230, fn. omitted.)

With respect to the case before it, the court explained:
"Certain gang evidence, namely the facts concerning the
threat to police officers, the Mexican Mafia evidence and
evidence identifying other gang members and their
unrelated crimes, had no legitimate purpose in this trial.
The trial court's ruling on the new trial motion in which
it broadly concluded the gang evidence was admissible to
prove motive and intent for the underlying charges was
arbitrary and fundamentally unfair. As we have concluded
elsewhere, the prosecution did not prove that this gang

evidence had a bearing on the issues of intent and motive. We thus discern 'no permissible inferences' that could be drawn by the jury from this evidence. [Citation.] From this evidence there was a real danger that the jury would improperly infer that whether or not Albarran was involved in these shootings, he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished. Furthermore, this gang evidence was extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues. In our view, looking at the effect of this evidence on the trial as a whole, we believe that this prejudicial gang evidence was '"of such quality as necessarily prevents a fair trial."' [Citation.]" (*Albarran, supra*, 149 Cal.App.4th at pp. 230-231, fns. omitted.)

As we have explained, some gang evidence would have been properly admitted even if bifurcation of the gang enhancement allegations had been ordered. We cannot say evidence of gang benefit was wholly lacking; expanding a gang's territory or demonstrating it can reach far beyond its home turf seems beneficial to us. Nor can we say the nature and quantity of the evidence was such that it must have affected jurors' resolution of the substantive issues. In sum, and in contrast to *Albarran*, this case does not "present[ ] one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered [appellants'] trial fundamentally unfair." (*Albarran, supra*, 149 California at p. 232.)

(LD 3, 45-55.)

> B.  <u>Analysis</u>

A state court's procedural or evidentiary ruling may be subject to federal habeas review if it violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by admitting evidence so arbitrary or prejudicial that its admission rendered the trial fundamentally unfair and violated fundamental conceptions of justice.  <u>Perry v. New Hampshire</u>,

84

- U.S.-, 132 S.Ct. 716, 723 (2012); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1103 (9th Cir. 1998); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20. (1991).

To the extent Petitioner's claim is considered a challenge to improper joinder of charging allegations, improper joinder does not, in itself, violate the Constitution; rather, misjoinder rises to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial. <u>United States v. Lane</u>, 474 U.S. 438, 446 (1986). Insofar as Petitioner raises a due process claim to the introduction of gang evidence, Petitioner is entitled to relief only if the evidence was so arbitrary or prejudicial that its admission rendered the trial fundamentally unfair and violated fundamental conceptions of justice. <u>Perry v. New Hampshire</u>, 132 S.Ct. at 723; <u>Estelle v. McGuire</u>, 502 U.S. at 67-69; <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009). Admission of evidence violates due process only if there are no permissible inferences that a jury may draw from it, and the evidence is of such quality as necessarily prevents a fair trial. <u>Boyde v. Brown</u>, 404 F.3d 1159, 1172-73 (9th Cir. 2005) (quoting <u>Jammal v. Van de Kamp</u>, 926 F.2d at 920).

Further, even the clearly erroneous admission of evidence that renders a trial fundamentally unfair may not permit the grant of habeas relief unless forbidden by clearly established federal law as established by the Supreme Court. <u>Holley v. Yarborough</u>, 568 F.3d at 1101. It is one matter to apply rules that are squarely established by the Court's holdings to the facts of each case, but it is another to extend it to new facts, which is required only if it is so obvious that a clearly established rule applies to a given set of

85

facts that there could be no fairminded disagreement on the question.  White v. Woodall, 134 S.Ct. at 1706.

The Supreme Court has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ, and absent such clearly established federal law, it cannot be concluded that the state court's ruling was an unreasonable application.  Holley v. Yarborough, 568 F.3d at 1101 (citing Carey v. Musladin, 549 U.S. 70, 77 (2006)).  The Court will proceed to consider more generally, in view of the unique totality of the circumstances of this case, whether the state court reasonably determined that Petitioner' due process right to a fair trial was not violated by the failure to bifurcate the proceedings and by the admission of the gang evidence.

Here, the gang evidence included information concerning the criminal history of not only Petitioners, but also third persons affiliated with Petitioners or with the gang.  Gang expert Okamoto's opinion as to the primary activities of the PDL was based in part on the criminal convictions of a handful of PDL gang members that ranged from possession and sale of marijuana and cocaine, shooting at an inhabited dwelling, and assault with a firearm to robbery, armed robbery, kidnapping, and attempted murder, with some gang enhancements.  (LD 31, 11 RT 2665-72, 2717-21.)  Guilt by association was a possible inference.

Here, evidence of Petitioner's guilt was strong.  As to Petitioner's criminal past, evidence of Petitioner's guilty plea to attempted home invasion robbery and other offenses was before the jury.  Because Petitioner himself had committed the same offenses or

similarly serious offenses, there was little risk that the trier
would inappropriately ascribe a third person's level of criminality
to Petitioner based on association alone. Thus, to a significant
extent, the additional information about the criminal activity of
those affiliated with the gang was not unduly prejudicial. The
attempt to tie Petitioner Nichols to another murder of a drug dealer
was inflammatory in nature and potentially prejudicial, but any
injurious effect was reduced by limiting instructions. Further, the
facts of the charged offenses and the strong evidence of the
perpetrators' association for the purpose of committing violent
crimes presented the trier with a much more direct and compelling
basis for an inference of wrongful intent and guilty concerted
action than the gang evidence.

Aside from its probative value with respect to the gang
allegations, relatively extensive evidence of gang affiliation,
association, and activity was relevant and material in various
respects, including to the course of the investigation and
development of the evidence, the perpetrators' identity, motive/s
for the offenses, the interactions and communications among the
perpetrators, modus operandi, the source and nature of the
perpetrators' information concerning the victim, the history and
origin of firearms involved in the charged offenses, and the
credibility of Petitioner and Collins. Cf. Windham v. Merkle, 163
F.3d 1092, 1103-04. It was objectively reasonable for the state
court to conclude that aside from the gang allegations, the gang
evidence was relevant.

The state court's conclusion that the evidence was sufficiently
probative and was not sufficiently prejudicial to render the

87

proceedings unfair was also objectively reasonable.  The
circumstances of the offense support an inference that the offenses
were undertaken at least in part to obtain resources for the gang,
invoke fear in the gang and drug community, and demonstrate the
reach of the gang beyond its turf.  In light of the evidence in the
record, the state court reasonably determined that the callousness
and violence of the circumstances of the charged offenses, the
victim's status as a senior gang member and large-scale drug dealer,
the Petitioner's admitted criminal past, and the absence of any
evidence of a shooting in Atwater all combined to reduce any
prejudicial effect that Petitioner might suffer from the otherwise
inadmissible gang evidence.

　　　Finally, the jury was instructed to consider the evidence of
gang activity only for the limited purpose of deciding whether a
defendant acted with the intent, purpose, and knowledge required to
prove the gang-related crime, enhancement, and special circumstances
allegations that were charged.  The jury was also cautioned that it
could not conclude from the evidence that a defendant was a person
of bad character or had a disposition to commit crimes.  (LD 3, 54.)
As a general proposition, jurors are presumed to follow the
instructions given.  See, Weeks v. Angelone, 528 U.S. 225, 234
(2000).  It is generally presumed that a jury will follow an
instruction to disregard inadmissible evidence inadvertently
presented to it unless there is an overwhelming probability that the
jury will be unable to follow the court's instructions and a strong
likelihood that the effect of the evidence would be devastating to
the defendant.  Greer v. Miller, 483 U.S. 756, 767 n.8 (1987)
(quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987) and Bruton v.

United States, 391 U.S. 123, 136 (1968)).  Here, the state court reasonably relied on the presumption.

Under the circumstances, it cannot be said that there could be no fairminded disagreement on the weighing of the probative value and prejudicial effect of the gang evidence.  The state court's decision was not contrary to, or an unreasonable application of, clearly established law.  Further, in light of the evidence in the record, and considering the state court's comprehensive review of the circumstances, the Court concludes that the state court's decision did not involve an unreasonable determination of fact based on the evidence before the court.

Accordingly, the Court concludes that Petitioner has failed to show he is entitled to relief pursuant to § 2254(d) on his claim or claims concerning a violation of due process from the denial of his motion for bifurcation and the admission of gang evidence.  It will be recommended that Petitioner's due process claims of fundamental unfairness regarding the failure to bifurcate be denied.

C.   Related Substantive Due Process and Equal Protection Claims

It is unclear whether these issues have been preserved, but if so, Petitioner's substantive due process and equal protection claims concerning the bifurcation issue should be denied.  The legal standards governing these claims have been previously set forth.

Here, the state court's bifurcation decision was based on the court's analysis of the pertinent legal factors, a process that was part and parcel of the state court's reserved and inherent powers to control the administration of justice and review trial court

89

proceedings for fairness in the cases before it.  Further, the state courts proceeded regularly by trial and motion proceedings in which the parties had an opportunity to be heard.  Petitioner has not shown that the procedures infringed a federally protected and fundamental right or operated too broadly beyond the ambit of the state's compelling interests.

With respect to an equal protection claim, Petitioner has not shown any difference in treatment or intentional discrimination. Petitioner has not shown how he suffered a violation of equal protection.

Accordingly, it will be recommended that Petitioner's substantive due process and equal protection claims be denied.

IX. <u>Trial Court Error in Admitting Evidence of Suggestive Identifications</u>

Petitioner Trice argues that the trial court's admission of unconstitutionally suggestive identifications of Petitioner and his co-defendants Dean and Nichols made by Tatum and Roshyla Ruiz violated Petitioner's right to a fundamentally fair trial and due process of law guaranteed by the Fifth, Sixth, and Fourteenth Amendments.  (Doc. 1, 6.)

Petitioner Nichols alleges that tainted identification procedures violated his right to due process.   (Doc. 1, 6.)

A. <u>The State Court's Decision</u>

The pertinent portion of the CCA's decision is as follows:

B. **<u>Identification Procedures</u>**

Appellants contend that impermissibly suggestive procedures violated due process and tainted various

90

identifications of them as the perpetrators. We conclude the identifications were properly admitted and that no due process violation has been shown.

### 1. General Legal Principles

" '[A] violation of due process occurs if a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [Citations.]'" (*People v. Sanders* (1990) 51 Cal.3d 471, 508; *Simmons v. United States*, (1968) 390 U.S. 377, 384.) A "defendant's protection against suggestive identification procedures encompasses not only the right to avoid methods that suggest the initial identification, but as well the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain. [Citation.] While a witness is entitled to become surer of an identification, due process precludes the generation of that increased certainty through a suggestive [identification procedure]. [Citations.]" (*Raheem v. Kelly* (2d Cir.2001) 257 F.3d 122, 135.)

" ' "In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) 'whether the identification procedure was unduly suggestive and unnecessary,' and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances."' [Citation.]" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942; see *Stovall v. Denno* (1967) 388 U.S. 293, 302, overruled on other grounds in *Griffith v. Kentucky* (1987) 479 U.S. 314, 320–328.) "The cases hold that despite an unduly suggestive identification procedure, we may deem the identification reliable under the totality of the circumstances, after we consider such factors as the witness's opportunity to view the suspect at the time of the offense, the witness's degree of attention at that time, the accuracy of the witness's prior description, the level of certainty the witness expressed when making the identification, and the lapse of time between the offense and the identification. [Citation.]" (*People v. Cook* (2007) 40 Cal.4th 1334, 1354; *Neil v. Biggers* (1972) 409 U.S. 188, 199–200.)

The defendant bears the burden of demonstrating " 'that the identification procedure resulted in such unfairness

that it abridged his rights to due process. [Citation.]'
[Citations.]" (*People v. Sanders, supra*, 51 Cal.3d at p.
508.) The defendant must show that the procedure was both
unduly suggestive and unfair " 'as a demonstrable reality,
not just speculation.' [Citation.]" (*People v. Cook,
supra*, 40 Cal.4th at p. 1355.) Contrary to Nichols's
statement that the standard of review is unsettled, "[w]e
review deferentially the trial court's findings of
historical fact, especially those that turn on credibility
determinations, but we independently review the trial
court's ruling regarding whether, under those facts, a
pretrial identification procedure was unduly suggestive."
(*People v. Gonzalez, supra*, 38 Cal.App.4th at p. 943;
*People v. Kennedy* (2005) 36 Cal.4th 595, 608-609.)

2. <u>Tatum's Identification of Dean</u> FN41

FN41. We assume appellants are not limited to
challenging identifications of themselves,
since, in light of other evidence linking them
in commission of the crimes, the identification
of one bolstered the prosecution's case against
the others. (*See People v. Sanders, supra*, 51
Cal.3d at pp. 507-508.)

a. *Background*

While Detective Blake was interviewing Tatum shortly after
the homicide, other officers were attempting to develop
possible suspects. Brocchini put together a photographic
array based both on physical descriptions given by Tatum
and on persons who had been suspected of committing
robberies in Modesto in the recent past. It did not
contain appellants. Blake showed it to Tatum about 1:40
a.m. She was unable to pick out anyone. Brocchini
subsequently gave Blake four more photographic lineups,
which Blake showed to Tatum that afternoon. One of the
lineups contained five photographs, while the others
contained six each. None were of appellants. Tatum did not
select anyone.

As the investigation focused on appellants, Blake obtained
photographic lineups that included them. On the morning of
March 7, 2002, he took People's exhibit 30-2, in which
Dean's photograph appeared in the bottom right-hand
corner, to Tatum's house to show her.FN42 Before showing
her the photographs, Blake read her the standard so-called

92

*Simmons*FN43 advisement that admonished her that the fact
the photographs were shown to her should not influence her
judgment, and that it was as important to free innocent
persons from suspicion as to identify guilty parties.FN44
Tatum studied the photographs, then pointed to Dean's
picture and said, " 'He's one of them. He was in my
house.'" Tatum said he was the person who took her to the
master bath to be with her children, and who watched over
her during the incident. She also said he shot from the
outside into the closet door in the master bedroom. Tatum
looked at the photographs for about two seconds; there was
no hesitation in her identification. At trial, Tatum
confirmed that she recognized Dean when viewing the
photographs.

> FN42. Brocchini and Roldan put together this
> photographic lineup. Brocchini could not recall
> whether there were other pictures of Dean that
> could have been used, but believed he and Roldan
> used the most recent one Roldan had.

> FN43. *Simmons v. United States, supra*, 390 U.S.
> 377.

> FN44. Blake read the admonishment to Tatum
> directly from his card. At trial, he did not
> have the card with him and had to paraphrase.

Appellants objected to People's exhibit 30-2, arguing that
the photographic lineup was suggestive because Dean's
photograph stood out from the others due to the degree of
brightness in the picture.FN45 Counsel for Dean described
Dean's photograph as looking "like the only one for which
a flash unit was used." The prosecutor responded that,
although the flash "lit [Dean] up," the array was not
unduly suggestive because all of the photographs were of
similar-looking individuals. The trial court examined the
exhibit and found that the faces and hairstyles were all
fairly similar, and that all of the individuals had facial
hair; with respect to differences, Dean's picture was
brighter than the others, and he was the only person
wearing a white shirt. The trial court concluded that,
looking at the lineup overall, it was not "unfair or
necessarily something that would lead to an improper
identification or that would make [Dean] quicker to be
chosen because of those differences"; hence, there was no
due process violation.

93

FN45. Appellants first raised the objection during the course of Roshyla's testimony, which preceded that of Tatum. Our analysis applies equally to Tatum's and Roshyla's identifications and, to the extent appellants complain that Collins identified Dean from an identical photographic lineup (People's exhibit 30-1), also to his identification. We have no trouble resolving the question of reliability in favor of admission of Collins's identification of Dean, inasmuch as the record shows Dean was at his house off and on throughout the day on March 1, and also showed up at his house after Trice was shot. Under these circumstances, the record establishes that Collins's in-court identification was based on an independent recollection of Dean. (See *People v. Contreras* (1993) 17 Cal.App .4th 813, 821; *People v. Phan* (1993) 14 Cal.App.4th 1453, 1462.)

As set out in the statement of facts, *ante,* Tatum identified all three appellants at trial. She testified that she estimated she was at the doorway of the bathroom for around five minutes, and that about 10 minutes elapsed between when the intruders entered the house until Ruiz was shot.

    b. *Analysis*

Appellants complain that the photograph of Dean contained in People's exhibit 30-2 stands out because it is brighter than the other photographs, and Dean is the only individual wearing a white shirt. They also contend that the fact a detective took the array to Tatum's house in the middle of the day, four days after the homicide, implicitly telegraphed to her that there was a likely suspect in the lineup.

"To determine whether a procedure is unduly suggestive, we ask 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citations.]" (*People v. Yeoman, supra*, 31 Cal.4th at p. 124.) We have examined the exhibit in question; all the photographs are of African-American males, generally of the same age, complexion, and build, and all with some sort of facial hair. Minor differences

94

in facial hair, hair style, background color, and image size do not make a lineup suggestive. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1217; see *People v. Holt* (1972) 28 Cal.App.3d 343, 350, disapproved on other grounds in *Evans v. Superior Court* (1974) 11 Cal.3d 617, 625, fn. 6.) Similarly, a lineup is not made suggestive by the fact the defendant is the only participant wearing a certain type of clothing, at least where, as here, the clothing is neither distinctive nor does it match important elements of the description provided by the witness. (See *Foster v. California* (1969) 394 U.S. 440, 442-443; *People v. Gonzalez, supra*, 38 Cal.4th at p. 943-944; *People v. Carter, supra*, 36 Cal.4th at pp. 1162-1163; *People v. Johnson, supra*, 3 Cal.4th at p. 1217; *Raheem v. Kelley, supra*, 257 F.3d at pp. 134-135.) As for appellants' claim the circumstances under which the photographs were shown implicitly telegraphed to T. that there was a suspect in the lineup, " '[a]nyone asked to view a lineup would naturally assume the police had a suspect.' [Citation.] This circumstance does not render the lineup unduly suggestive. [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 699.)

This leaves us to consider the undeniable fact that Dean's photograph is brighter than the rest. Differences in images, such as discoloration, the size of the border around the photograph, and whether some images are glossy while others are not, are generally held to be "trivial distinctions [that] are immaterial. [Citation.]" (*People v. Carter, supra*, 36 Cal.4th at p. 1163; see, e.g., *People v. Gonzalez, supra*, 38 Cal.4th at p. 943; *People v. Johnson, supra*, 3 Cal.4th at p. 1217.) Here, Dean's photograph is only somewhat brighter than the photograph in the upper left-hand corner, and differences in photographic quality and lighting are apparent in all six photographs.

Even were we to find the photographic array somewhat suggestive, under the totality of the circumstances, and considering the factors set out in *Neil v. Biggers, supra*, 409 U.S. at pages 199-200, we find "no substantial likelihood" that Tatum (or Roshyla, for that matter) misidentified Dean when viewing the six photographs. (*People v. Cunningham* (2001) 25 Cal.4th 926, 990; *People v. Sanders, supra*, 51 Cal.3d at pp. 508-509; see *People v. Phan, supra*, 14 Cal.App.4th at p. 1462.) FN46 Accordingly, no due process violation [h]as been shown.

95

FN46. Appellants cite *People v. Carlos* (2006) 138 Cal.App.4th 907 as a case in which the conviction was reversed because the photographic lineup procedure was impermissibly suggestive, and analogize the lighting in Dean's photograph to the placement, in *Carlos*, of the defendant's name under his photograph. (*Id.* at p. 912.) Differences in lighting and photographic quality are much more likely to occur, and much harder to guard against, than the placement of a name under a photograph. In any event, the court in *Carlos* found a due process violation not only because the defendant's photograph was made to stand out from the others, but also because the method of labeling was unnecessary, the photographic array was not disclosed to the defense until the first day of trial, defense counsel's request for a brief continuance was denied, and none of the witnesses identified the defendant at trial. (*Ibid.) Carlos* is clearly distinguishable from the case at bench.

3. Roshyla's Identification of Dean

    a. *Background*

At the time Blake read the admonishment to Tatum and showed her People's exhibit 30-2, he and she were at the dining room table. Roshyla and her brother were watching a videotape in the living room, just off of the dining area. The rooms are separated by a half wall and a step, so that the living room is about eight or nine inches lower than the dining room. The children were seated on a couch, facing the television, and appeared to be paying attention to it. The table where Blake and Tatum sat was about 20 feet away and behind the children. Blake was seated facing the living room, and he kept his eye on the children and paid attention to where they were while Tatum was looking at the photographs. When having different witnesses look at a lineup, Blake seeks to separate them so that they do not influence each other. He believed he was able to accomplish that in this instance. Generally speaking, the children were in a position in which they could not see what Blake and Tatum were doing. Blake did not believe the children could hear the exact words he and Tatum were using.

96

After Tatum finished looking at People's exhibit 30-2, she gave Blake a piece of evidence she had found. He and she were concentrating on that when Roshyla came up to the table and looked at the lineup, which was lying by Tatum's hand. Roshyla pointed to Dean's picture and said, "'he was in my house.'" Roshyla told Blake that after she had crawled out of the bathroom window, she saw two groups of men run past her. Dean was in the first group. It did not strike Blake as odd that Roshyla used almost the same terminology as Tatum; in his experience, children mimic the type of language and grammar that their parents use or that they are around.

Appellants objected that Roshyla saw Tatum make the identification and made the same identification for that reason; accordingly, Roshyla's identification was tainted. The prosecutor responded that the identifications were made separately. The trial court ruled that the jury should determine, as part of the case, whether Roshyla was sufficiently isolated from Tastum's identification.

At trial, Roshyla testified that the man whose photograph she identified was the one who came into the room, went back out, and brought her mother in. She was "[r]eally sure" the man in the photograph was one of the robbers who was in the house that night. She also saw him again when she was on her way to the neighbor's house. He was one of the men by the fence. She saw him there for about 10 seconds. When shown People's exhibit 30-2 by the prosecutor, she identified the picture of Dean as being the person with the messed-up teeth who brought her mother into the room. She then identified Dean in court.

On cross-examination, Roshyla testified that at the time she was shown the photographs, she was told to pick out a person who looked like he had been in the house. The investigator and Tatum were present when Roshyla was shown the photographs, and Tatum was sitting next to Roshyla. Roshyla thought the investigator had already shown photographs to Tatum; she did not know whether Tatum had picked any out because Roshyla was not sitting next to Tatum the whole time. Instead, Roshyla was walking around the house and watching television. Roshyla was in the living room and Tatum's bedroom. A bar or divider separated the living room from the dining room, although Roshyla was tall enough to see over it. Roshyla testified

97

that she and Tatum talked about what happened on the night
Ruiz was shot; however, Tatum only asked what Roshyla had
seen, and did not tell Roshyla what she (Tatum) saw.

b. *Analysis*

Appellants contend Roshyla's identification of Dean was
tainted by her having seen her mother make an
identification of Dean. The record does not support a
conclusion that Roshyla had any idea that Tatum had made
an identification, let alone which photograph she chose.
Under the circumstances, appellant has failed to show that
the identification procedure was unduly suggestive or that
Roshyla's identification of Dean was tainted. (See *People
v. Cook, supra*, 40 Cal.4th at pp. 1354-1355; *People v.
Clark* (1992) 3 Cal.4th 41, 136, fn. 17.) The jury was free
to take the circumstances under which the identification
was made, and Eisen's testimony, into account in
determining the weight to give to Roshyla's identification
of Dean.FN47

> FN47. Significantly, the trial court instructed
> the jury that factors to be considered in
> assessing eyewitness identification testimony
> included "the testimony of any expert regarding
> acquisition, retention, or retrieval of
> information presented to the senses," "[w]ere
> the photographic and physical lineups fair and
> were they conducted in a fair manner[,]" and
> "[w]as the witness's identification the product
> of his or her own recollection[.]" (See *People
> v. Ochoa* (1998) 19 Cal.4th 353, 413, fn. 4.)

4. Tatum's Identification of Nichols

a. *Background*

On March 4, 2002, Detective Owen showed Tatum People's
exhibit 32-2, a photographic lineup in which Nichols's
picture appears in the number 3 position. He first gave
her the *Simmons* admonishment, which in part explained that
she was not obliged to pick out anyone, then asked her to
think about the incident and focus on the suspect who was
heavier set and older. Tatum said she could actually
picture that person. She then looked at the photographs
for 10 to 15 seconds and said that the skin tones of the
suspect were lighter than those in the pictures. Owen then

asked if, other than the skin tones, any of the
photographs looked similar. According to Tatum, she was
able to eliminate all but photo 3 as not looking like
anyone who was in her house. The complexion, cheeks,
hairline, and "[e]verything" in that photograph was
similar to one of the men who was in her house. She also
specifically remembered the nose. She expressed a desire
to be able to see a lineup in person. She wanted to see
the full body of the man in photo 3, as she remembered him
being heavy and having a potbelly or beer belly. She told
Owen she recalled that his stomach jiggled when he moved,
and he had a fat gut and fat sides.

A live lineup involving Nichols was conducted on May 2,
2002. Prior to the lineup, Tatum was admonished that she
was not to assume that the person who committed the crime
was among the group of individuals she would be shown, and
that she was not obligated to identify anyone. At the
lineup, she was shown six people. She identified Nichols.
She also identified him (and the other appellants) at the
preliminary hearing and at trial. There was no doubt in
her mind once she saw Nichols in the live lineup that he
was one of the people in her house. The individuals in the
lineup were five feet 11 inches or six feet tall, except
for one who was six feet four inches tall. Thus, none
matched the description, height-wise, that Tatum gave in
the first interview Blake conducted with her, in which she
had described the person as having a light complexion and
a beer belly, and being about five feet eight inches tall
and 230 pounds. FN48

    FN48. In Blake's opinion, Nichols had a medium
    complexion.

At trial, Tatum admitted having dated one of the
participants in the lineup. She did not tell the officer
that she recognized him. She did not think it was
relevant, as she was looking for the person she saw in her
home the night Ruiz died.

Appellants objected to the lineup as being inherently
suggestive. The trial court overruled the objection.

        b. _Analysis_

Relying in large part on the testimony of Dr. Eisen, an
expert in eyewitness identification, appellants claim

Tatum's identification of Nichols was tainted. They point,
inter alia, to the fact that Owen asked her whether any
photographs looked similar to the suspect apart from skin
tone, Nichols was the only person in the live lineup who
had previously been displayed to Tatum in a photographic
array, and one of the participants in the live lineup was
several inches taller than the rest.

Contrary to appellants' apparent argument, Eisen's
testimony permitted, but did not compel, a conclusion the
identification procedures were impermissibly suggestive.
"[F]or a witness identification procedure to violate the
due process clauses, the state must, at the threshold,
improperly suggest something to the witness—i.e., it must,
wittingly or unwittingly, initiate an unduly suggestive
procedure." (*People v. Ochoa, supra*, 19 Cal.4th at p.
413.) In light of the fact differences in lighting and
photographic quality can alter skin tones, we see nothing
suggestive in what Owen said. Similarly, we find nothing
suggestive in the state's apparent acquiescence to Tatum's
request to see Nichols in a live lineup. "Due process does
not forbid the state to provide useful further information
in response to a witness's request, for the state is not
suggesting anything." (*Ibid.*) That Nichols was the only
participant common to both the photographic array and the
live lineup does not render the identification procedures
impermissibly suggestive or per se violate due process.
(*People v.. Cook, supra*, 40 Cal.4th at p. 1355; *People v.
Wimberly* (1992) 5 Cal.App.4th 773, 789.)

Appellants have failed to establish a violation of due
process. The value of Eisen's testimony was properly left
to the jury to determine.

5. <u>Tatum's Identification of Trice</u>

    a. *Background*

When Brocchini created a photographic lineup for Trice,
the only photograph of Trice he could find was from 1995.
After Owen showed Tatum the photographic lineup that
included Nichols's picture, he showed her People's exhibit
32-1, a photographic lineup in which Trice's picture
appears in the number 5 position. Tatum looked at the
lineup for 25 to 30 seconds and said that none of the
people looked familiar. Owen observed, however, that she
looked at picture 5 several times.FN49 Not wanting to

taint her identification by specifying the picture, he
said that he noticed she kept looking at a particular
photograph. She responded, "'Oh, you mean No. 5?'" He then
asked why she looked back at that picture. She said the
complexion, forehead, and hairline were the same, but she
was not sure. She said she wanted to see the individual in
person. Tatum told Owen that she could eliminate numbers 4
and 6 as not being the suspect, but none of the others.

> FN49. Owen knew, when he displayed the
> photographs, that Trice was in the number 5
> position.

At trial, Tatum recalled being able to eliminate all but
number 5 as not having been in the house. She told the
detective that number 5 looked like the person and that
his features were very similar to what she had seen on one
of the perpetrators. The main things were the forehead and
hairline and the shape of the face. The complexion was
similar, in that it was dark. Tatum told the detective
that she wished she could do an in-person lineup, because
she felt confident that she could pick out each individual
in person. In person, she would be able to consider body
type, height, and the way each stood.

    b. *Analysis*

Despite the lack of objection in the trial court,
appellants now contend, again based on Eisen's testimony,
that Tatum's identification of Trice was tainted because
Owen made comments that steered her to focus on Trice's
photograph. Assuming the issue is properly before us on
appeal, through a claim of ineffective assistance of
counsel or otherwise (see, e.g., *People v. Williams* (1988)
44 Cal.3d 883, 906-907; *People v. Barber* (2002) 102
Cal.App.4th 145, 149-150), we find no impermissibly
suggestive procedure. Owen did not steer Tatum to focus on
Trice's photograph; she had already demonstrated an
interest in it beyond that which she showed concerning the
other pictures, and he simply asked why. He did not
improperly suggest anything. (See *People v. Ochoa, supra*,
19 Cal.4th at p. 413.) Once again, Eisen's testimony was
properly left to the jury to assess.

To summarize, in no instance have appellants persuaded us
that their rights to due process were violated. The trial
court did not err in admitting the challenged

101

identification evidence.

(LD 3, 56-67.)

B. Analysis

Due process of law requires suppression of eyewitness identification evidence "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Perry v. New Hampshire, 132 S.Ct. at 718, 724; Manson v. Brathwaite, 432 U.S. 98, 107-09 (1977); Neil v. Biggers, 409 U.S. 188, 196-98 (1972). An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual, such as repeated presentation of a subject or gross disparities in appearance or other circumstances or behavior that direct attention to a particular subject, and thereby increases the likelihood of misidentification. United States v. Bagley, 772 F.2d 482, 492-93 (9th Cir. 1985) (citing Simmons v. United States, 390 U.S. 377, 382-83 (1968)).

It is not only the presence of improper state conduct in arranging and conducting the unnecessarily suggestive pretrial identification procedures, but also the reliability of the identifications that figures in the determination of whether evidence of the identification must be excluded. Manson v. Brathwaite, 432 U.S. at 100-14. Identification testimony is inadmissible as a violation of due process only if 1) a pretrial encounter is so impermissibly suggestive as to give rise to a very

102

substantial likelihood of irreparable misidentification, and 2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  Perry v. New Hampshire, 132 S.Ct. at 720.

In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: 1) the witness' opportunity to view the defendant at the time of the incident; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description; 4) the level of certainty demonstrated by the witness at the time of the identification procedure; and 5) the length of time between the incident and the identification. Perry, 132 S.Ct. at 725 n. 5; Manson, 432 U.S. at 114; Neil, 409 U.S. at 199–200.

Here, the state court articulated standards consistent with clearly established federal law.  The state court analyzed each identification and reasonably applied federal law.

No circumstances of suggestion or undue focus attended Tatum's identification of Dean at the March 7 photographic lineup.  Instead, Tatum was given the Simmons advisement, her identification was made in a couple of seconds and without hesitation, and it proceeded from her observations of Dean during a period of at least five minutes when he took her to the bathroom and watched over her.  It was objectively reasonably for the state court to conclude that the brightness of Dean's picture and his wearing a white shirt were not

sufficient to make the procedure suggestive in view of the fact that the individuals shown were African-American males of generally the same age, complexion, and build, all with facial hair and with fairly similar faces and hairstyles; further, a white shirt was not distinctive or part of a description of the perpetrators' clothing. Tatum subsequently identified Dean at trial.  The state court reasonably concluded that there had not been any impermissible suggestion.  Further, the identification had been made with certainty and relatively soon after the crime by one who had a strong motive to attend to the robbers and who further had a substantial opportunity to view Dean at the murder scene.  The state court reasonably concluded that there was no substantial likelihood that Tatum misidentified Dean during the photographic lineup.

Likewise, the state court's decision regarding Roshyla's identification of Dean did not involve an objectively unreasonable application of clearly established federal law or an unreasonable determination of the facts.  In light of the testimony of Brocchini, Tatum, and Roshyla, the state court reasonably concluded that Roshyla had not been influenced by Tatum's identification of Dean. Further, Roshyla had a substantial opportunity to observe Dean in the house as the man who brought her mother into the bathroom and again had ten seconds to observe Dean as the man by the fence outside the residence.  Roshyla's identification appears to have been spontaneous, and she was certain that Dean was the person with

bad teeth who brought her mother into the bathroom.  Roshyla also identified Dean in court.  The state court reasonably concluded that Petitioner had not shown any undue suggestion or taint.

Petitioners have not shown entitlement to relief with respect to the state court's decision concerning Tatum's identifications of Petitioner Nichols at the live lineup on May 2, 2002, the preliminary hearing, and the trial.  During the previous March 4 photographic lineup, Detective Owen's direction to Tatum to focus on the heavier and older suspect did not address any particular subject in the photographs, but rather an aspect of the charged offense; it was accompanied by the *Simmons* advisement.  The query concerning similarity aside from skin-tone was not necessarily suggestive of a particular subject, and it was a logical question given the variability of tones and shades in photographic representations.  A fairminded jurist could reasonably conclude that the photographic lineup was not suggestive.  Tatum found that "everything" in the photograph of Petitioner Nichols, including complexion, cheeks, nose, and hairline, was similar to the perpetrator's, and she requested a live lineup.

Because Tatum requested the procedure, the live lineup was not necessarily suggestive.  At the live lineup, she identified Petitioner Nichols without any doubt once she saw him, and the discrepancy in height given in Tatum's first description was not necessarily sufficient to question the reliability of her

identification in light of her sure and specific recognition of the

other physical features, such as the nose and belly.  The state

court reasonably concluded that Petitioners had not established

impermissibly suggestive identifications.

Tatum's identification of Trice was not impermissibly tainted

by Owen's remark about his observation that she repeatedly looked at

an unspecified photograph.  Owen merely remarked about Tatum's own

focus as distinct from communicating something that focused

previously undirected attention.  Tatum himself specified the

photograph; noted similarity of complexion, forehead, and hairline;

and expressed a desire to see the individual in person in order to

eliminate uncertainty.  Her identification at trial likewise was

based on similarity of the forehead, hairline, face shape, and

complexion.  The state court reasonably concluded that there was no

impermissibly suggestive procedure or substantial likelihood of

irreparable misidentification.  Further, because of the extensive

opportunities for Tatum, Roshyla, and Collins to perceive the

persons identified by them, it was objectively reasonable to

conclude that under all the circumstances, the identifications were

reliable.

In sum, Petitioners have not shown that the state court

decision was contrary to, or an unreasonable application of, clearly

established federal law, or that the state court's findings of fact

were unreasonable in light of the evidence before it.  Accordingly,

106

it will be recommended that Petitioners' due process claims of impermissibly suggestive identifications be denied.

### X.    Ineffective Assistance of Counsel

Petitioner argues that his Sixth and Fourteenth Amendment right to the effective assistance of counsel was violated by trial counsel's failure to object to a suggestive identification by Tatum Ruiz and to the evidence of the officer's behavior that focused Ruiz's attention on Petitioner.  (Doc. 1 at 6, 12-14, 6.)

The state court assumed that the due process claim concerning Tatum's identification of Petitioner was before it despite the absence of an objection, referring to an ineffective assistance of counsel claim.  (LD 3, 67.)

To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show that 1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and 2) unless prejudice is presumed, it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).

As previously set forth, Petitioner has not shown that he is entitled to relief on his due process claims concerning the identifications.  Because Petitioner's claims concerning the

suggestive identifications were not meritorious, counsel was not required to object.  Cf. James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994) (failure to raise the issue of sufficiency of the evidence is not prejudicial where there was overwhelming evidence of guilt; failure to make a motion which would not have been successful is not ineffective assistance of counsel).  Further, because the state appellate court reached the merits of the identification claim/s without reliance on the absence of an objection, any failure of counsel to object to the identifications lacked any prejudicial effect.

In sum, Petitioner has shown neither substandard conduct nor prejudice.  Petitioner has not established that he suffered a violation of the right to the effective assistance of counsel. Accordingly, it will be recommended that Petitioner's claim of ineffective assistance of counsel be denied.

XI.   Rights to Confrontation and Cross-Examination

Petitioner argues that he suffered a violation of his Sixth Amendment right to confront and cross-examine witnesses when Dr. Lawrence was permitted to testify to the cause of death determined in an autopsy report authored by Dr. Rulon, who was unavailable due to absence from the county.  Petitioner argues that the autopsy report was testimonial and that the testifying pathologist was not a percipient witness to the autopsy examination.  (Doc. 1 at 6, 12-13.)  Petitioner relies on Crawford v. Washington, 541 U.S. 36, 59

(2004), holding that testimonial statements of witnesses absent from trial may be admitted only where the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the witness; and <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305 (2009), holding that notarized, sworn certificates of analysis prepared by laboratory analysts that under state law constitute prima facie evidence come within the core class of testimonial documents protected by the Sixth Amendment.

> A.   The State Court's Decision

In its decision, the CCA set forth the factual background as follows:

> Dr. Rulon performed the autopsy on Ruiz. Detective Buehler testified that he attended the autopsy. Also present were a forensic photographer to document the autopsy procedure so that photographs were available if the case ended up going to court, and someone from the district attorney's office.

> During the autopsy, Buehler observed three bullets being taken out of the body. One was taken from Ruiz's left pelvis, one from his left neck, and the third from his left armpit. Later that afternoon, Buehler was called back by Dr. Rulon and received a fourth bullet from her. Buehler, who the parties stipulated was an expert in identifying bullets, opined that the first three bullets came from a .22-caliber rimfire cartridge and would have been fired from the same type of firearm. The item he received from Rulon was a similar .22-caliber slug.

> During trial, the prosecutor informed the court and defense counsel that Rulon had left the county and was unavailable to testify. As a result, the prosecutor intended to call Dr. Lawrence, her supervisor, to testify regarding her autopsy report, her observations, and various items of physical evidence. Appellants objected, citing *Crawford v. Washington* (2004) 541 U.S. 36

(*Crawford*). Following argument, and after reviewing *People v. Beeler* (1995) 9 Cal.4th 953 (*Beeler)*, the trial court concluded that, as long as an appropriate foundation was laid, the autopsy report was admissible as a business record under Evidence Code section 1271. The court further determined that, assuming the proposed witness was trustworthy, testimony could be admitted from a doctor who did not perform the autopsy. Appellants argued that *Beeler* was no longer valid following *Crawford,* and that to permit a doctor to testify, without making an independent evaluation based on evidence other than the report, violated appellants' confrontation and due process rights. The prosecutor responded that the autopsy report was not testimonial and, hence, not subject to *Crawford*, and that in any event, I would be satisfied because the defense would be able to cross-examine Lawrence. The court declined to change its ruling.

Lawrence subsequently testified that he was a forensic pathologist, i.e., a doctor who performed autopsies for the purpose of determining cause and circumstances of death. Forensic pathologists look at deaths that are of interest in the legal system.

In 2002, Rulon was an employee of Delta Pathology, which Lawrence founded and owned. Technically, he was her boss. Rulon was a Board-certified pathologist and forensic pathologist like Lawrence, and she was fully experienced and performed throughout her employment in an exemplary fashion. Her reports followed Delta Pathology's protocol or procedure with regard to how autopsy reports should be prepared.

Rulon conducted an autopsy on Ruiz, and Lawrence reviewed her report. FN50 Such reports are made in the regular course of Delta Pathology's business. Lawrence also looked at the autopsy photographs and reviewed the investigative information about the general circumstances of the case. Based on those items, he formed the opinion that the cause of Ruiz's death was multiple gunshot wounds.

   FN50. The trial court granted appellants a continuing objection on confrontation grounds.

Ruiz had a total of 11 entrance gunshot wounds on the body. Two were connected to one another, meaning he was struck nine, and possibly 10, times. Ruiz suffered

110

fractures of the facial skeleton, perforation of the lung, and abdominal organ injuries. There were five fatal wounds, meaning they hit vital organs and caused extensive hemorrhage or organ destruction that caused death. Any one of the five could have killed Ruiz, although with good medical treatment, it was within the range of possibility that any given wound would not have been fatal. If Ruiz had received all of the wounds within a relatively short period of time, such as a minute, it was doubtful, but possible, that prompt medical attention could have saved his life. Several of the wounds had a downward trajectory. A couple had stippling, indicating they were fired probably from a distance of a foot or less.FN51 If a bullet was not found within a wound, Lawrence could not tell the caliber of the gun. Generally speaking, Lawrence could not tell Ruiz's or the shooter's position just by looking at the wound, although it might be possible to say a certain position was consistent or inconsistent with a particular wound.

> FN51. If someone were shot through a wall, there would normally not be stippling on the victim.

The mechanism of death was shock and hemorrhage. It was due directly and primarily to the gunshot wounds. There was no significant natural disease that could have caused death. Lawrence could say with medical certainty that Rulon's opinion was the correct one.

Appellants reiterated their confrontation objections to Lawrence's testimony in conjunction with the trial court's determination that the death certificate for Ruiz would be admitted into evidence. They raised them again when the subject of admission of the autopsy report arose. When the trial court wondered why the report was needed when Lawrence's testimony had been admitted, the prosecutor observed that in *Beeler*, both the report and the testimony were admitted. The prosecutor expressed concern with laying the foundation for admissibility of Lawrence's testimony. Upon learning that enlargements of the diagrams attached to the report had been admitted into evidence, the trial court declined to admit the autopsy report. Appellants then withdrew their objections to the report. After defense counsel conferred, and apparently speaking for all of them, Nichols's attorney said: "We are going to go ahead, Your Honor, on this one we would, without waiving our issues with respect to the right of

111

```
confrontation, we are—and in light of the testimony that
was brought in by Dr. Lawrence, we withdraw our objection
to receiving [the autopsy report]." Counsel explained:
"The objection to the report was based on the denial of
right of confrontation, and Dr. Lawrence was relying upon
this report, Your Honor. We objected to any of his
testimony and also objected to the admission of the report
as a denial of confrontation. This Court has already, in
essence, ruled against us on the issue of denial of
confrontation. And since that ruling has, in essence, in
my mind, already occurred, we are withdrawing our
objection to the admissibility on all other grounds...."
The prosecutor promptly withdrew the autopsy report,
saying the defense could move it in on their own if they
wanted. Counsel for Trice moved it into evidence without
objection. When counsel for Nichols stated, "With the
previous notation about the right of confrontation," the
prosecutor responded, "Which is now waived." The court
cautioned that if there was no objection to the report, it
would come in without preserving anything for the appeal,
then admitted the autopsy report into evidence.
```

(LD 3, 68-71.)

In its decision, the CCA next traced the holdings of Crawford and its progeny as well as state court decisions interpreting the Supreme Court's cases.  (LD 3, 72-79.)  The CCA discussed Melendez-Diaz v. Massachusetts, 557 U.S. -, 129 S.Ct. 2527 (2009), which held that notarized certificates of analysis showing the results of forensic testing were testimonial for purposes of the Confrontation Clause.  The CCA also reviewed at length the state court cases interpreting Crawford.  The CCA concluded that even if testimony by Lawrence, who did not perform the autopsy but merely reviewed notes of Dr. Rulon, would ordinarily violate the Confrontation Clause, there was no prejudicial error in Petitioner's case.  The court stated the following:

In the present case, with respect to the autopsy evidence, Lawrence did not simply testify as a proxy for Rulon. Instead, he reviewed the autopsy photographs in addition to her report, and was able to offer his own opinion concerning the severity of Ruiz's wounds and the cause of death, and as to whether Rulon's conclusions were correct. We need not decide whether these circumstances are significant, nor do we need to take sides in the debate over *Geier* or, for that matter, offer our opinion concerning the continued vitality of cases such as *Beeler* and *People v. Clark, supra,* 3 Cal.4th 41, at pages 158-159, which, like *Beeler,* deals with one physician testifying about the report of the physician who actually conducted the autopsy, and admission of that report as a public or business record: Assuming error, it did not prejudice appellants.

A violation of the confrontation clause is subject to harmless-error analysis under the *Chapman* standard. (*Geier, supra,* 41 Cal.4th at p. 608; *People v. Mitchell* (2005) 131 Cal .App.4th 1210, 1225 & fn. 42; see *People v. Ledesma* (2006) 39 Cal .4th 641, 709.) The question is whether we can find, beyond a reasonable doubt, "that the jury verdict would have been the same absent any error. [Citations.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 239.)

The answer here is yes. With respect to the autopsy evidence, appellants not only withdrew their objections to admission of Rulon's report itself, but Trice actually moved it into evidence without objection from any other party. Once received without objection, the report was in evidence for all purposes. (See *Wicktor v. Los Angeles* County (1960) 177 Cal.App.2d 390, 406; People v. O'Brien (1932) 122 Cal.App. 147, 155; *People v. Hickok* (1921) 56 Cal.App. 13, 17.) Appellants could not affirmatively seek admission of the report while still preserving their Sixth Amendment objections thereto.

Once the autopsy report was in evidence, any error in admitting Lawrence's testimony cannot possibly have impacted the verdict, since the pertinent evidence was already before the jury in the form of Rulon's report. Moreover, appellants did not seriously dispute that Ruiz was shot to death or that he was shot multiple times.FN55 (See *People v. Williams* (1959) 174 Cal.App.2d 364, 391.) Berenice Sanchez, the Ruizes' neighbor, described seeing

113

Ruiz bleeding from the chest. The first officers on the scene testified that Ruiz had been shot and was bleeding profusely. Detective Buehler witnessed three .22-caliber slugs being recovered from Ruiz's body during the autopsy, including one from the neck. Neither the autopsy report nor Lawrence's testimony shed any light on whether Ruiz was shot by multiple firearms; Lawrence explained that unless a bullet was found in a wound, he could not determine the caliber of the gun.FN56 Testimony concerning the trajectory of the shots and stippling (or absence thereof) added little or nothing. Lawrence's testimony (based on the report) that Ruiz was six feet tall and approximately 240 pounds was elicited by Nichols and can only have been beneficial to him, as it enabled him to attack Tatum's identification of him as one of the perpetrators by suggesting he was about Ruiz's size and not around the five feet eight inches that was contained in Tatum's original description to police.

FN55. Indeed, Dean's attorney told jurors, in his opening statement, that Ruiz "ended up with a bunch of gunshot wounds to him that killed him," but that there was no physical evidence appellants were responsible.

FN56. In his argument to the jury, the prosecutor conceded that he could not say any particular defendant was the actual killer, or that, for example, Nichols had the .22, fired nine rounds, and those killed Ruiz.

(LD 3, 79-81.)[6]

B. Analysis

Here, the state court reasonably concluded that the law concerning a Confrontation Clause violation was unclear and uncertain. See Flournoy v. Small, 681 F.3d 100, 1005 (9th Cir.

[6] The portion of the CCA's decision regarding ballistic or firearms evidence is omitted because the petition addresses only the admission of the evidence concerning the autopsy. (Pet., doc. 1 at 6, 12-13, 16-17.) The Court declines to decline to consider any new matter raised in the traverse. See, Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994), cert. den., 514 U.S. 1026 (1995).

2012).  The CCA also properly determined that because Petitioner moved the autopsy report into evidence, the jury already had before it the totality of the absent pathologist's autopsy report and opinion.  Petitioner thus suffered no prejudice from the testimony and opinion of Lawrence, who had formed his opinion and testimony in part on the autopsy report and was available for cross-examination. Further, as the CCA noted, Lawrence's testimony was not seriously disputed and was based on the report or opinion of the absent pathologist and also on the physical evidence and investigation as well as his observation of autopsy photographs and diagrams.  To the extent Lawrence relied on the procedures documented by the absent pathologist in the report, Lawrence had independent knowledge of the procedures used in the laboratory and of the history and reliability of the absent pathologist.

Even if there is a violation of the right to confrontation under the Sixth and Fourteenth Amendments, the constitutional violation will not merit habeas relief unless the error had a substantial and injurious effect or influence in determining the jury's verdict.  Fry v. Pliler, 551 U.S. 112, 119-20 (2007); Jackson v. Brown, 513 F.3d 1057, 1084 (9th Cir. 2008) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  Here, Petitioner has not shown that any Confrontation Clause error had a substantial or injurious effect or influence in determining the jury's verdict (Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)), or that the state

115

court's decision was contrary to, or an unreasonable application of, clearly established federal law.

Further, the facts in the instant case involve not one witness parroting the statements of another, but rather an expert opinion based not only on a third party's examination and report, but also on independent observation of documentation of the procedure by a forensic photographer, and on the evidence discovered in the investigation.  Given these circumstances, the Court concludes that Petitioner has not shown that the state court's decision was based on an unreasonable finding of fact.

Accordingly, it will be recommended that Petitioner's claim of a violation of his rights to confrontation and cross-examination be denied.

XII.   Multiple Grounds of Alleged Prosecutorial Misconduct

Petitioner argues that he was denied his right to due process of law and a fundamentally fair trial in violation of the Fifth and Fourteenth Amendments when the prosecutor engaged in fourteen separate instances of misconduct by representations made in the opening statement and final argument and by failures to correct inaccurate and misleading testimony by prosecution witnesses.  (Doc. 1, 7.)

Petitioner Nichols mounts a similar but more limited challenge based on the prosecutor's opening statement, presentation of evidence, and argument that telephone records linked Petitioner

116

Nichols and co-defendant Dean during the time of the homicide.
(Doc. 1, 40-42.)

### A. The State Court's Decision

The decision of the CCA on these claims is as follows:

### 3. Presentation of Incorrect and Misleading Testimony and Argument

Appellants contend they are entitled to reversal because the prosecutor presented false and misleading information in his opening statement, presented and failed to correct inaccurate and misleading testimony, and then exploited the errors in his argument to the jury. We disagree.

### a. *Background*

The errors claimed were all raised in appellants' motions for new trial and were rejected by the trial court, except to the extent they contributed to its decision to strike the gang enhancements. The errors claimed, and what the record shows, are:

(1) Appellants complain that in his opening statement, the prosecutor represented, over objection, that numerous telephone calls linked the telephones of Nichols and Dean during the time of the homicide.FN61 The prosecutor relied on the December 3, 2006, report of Detective Blake. In Blake's January 15, 2007, report, however, Blake related that the number originally attributed to Nichols was in fact that of Jennisha Johnson, a friend of Dean. As a result, appellants claim, it was unreasonable for the prosecutor to rely on the erroneous report. However, the prosecutor gave his opening statement on December 12, 2006, before Blake's second report. Moreover, Brocchini testified that the number in question was Jennisha Johnson's cell phone number, that he had called her on that phone, and that it was not Nichols's number, contrary to what was stated in Blake's report.

> FN61. In his opening brief, Dean says it was claimed that Nichols's telephone number appeared on Collins's phone record. While he does not provide us with record citations to any testimony or pertinent remarks by the

prosecutor, he does quote the portion of the
trial court's ruling on the new trial motions
that dealt with the prosecutor's assertion, in
opening statement, that Dean and Nichols made
numerous telephone calls to other suspects in
the case. Accordingly, we assume Dean's
challenge is to the prosecutor's assertion
concerning Nichols and Dean, not Collins.

(2) Appellants complain that Brocchini testified that
Thomas White and Dupree Hull were associated with phone
numbers found in Ruiz's cell phone records, and that the
last call to Ruiz's cell phone was associated with White.
Brocchini claimed that he relied on MPD records to link
the telephone numbers, but subsequently admitted there
were no such records and that documentation was limited to
his handwritten notes. Those notes were not disclosed to
the defense prior to trial. Appellants now say the failure
of the prosecutor to give defense counsel the updated copy
of Brocchini's report was a discovery violation, and
Brocchini's conjecture that White and Hull were linked to
the telephone numbers was without foundation. The record
shows that, on cross-examination, counsel for Nichols
asked what efforts Brocchini had made to link the
telephone numbers obtained from Ruiz's cell phone.
Brocchini responded that he ran them through a database in
MPD. Brocchini conceded that, despite his 21 years of
experience as a peace officer and his awareness of the
reasons for writing reports, he did not provide one to the
defense prior to trial, and in fact did not prepare a
report until counsel requested one. Brocchini also
admitted that when asked to back up the linkage between
Hull and White and the numbers obtained from Ruiz's cell
phone, he could not do so.FN62

FN62. At the hearing on the new trial motions,
Brocchini testified that when he was preparing
for his trial testimony, specifically cross-
examination concerning telephone numbers found
in the call log of Ruiz's cell phone, he saw
some handwritten entries on one of his reports.
Between his various testimony sessions, he was
asked to do some research of MPD's database
regarding the source of those notations. He
discovered that the records, which were old,
were gone. As a result, he gave what information
he could remember from his investigation of the

118

case, which had occurred approximately five
years before his actual testimony.

(3) Appellants complain that Brocchini testified that
White and Hull were Blood gang members, and he suggested
appellants could have obtained Ruiz's home address from
one of them. After trial, field identification cards and
Brocchini's 1998 report were disclosed, identifying Hull
as a member of the Crip faction of the Oak Street Posse.
Appellants say this was a discovery violation, and
Brocchini's testimony that White and Hull were Bloods was
without foundation. They also say the prosecutor, having
stated in court that he previously prosecuted Hull for
murder, knew or should have known Hull was a Crip and not
a Blood.FN63

> FN63. At the hearing on the new trial motions,
> Brocchini conceded that he testified at trial
> that Hull was a Blood, but in his 1998 report,
> Hull's name was on the Crip side of the OSP
> list. Brocchini explained that he had spoken to
> a lot of OSP gang members over the years, and
> that the older gangsters who had been around a
> long time were on the Blood side, while the
> younger ones who started coming up in around
> 1998 were on the Crip side. He knew that White
> was on the Blood side, and, because he thought
> about Hull as being one of the older members,
> was just going from memory and made a mistake.

(4) Appellants complain that in his closing argument, the
prosecutor asserted that Dana Orent, the defense's gang
expert, "defied police procedure" by stashing evidence in
his garage. Appellants say the prosecutor misstated the
evidence, because Orent did not "stash" evidence, but
merely kept copies at his home for his own records.
Appellants also note there was no evidence of police
procedures, and they say the trial court erred by
overruling their objection. In this regard, Orent
testified that when he was asked by someone from MPD to
review materials in connection with this case, he was no
longer at the Pasadena Police Department. Orent termed
himself "a pack rat" with respect to gang stuff, and
explained that he had collected thousands of materials
over the last 15 or 20 years. Whatever he would collect,
including, for instance, photographs on the street, he
would make copies of for his personal files. During the

1    course of the prosecutor's closing argument, the following
2    took place:

3        "MR. MANER: ... The evidence that came into the
         courtroom in this case was that Mr. Orent did
4        not send an index of where the evidence came
         from.... If he had said that, it would be easy
5        for the detective to know, okay, this picture
         comes from this report. Orent never did that. In
6        fact, Orent defied police procedure—

7        "MR. CHASE: Objection, Your Honor. Again. [¶]
8        ... [¶] [H]e is again testifying, Your Honor.
         There's no evidence Mr. Orent in any way, shape
9        or form did not follow police procedure. None.
10       [¶] ... [¶]

11       "THE COURT: The objection's overruled at this
         point[.] It's within the evidence presented at
12       the trial. Go ahead, please.

13       "MR. MANER: Okay. Police Procedure. Is it proper
14       police procedure when you go on a search warrant
         and you find evidence, to take it home and stash
15       it in your garage? Okay? Do you need a course in
         police procedure to understand that? [¶] But
16       that's what Mr. Orent did. He testified [—]

17       "MR. MILLER: Objection, that misstates the
18       testimony.

19       "THE COURT: It's overruled.

20       "MR. MANER: He testified that he and his partner
21       found a roll of film and they developed it and
         they took it and he has all—he kept it in his
22       garage at home, or maybe it was in his living
         room, I forget, he kept it at home. And he had
23       other evidence from other crime scene searches
24       of gang members at home, he had his own personal
         gang file. The appropriate thing for police
25       officer to do when you get evidence of a crime.

26       "MR. MILLER: Objection.

27       "MR. MANER: You book it into evidence.
28

                          120

1      "MR. MILLER: Now counsel's testifying.

2      "THE COURT: I think this is within the common
3      experience and common sense. [¶] ... [¶]

4      "MR. CHASE: He is misstating the evidence. Mr.
    Orent testified he made copies and put it in his
5      file.

6      "MR. MANNER: Well, I guess we disagree about
7      that, Judge. They'll decide ultimately.

8      "THE COURT: The objection is overruled. [¶] ...
    [¶]
9

10      "[MR. MANER:] Lost track of where I was. But the
    gist of it is Orent didn't follow traditional
11      police procedures in cataloguing and keeping
    evidence. So why is it a surprise to anybody
12      that he would know something no one else would
    know about where this evidence of J Dogg and
13      these pictures came from? ... And he had his own
    personal stash of stuff."
14

15  (5) Appellants complain that during his closing argument,
16  the prosecutor discussed why he decided not to use Orent
  as a prosecution witness at trial. Appellants say that,
17  because no evidence was presented on this subject, the
  prosecutor offered his own unsworn testimony. They concede
18  that the trial court sustained their objection, but claim
  this was not an adequate remedy. In this regard, Nichols's
19  attorney argued to the jury that Orent furnished materials
  to the district attorney's office in connection with this
20  case, but the district attorney's office decided for some
  reason not to use him as an expert witness and instead
21  chose to use someone with considerably less experience.
  When Orent complained, the prosecutor sent him a letter
22  during trial and told him, inter alia, that Orent did not
23  have permission to discuss the matter with anyone outside
  the district attorney's office.FN64 In his closing
24  argument, the prosecutor stated: "We heard a lot about our
  internal district attorney decision making process, which
25  isn't in evidence, as far as whether we use Mr. Orent as a
  witness. And I'm not going to explain to you what
26  decisions I make in terms of what experts I bring to court
27  and what experts I don't, 'cause that's not something for
28  you to focus on or consider about, and it's not evidence

in this case. [¶] But use your common sense. If you have
police agencies that are involved in a case and you call
up a sister agency ... and they say, Hey, we got a gang
from your town that did a murder up here. Can you give us
a cop to be a gang expert? Do you have someone who's an
expert on this Pasadena gang? [¶] They go, Yeah, here's
this guy, he works for us, he's our expert. At one point
that was Dana Orent. The evidence shows he retired. He
went out and now he's working for the defense attorneys,
okay? In situations other than this one. So he's not free
anymore. Police agencies will lend experts to other police
agencies for free. We'll pay their hotel, we'll pay their
travel and so forth, but we don't have to pay them
thousands of bucks a day like Mr. Eisen here. [¶] So was
there a shift in experts for accounting reasons, or to
save money? That sounds like a logical reason as any."
There was no objection from the defense until the
prosecutor sought to counter the perceived argument that
the prosecution did not use Orent as a witness because
Orent said Dean was not a gang member, by arguing that
there was a duty to turn over exculpatory evidence, and
that the defense would have asked Orent about that. The
court told the prosecutor that it did not want to get into
arguing the law outside the case, whereupon the prosecutor
asked jurors what they thought the defense's first
question to Orent would have been if Orent had had the
opinion that Dean was not a gang member. Defense
objections were sustained.

> FN64. In light of the letter, jurors were
> instructed: "If you find that the prosecutor
> told a witness not to speak with defense
> counsel, or attempted to dissuade any witness
> from talking with defense counsel, you can
> consider that fact in determining if the case
> has been proven beyond a reasonable doubt."

(6) Appellants complain that Brocchini erroneously
testified that appellants repeatedly asked Collins where
Ruiz lived. Appellants give no record citation to support
this claim other than Trice's written new trial motion,
which does not refer to the same pagination as the record
on appeal. It is not this court's duty to comb the record
for support for the parties' claims. We note, however,
that on cross-examination, Dean's attorney asked Brocchini
on what he based his testimony that Dean showed up with
the others at Collins's house and asked where Ruiz lived.

122

Counsel commented, "I missed that in [Collins's]
testimony." Brocchini replied that he based it on
Collins's testimony. Brocchini clarified: "I said they all
four showed up and it was mainly Trice that was asking for
the hookup to [Ruiz]. 'I want to buy dope from [Ruiz],
where does [Ruiz] live.' [¶] But they were all there
together, and they were all trying to make contact with
[Ruiz]." Appellants are correct that Collins did not
testify exactly as recalled by Brocchini. Collins did
testify, however, that when appellants were at his house,
hanging out and drinking, he and Trice talked about
"basically, you know, how to get some dope, where to get
it, what kind, when can I hook them up, when can I go get
it." Collins testified that Trice asked him a few times to
hook him up with someone who had a quarter kilo of drugs.
Trice was "basically" asking Collins if Collins could hook
them up with Collins's connection. Trice wanted to know
"[w]hen and where, what time."

(7) Appellants complain that Brocchini testified that Lisa
Young testified concerning Trice's status as a gang
member.FN65 Appellants contend Young did not so testify.
They are correct; the question asked by the prosecutor and
answered by Young was whether Dean ever told her he was a
gang-banger.

> FN65. Again, appellants provide no citation to
> the record supporting this assertion other than
> Trice's written new trial motion.

(8) Appellants complain that Brocchini testified that Dean
admitted he was a gang member when he was booked into the
jail following his arrest in this case. Appellants say
there was no documentation of any such admission. In
reality, counsel for Dean asked Brocchini whether he
recalled testifying at the preliminary hearing that it was
his opinion Dean was a gang member based on an admission
made by Dean to jail staff. When Brocchini said he
recalled the testimony, counsel asked him the basis for
that opinion. Brocchini responded that he believed the
arresting officer told him that Dean made the statement.
When counsel asked the name of the officer, Brocchini
responded, "I don't know. And that's why I never used it
in my basis for opinion that he's a gang member in this
jury trial." (Italics added.) When defense counsel
asserted Brocchini did so at the preliminary hearing so
that Brocchini got Dean to trial on gang allegations,

Brocchin responded, "Well, I stand by it. I was told by jail staff, or by an officer that booked him, that he said he was a gang member. And I—and I believe that happened. [¶] But you're asking who it was, I'm going to tell you I can't remember. And the person never wrote a report." Counsel then showed Brocchini a jail classification form signed by Dean, that Brocchini said he had never seen before. According to the form, Dean was asked by "S. Garcia," a clerk at the jail, whether he was affiliated with any gang. The checked box was "no." According to Brocchini, if Dean admitted to Garcia that he was a gang member, it would be on the form. Garcia was not the person who told Brocchini that Dean admitted being a gang member. Brocchini insisted that he was told by someone and believed it, but he could not find any documentation for it and so did not rely on it at trial.

(9) Appellants complain that Brocchini testified that a certain telephone number (626-212-9466) was associated with Trice. Appellants say there was no documentation to support the claim. Brocchini testified, however, that he reviewed certain cell phone records. Voluminous telephone records were disclosed to the defense. On cross-examination, it was brought out that on one of his reports, Brocchini listed a pager number as 626-212-9566. Brocchini testified that the correct number was 626-212-9466. He based this on Collins calling it from his house. Brocchini explained that when he interviewed Tricia Lee on March 8, 2002, she gave the number as 626-212-9566. Collins, however, called 9466. Brocchini was then shown Collins's telephone bill and admitted he had made a mistake, as the number was not there. Nevertheless, he said he believed the correct number for Trice's pager to be 626-212-9466. He subsequently explained that he got that number from Dean's telephone bill. Tricia Lee gave him the pager number as 9566; he did not know whether she did so intentionally or accidentally, as she gave it to him from her memory. Then, on Dean's telephone bill, Brocchini found 12 calls to 9466, the same number except for one digit.

(10) Appellants complain that Brocchini testified that a certain photograph of Trice was taken following a 1995 Merced arrest. Appellants say that in reality, Trice's last arrest in Merced was in 1992. Again, we have not been cited to any testimony in this regard, nor are we told why, considering what the jury learned about Trice's

124

criminal record, any such error was of any import.

(11) Appellants complain that Okamoto testified that Dean
was arrested with Trice during a probation search.
Appellants say Trice was not arrested at that time.
Appellants have misread the record. In reality, Okamoto
testified that Dean was seen entering a vehicle that then
left a location law enforcement had under surveillance.
The vehicle was stopped and Dean, who was a passenger, was
arrested. Trice was also a passenger in the vehicle. The
subjects in the vehicle were detained while a search
warrant was executed at Dean's residence. There was no
testimony that Trice was arrested.

(12) Appellants complain that Okamoto testified that a
getaway vehicle was parked several blocks from the Ruiz
residence. Appellants argue there was no evidence to
support this assertion. They overlook the fact that
Brocchini testified, earlier in the trial, that the trail
of evidence was consistent with a getaway car being parked
about a block from the Ruiz home. Moreover, the trial
court admonished the jury that Okamoto's testimony
concerned the predicate acts and not the charged offenses,
and that Okamoto was not there to make the jury's decision
as to whether or not certain things happened. The court
also told jurors that if there was a question about
whether the opinion was based on matters that actually did
come into evidence, they could check the court reporter's
record during deliberations.

(13) Appellants complain that Okamoto incorrectly
testified that Trice had been convicted in 1995 for sale
of cocaine base. Appellants note that the conviction was
removed from the predicate acts chart, but complain that
jurors were never admonished. Appellants do not cite us to
where Okamoto actually testified about the conviction,
although it is apparent from a discussion among counsel
that took place outside the jury's presence, that the
predicate acts chart had on it a drug conviction out of
Los Angeles County to which Trice objected. As best we can
determine, the prosecutor asked whether Okamoto was aware
of a prior conviction of Trice that happened in Merced
County in 1995, but the trial court ruled that the
document being relied on was not necessarily one that an
expert would rely on in forming an opinion. On cross-
examination, Trice himself admitted to having suffered a
conviction in 1995 for possession for sale of cocaine

base. In any event, although Trice's attorney said he thought somebody testified in front of the jury concerning the erroneous conviction, he also said he would take care of it in his own way.

(14) Appellants complain that the prosecution failed to disclose, until after trial, Brocchini's 1998 report, listing Collins as a member of the Blood faction of the Oak Street Posse criminal street gang.

   b. *Analysis*

With respect to alleged prosecutorial misconduct in general, " '[a] prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.]" (*People v. Hoyos, supra*, 41 Cal.4th at p. 923.) A showing of bad faith is not required. (*Id*. at p. 924, fn. 36.) "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*People v. Ochoa, supra*, 19 Cal.4th at p. 427.)

With regard specifically to the presentation of, or failure to correct, false or misleading testimony, " '[u]nder well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted.' [Citations.] Put another way, the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading. [Citations.] This obligation applies to testimony whose false or misleading character would be

126

evident in light of information known to the police involved in the criminal prosecution [citation], and applies even if the false or misleading testimony goes only to witness credibility [citations]. Due process also bars a prosecutor's knowing presentation of false or misleading argument. [Citations.] As [the California Supreme Court has] summarized, 'a prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process.' [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 716–717; accord, *Napue v. Illinois* (1959) 360 U.S. 264, 269 .) "When the prosecution fails to correct testimony of a prosecution witness which it knows or should know is false and misleading, reversal is required if there is any reasonable likelihood the false testimony could have affected the judgment of the jury. This standard is functionally equivalent to the 'harmless beyond a reasonable doubt' standard of *Chapman [, supra,]* 386 U.S. 18. [Citation.]" (*People v. Dickey, supra*, 35 Cal.4th at p. 909, italics omitted.)

We have already discussed the testimony concerning Collins's gang status, *ante*, and decline to revisit it here. Assuming false testimony was presented, we see no reasonable likelihood it could have affected the judgment of the jury, for the reasons stated in connection with appellants' claim of *Brady* error. This is so even assuming the claim here is one of intentional misconduct. (See *People v. Hoyos, supra*, 41 Cal.4th at p. 924, fn. 36.)

We have examined the record and conclude appellants have greatly overstated the effect of the remaining alleged errors. With the exception of Brocchini's testimony that Hull was a Blood and the prosecutor's argument concerning Orent, which we discuss *post*, either there was no actual error or the errors were of little import, whether considered individually or cumulatively. Prosecutorial misconduct in an opening statement is rarely grounds for reversal (see *People v. Wrest* (1992) 3 Cal.4th 1088, 1108; *People v. Harris* (1989) 47 Cal.3d 1047, 1080, disapproved on other grounds in *People v. Wheeler* (1992) 4 Cal.4th 284, 299, fn. 10); here, the prosecutor's misstatement with respect to the telephone calls was cured by the actual testimony on the point. Moreover, the trial court's instructions (which were given both before opening statements and again before closing arguments and which referred expressly and specifically to those statements

127

and arguments), that jurors could use only the evidence presented in the courtroom in deciding the facts and that nothing the attorneys said was evidence, were sufficient to dispel any prejudice. (See *People v. Hinton, supra*, 37 Cal.4th at p. 863.) The alleged errors that occurred during testimony were, almost without exception, corrected in front of the jury, or, when the claim was lack of foundation or documentary support for the testimony, that lack was brought to jurors' attention. While the prosecutor's duty to correct false or misleading testimony may not be discharged merely because defense counsel knows of, and the jury may discern, the error (*U.S. v. LaPage* (9th Cir.2000) 231 F.3d 488, 491–492; but see *People v. Ervin* (2000) 22 Cal.4th 48, 91–92), it would be illogical to conclude an error prejudiced a defendant merely because defense counsel, and not the prosecutor, was responsible for the error being corrected. What matters, in terms of potential harm, is whether the error was in fact corrected for the jury. The errors were corrected in the present case; moreover, a number of appellants' claims concern evidence presented in support of the gang allegations. The gang enhancements were stricken by the trial court in its ruling on appellants' new trial motions, and appellants fail to persuade us that this remedy was inadequate.

As for the erroneous testimony that Hull was a Blood, which was not corrected in front of the jury, appellants assert that Brocchini suggested appellants could have obtained Ruiz's home address from White or Hull, and not from Collins. The actual testimony was not nearly as clear on this point as appellants would have us believe. The prosecutor elicited from Brocchini that it was obvious to police Ruiz was a fairly prolific drug dealer and gang member. When the prosecutor asked whether that was common knowledge among people who were gang members, drug dealers, or customers, the trial court sustained a defense objection and directed the prosecutor to lay additional foundation. The prosecutor then asked whether, based on Brocchini's experience in narcotics cases and what he knew about Ruiz, Brocchini had an opinion as to whether Blood gang members or Nortenos out on the street would likely know that Ruiz would be a good source of rock cocaine. The trial court sustained a defense objection. The prosecutor then asked whether Brocchini was familiar with Ruiz's character as a drug dealer from 1995 to 2002. Brocchini said he was, and testified that Ruiz was not an "undercover drug dealer," but instead flaunted the fact,

128

driving a red Northstar Cadillac all over town and
dressing in nice clothes. The prosecutor then asked
whether Blood gang members would know that. The defense's
objection, that the question called for speculation, was
sustained. The prosecutor elicited that a lot of people in
town who were involved in drugs or gangs were aware that
Ruiz was a drug dealer. When he asked about Blood gang
members coming from out of town and asking around for a
good source, however, the trial court again sustained an
objection that the question called for speculation. The
prosecutor was permitted to elicit that Pasadena Bloods
would associate with Modesto Bloods, as gang members from
different towns often get to know each other in custodial
settings, but another objection based on the question
calling for speculation was sustained when the prosecutor
sought to ask whether, if out-of-town gang members were in
town looking for a narcotics source, Ruiz's name would
come up. The prosecutor then left the subject.

It is apparent that the prosecutor was attempting to
suggest appellants could have obtained Ruiz's home address
from a source other than Collins, but it is equally
apparent he was unsuccessful. The implication was
contained in his questions, not Brocchini's answers, and
jurors were instructed that questions were not evidence
and not to assume something was true just because an
attorney asked a question suggesting it was true. "Jurors
are presumed to understand and follow the court's
instructions. [Citation.]" (*People v. Holt* (1997) 15
Cal.4th 619, 662.) In light of the actual testimony and
the evidence a number of people in town who were involved
in drugs or gangs were aware Ruiz was a drug dealer, there
is no reasonable likelihood any false impression created
by Brocchini's testimony that Hull was a Blood could have
affected the judgment of the jury, especially in light of
Brocchini's admission that he could not back up the
linkage between names and the numbers found in Ruiz's cell
phone. (See *People v. Dickey, supra*, 35 Cal.4th at p.
910.) Appellants' claim the prosecutor knew or should have
known Hull was a Crip does not help them; the record shows
the prosecutor stated, without contradiction, that the
case in which he prosecuted Hull for murder was not a
gang-related case, and so he did not know whether Hull was
a Crip or a Blood. We will not assume the prosecutor was
lying.

We turn now to the prosecutor's argument concerning Dana

129

Orent. "Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing the evidence is misconduct. [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 823.) A prosecutor " 'may "vigorously argue his case"'" (*People v. Welch, supra*, 20 Cal.4th at p. 752), but "[a] prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' [Citation.]" (*People v. Hill, supra*, at p. 823.)

We think there can be little doubt the prosecutor crossed the line from proper to improper argument when he asserted that Orent took evidence home and stashed it in his garage. Even assuming some aspects of traditional police procedure might fall within the realm of common experience, the prosecutor here completely misrepresented Orent's testimony by asserting that Orent took, kept, and withheld evidence. In reality, as defense counsel pointed out, Orent clearly testified that he made and kept copies in his files, and nothing in the record suggested otherwise. The prosecutor erred by making the argument, and the trial court erred by overruling the defense objections to it. We fail to see how appellants were prejudiced, however, since the prosecutor's misstatements concerned a witness and testimony that were relevant only to the stricken gang allegations.

With respect to the prosecutor's statements concerning why he did not use Orent as a witness, the record shows appellants did not initially object to the argument, nor, when they did object, was it on the ground the prosecutor was offering unsworn testimony. Accordingly, the issue has not been preserved for appeal. (See *People v. Ochoa, supra*, 19 Cal.4th at p. 427.) In any event, the prosecutor himself pointed out that why he used certain witnesses was not in evidence and was not something for jurors to consider, and, again, the argument concerning Orent only affected the gang allegations. There was no prejudice.

(LD 3, 93-107.)

        B.  <u>Analysis</u>

The pertinent legal standards concerning prosecutorial misconduct have been previously set forth in connection with the

claim concerning introduction of photographic evidence.

This Court must decide whether Petitioner suffered prejudice by determining whether the state court made an objectively reasonable decision when it concluded that there was no reasonable probability that the jury would have reached a different result without the offending comments. The Court must place the improper remarks in the context of the entire trial and should consider the weight of the evidence submitted against the Petitioners, the prominence of the erroneous comments in the entire trial, whether the prosecution misstated the evidence, any instructions to the jury to disregard the comments, whether the comment was invited by defense counsel in summation, and whether defense counsel had an adequate opportunity to rebut the comments. Trillo v. Biter, 754 F.3d 1085, 1091 (9th Cir. 2014).

This Court is further guided by the established principle that due process is violated by a prosecutor's knowing use of false testimony, or failure to correct testimony known to be false, in order to secure a conviction. Napue v. Illinois, 360 U.S. 264, 269 (1959); Pyle v. Kansas, 317 U.S. 213, 215-216 (1942).

Here, the state court articulated legal standards that were consistent with clearly established federal law. The prosecutor's representation in opening statement concerning telephone calls connecting Nichols and Dean at the time of the homicide was corrected by Brocchini's own testimony, and defense counsel had an

131

adequate opportunity to respond to the matter.  With respect to the attorneys' representations about evidence in argument, the jurors were instructed that they could use only the evidence presented to them in the courtroom, and that nothing the attorneys said was evidence.  (LD 3, 104.)  Isolated passages of a prosecutor's argument may not have a significant impact on the jury's deliberations where the jury is informed that they are matters of opinion and not evidence.  <u>Donnelly v. DeChristoforo</u>, 416 U.S. at 646.  Instructing the jury that lawyers' comments and argument are not evidence can cure the harmful effect of isolated instances of improper argument.  <u>Sassounian v. Roe</u>, 230 F.3d 1097, 1107 (9th Cir. 2000).  Arguments of counsel carry less weight with a jury than do instructions from the court.  <u>Boyde v. California</u>, 494 U.S. 370, 384-85 (1990).

Further, the calls were not of major importance given the other strong evidence of the participation of Petitioner Nichols and Dean in the offenses.  It was not reasonably probable that the jury would have reached a different result in the absence of the comment made in opening statement.  The state court reasonably applied clearly established federal law, and its decision was not based on an unreasonable determination of fact.

Brocchini's linkage of Ruiz's telephone to those of Thomas White and Dupree Hull was shown by cross-examination at trial to lack any current documentation or back-up.  It is thus not

132

reasonably probable that Brocchini's testimony had any significant effect on the result reached by the jury.

The state court decision that there was no prejudice from any testimony by Brocchini regarding Petitioners' having repeatedly asked Collins where Ruiz lived, was not based on an unreasonable application of clearly established federal law or unreasonable determination of fact. Any mischaracterization of Collins's testimony was neutralized by Dean's counsel's cross-examination of Brocchini in which he testified that it was Collins's testimony that was the basis for Brocchini's testimony regarding Dean's having arrived with the others at Collins's house and having made the inquiries. The jury had before it Collins's testimony regarding Trice's having repeatedly asked Collins for a drug connection and for details concerning the anticipated transaction, including when and where. The cross-examination provided the jury an opportunity to evaluate not only Brocchini's credibility, but also the nature and extent of Collins's testimony about the conduct of the defendants before the homicide. In light of the totality of the evidence, it is not reasonably probable that the jury's decision would have been different absent Brocchini's characterization of Collins's testimony, a matter already in evidence before the jury.

Likewise, the state court reasonably concluded that Petitioner had not shown any prejudice from Brocchini's testimony that Lisa Young had identified Petitioner as a gang member during her own

testimony. Petitioner does not dispute that, as the CCA stated, the record of Young's testimony shows she was asked whether <u>Dean</u> had ever told her that he was, and she answered only that he had. In view of the strength of Dean's admission as related by Young, it is unlikely the jury would have confused Young's own testimony with its characterization by Brocchini, who had repeatedly been shown to have lacked conscientiousness in the collection and recollection of the facts and the evidence. Further, the record was replete with independent indicia of Petitioner's allegiance to the gang.

Similarly, with respect to Brocchini's testimony that Dean had admitted gang membership when booked into the jail after the arrest in this case, the state court's conclusion regarding the absence of prejudice was objectively reasonable. During cross-examination, defense counsel explored the existence of an inconsistent jail record, the absence of any documentation of Brocchini's assertion, and Brocchini's inability to recall the identity of the officer who Brocchini maintained had told Brocchini of Dean's alleged admission. Similarly, Brocchini's testimony that a telephone number was associated with Petitioner included Brocchini's responses on cross-examination indicating Brocchini had made a mistake.

The state court also properly concluded that even if Brocchini incorrectly testified that a photograph of Petitioner was taken following a 1995 arrest instead of a 1992 arrest, such an error would not have been "of any import" because of what the jury had

already learned regarding Petitioner's criminal record. (LD 3, 101.) Similarly, it was objectively reasonable for the state court to find that any asserted error in Okamoto's testimony regarding Petitioner's having been convicted in 1995 for sale of cocaine base was harmless because on cross-examination, Petitioner himself had admitted to having suffered a conviction in 1995 for possession of cocaine base for sale.

Likewise, Petitioner does not dispute that the record reflects that Okamoto testified Dean was arrested when Dean and Petitioner were detained while a search warrant was executed at Dean's residence, and not that Petitioner was arrested; the record thus refutes Petitioner's assertion that there was erroneous testimony that required correction. As to Okamoto's statement that a getaway vehicle was parked several blocks from the victim's residence, the record reflects that the jury was admonished that that Okamoto's testimony concerned the predicate acts pertained to the gang allegations, and not to whether or not certain things happened. Further, if there was any question regarding whether opinion evidence was based on matters that were in evidence, the jury during deliberations could ask the court reporter to check the record.

With respect to the failure to disclose Brocchini's 1998 report and field identification cards identifying Hull as a member of a Crip faction of the Oak Street Posse, the state court had fully examined the problem in light of the totality of the evidence and

concluded in an objectively reasonable manner that even if false testimony was presented, there was no reasonable likelihood that it could have affected the judgment.

As to Petitioner's argument that the record contained uncorrected testimony that Hull was a Blood gang member, the record contained testimony from Brocchini that a lot of people in town who were involved in drugs or gangs were aware that Ruiz was a drug dealer and that Blood gang members from Modesto would associate with Pasadena Bloods in custodial settings. The jury was instructed that the attorneys' questions were not evidence and that they were not to assume something was true just because an attorney asked a question suggesting that it was true. In view of the actual state of the evidence as set forth by the CCA and adopted by Petitioner, a fairminded jurist could conclude that the state court reasonably applied clearly established federal law when it determined that there was no reasonable likelihood that any false impression created by Brocchini's testimony that Hull was a Blood could have affected the jury's judgment.

As to the assertion that the prosecutor knew or should have known that Hull was a Crip and not a Blood because of his previous prosecution of Hull, Petitioner does not dispute that the record shows that the prosecutor stated without contradiction that he did not know Hull's gang membership because the earlier murder prosecution of Hull had not been a gang-related case. Thus, the

record essentially forecloses Petitioner's contention, and the state court's conclusion was not contrary to, or an unreasonable application of, clearly established law, or based on an unreasonable determination of fact.

With respect to the prosecutor's argument regarding defense gang expert Dana Orent, the prosecutor's improper argument that Orent took evidence home and stashed it in his garage did not compel a conclusion that habeas relief was warranted. The state court reasonably concluded that because the misstatements concerned a witness and testimony that were relevant only to the stricken gang allegations, the Petitioner had not shown any prejudice.

Regarding the assertion that the prosecutor improperly argued and effectively testified why he did not use Orent as a witness, it is established that attorneys are generally prohibited from taking the witness stand to testify in a case they are litigating because it raises a risk that jurors will be unduly influenced by the prestige and prominence of the prosecutor's office and will base their credibility determinations on improper factors. <u>United States v. Edwards</u>, 154 F.3d 915, 921 (9th Cir. 1998). Related concerns for maintaining the appearance of justice and public confidence in the administration of justice are especially significant where the testifying attorney represents the prosecuting arm and is an advocate of the government. <u>Id.</u> The rule against an attorney's testifying functions to maintain a boundary between the advocate and

137

the witness by preventing an attorney from appearing as both a witness and an advocate in the same litigation.  United States v. Prantil, 764 F.2d 548, 552-53 (9th Cir. 1985).  When, in context, a prosecutor is portrayed as being personally involved with an investigation or transaction that is in evidence, it can be a violation of the rules against vouching or advocates acting as witnesses.  See, United States v. Hermanek, 289 F.3d 1076, 1089-99 (2002).

Here, the state court reasonably concluded that assuming that the prosecutor's offering unsworn testimony had been preserved as an issue, Petitioner had shown no prejudice because the prosecutor himself noted that his reasoning for not using certain witnesses was not in evidence and was thus not to be considered by the jury, and because argument concerning Orent affected the gang allegations, which had been stricken.

Viewing the totality of Petitioner's allegations of prosecutorial misconduct, the state court reasonably determined that there was no fundamental unfairness considering the nature of the misconduct, the nature and position of the pertinent evidence and issues, the fact that the gang enhancement allegations had been stricken, and the admonitions given to the jury.  The issue before the Court in this § 2254 proceeding in which the state court found prosecutorial misconduct is not whether the prosecutor was a model of propriety, but rather whether the state court reasonably applied

138

clearly established federal law and reasonably determined the facts in light of the evidence before it when it concluded that the prosecutor's misconduct did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. Parker v. Matthews, 132 S.Ct. at 2153; Darden v. Wainwright, 477 U.S. at 181; Comer v. Schriro, 480 F.3d at 988. Here, it cannot be said that the state court's decision was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Petitioner Nichols includes in the petition a supplemental report indicating that on October 7, 2005, criminalist Donna Mambretti reported that a latent palm print on the rental car did not match Petitioner's print. (Pet., doc. 1, 24.) The test result, as set forth without context in Petitioner's petition, does not foreclose the possibility that another latent print was being tested or that the result was erroneous for a variety of reasons. The trial record contains the testimony of Donna Mambretti, a latent print analyst with the California Department of Justice, that of fourteen different impressions lifted from the rental car, one on the driver's side hood of the car was Petitioner Nichols's left palm print. (9 RT 2135, 2196-97, 2204-05 [trial testimony given January 18, 2007].)

Petitioner has not shown that any false testimony was presented or was the basis of argument.  Accordingly, it will be recommended that Petitioners' claims of prosecutorial misconduct be denied.

XIII.  <u>Sentencing Error</u>

Petitioner argues that because there were insufficient jury findings or evidence of Petitioner's discharging a firearm and causing Jose Ruiz's death within the meaning of Cal. Pen. Code § 12022.53(d), Petitioner suffered a violation of his rights to due process of law under the Fifth, Sixth, and Fourteenth Amendments when the trial court imposed a life term enhancement.  (Doc. 1, 7.)

A. <u>The State Court's Decision</u>

The decision of the CCA on Petitioner's claim is as follows:

A. **<u>Firearm Discharge Enhancements</u>**

Appellants contend the firearm discharge enhancements must be stricken for failure of proof. We agree with respect to Nichols, but disagree with respect to Dean and Trice.

1. <u>Background</u>

As previously described, firearm discharge enhancement allegations, pursuant to section 12022.53, subdivisions (b), (c), (d) and (e)(1), FN67 were charged and found true with respect to counts I, III, and IV. At sentencing, the prosecutor observed that subdivision (e)(1) was rendered inapplicable by the trial court's having struck the gang enhancements, but that subdivision (d) still resulted in an enhancement of 25 years to life. As a result, the trial court struck the enhancements alleged pursuant to subdivision (e)(1), but imposed sentence pursuant to subdivision (d).

> FN67. When we hereafter refer to subdivisions (a), (b), (c), (d) and (e)(1), we are referring to those subdivisions of section 12022.53.

140

No one objected to imposition of sentence under subdivision (d). Appellants now contend, however, that with the gang findings stricken, imposition of enhancements pursuant to subdivision (d) was unauthorized, as the evidence is insufficient to establish personal firearm discharge causing death or great bodily injury by each, or any, appellant.FN68

> FN68. Failure to object to an unauthorized sentence does not result in forfeiture of the issue for purposes of appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

2. <u>Analysis</u>

" 'The legislative intent behind section 12022.53 is clear: "The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime."' [Citations.]" (*People v. Palacios* (2007) 41 Cal.4th 720, 725.) To this end, and in recognition of different degrees of culpability, section 12022.53 imposes three gradations of punishment based on the seriousness of the type and consequences of the firearm use. (*People v. Grandy* (2006) 144 Cal.App.4th 33, 42.) The portions of section 12022.53 pertinent to the issue raised by appellants provide:

> "(d) Notwithstanding any other provision of law, any person who, in the commission of [murder (subd. (a)(1)) or robbery (subd. (a)(4)) ] ..., personally and intentionally discharges a firearm and proximately causes great bodily injury..., or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life.

> "(e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:

> "(A) The person violated subdivision (b) of Section 186.22.

141

"(B) Any principal in the offense committed any
act specified in subdivision ... (d)."

Under the statute, a nonshooter cannot be subjected to
enhanced punishment under subdivision (d) absent a gang
finding under section 186.22, subdivision (b). This does
not mean, however, that a shooter must personally inflict
great bodily injury or death in order to be liable in the
absence of a gang finding. While a subdivision (d)
enhancement may most commonly be imposed where a bullet
fired by the defendant strikes the victim (see *People v.
Zarazua* (2008) 162 Cal.App.4th 1348, 1361), the plain
language of subdivision (d) does not compel such a result,
but instead requires that the shot fired by the defendant
be a proximate cause of great bodily injury or death. In
other words, the shooter need not personally cause great
bodily injury or death, but instead need only proximately
cause such a result.

It has been held that "a defendant can proximately cause
injury by discharging a firearm within the meaning of
section 12022.53, subdivision (d) even if his or her
bullet does not actually strike the victim." (*People v.
Palmer* (2005) 133 Cal.App.4th 1141, 1150.) We agree.

*People v. Bland* (2002) 28 Cal.4th 313 (*Bland*) is
instructive. In that case, the defendant and a companion
shot at a car containing three individuals, killing one
and injuring the other two. Despite the fact the evidence
was not clear who fired the shots that struck the two
survivors, the defendant was convicted of murder and two
counts of attempted murder, and jurors found true a
subdivision (d) allegation with respect to all counts.
(*Bland, supra*, at p. 318.)

The California Supreme Court held that the trial court had
a sua sponte duty to define proximate causation, as the
term has a technical meaning peculiar to the law. (*Bland,
supra*, 28 Cal.4th at p. 334.) It approved jury
instructions stating that (1) "'[a] proximate cause of
great bodily injury or death is an act or omission that
sets in motion a chain of events that produces as a
direct, natural and probable consequence of the act or
omission the great bodily injury or death and without
which the great bodily injury or death would not have
occurred'" (CALJIC No. 17.19.5), and (2) when the conduct

142

of two or more persons contributes concurrently as a cause of the great bodily injury or death, the conduct of each is a cause of the great bodily injury or death if that conduct was a substantial factor contributing to the result, and a cause is concurrent if it was operative at the moment of the great bodily injury or death and acted with another cause to produce that result (CALJIC No. 3.41). (*Bland, supra*, at pp. 335, 336.)

In concluding that CALJIC No. 17.19.5 correctly defines proximate causation, the court rejected the determination by the Court of Appeal majority that the instruction was not a proper definition because it "'would permit a true finding on the enhancement based [on] the cohort's inflicting the death and injuries and defendant's aiding and abetting him simply by also firing a gun. The enhancement cannot be found true unless defendant personally fired the bullets which struck the victim.'" (*Bland, supra*, 28 Cal.4th at p. 335.) The Supreme Court stated: "Section 12022.53(d) requires that the defendant 'intentionally and personally discharged a firearm' ..., but only that he 'proximately caused' the great bodily injury or death. The jury, properly instructed, reasonably found that defendant did personally discharge a firearm. The statute states nothing else that defendant must personally do. Proximately causing and personally inflicting harm are two different things." (*Bland, supra*, at p. 336.) The court concluded: "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet.... [¶] ... [S]ection 12022.53(d) does not require that the defendant fire a bullet that directly inflicts the harm. The enhancement applies so long as defendant's personal discharge of a firearm was a proximate, i.e., a substantial, factor contributing to the result." (*Bland, supra*, at pp. 337, 338; see, e.g., *People v. Carrillo* (2008) 163 Cal.App.4th 1028, 1036-1038 [although trial court erred by instructing that subd. (d) allegation was true if conduct of defendant or coperpetrator harmed victim but then failing to instruct that concurrent causes could operate together to determine proximate cause, allegation could be found true under circumstances where defendant was one of several persons who shot at victim, victim was struck by rounds fired from more than one gun, and there was no evidence defendant fired one of those guns]; *People v. Zarazua, supra*, 162 Cal.App.4th at pp. 1351, 1361-1362 [subd. (d) allegation properly found true

143

where victim was killed in traffic collision that occurred when car in which he was riding was hit by car carrying two members of one gang, who were fleeing because of gunfire from car carrying members of rival gang, including defendants]; *People v. Palmer, supra*, 133 Cal.App.4th at p. 1145, 1149–1150 [subd. (d) allegation properly found true where police officer sustained broken ankle while diving for cover from shots fired by defendant, who, with his companion, was attempting to flee the scene after committed an armed robbery].)

In light of the foregoing, we have no trouble concluding that, when multiple gunmen shoot at a victim who is effectively trapped inside a small enclosed area such as a closet, and the victim is significantly injured or killed, all of the gunmen have proximately caused great bodily injury or death within the meaning of subdivision (d), regardless of whether it can be determined that any particular shooter or shooters personally fired the injurious or fatal shot or shots, and regardless of whether bullets fired by any particular shooter actually struck the victim. The question in the present case, then, is whether the evidence is sufficient to establish that any particular appellant or appellants personally and intentionally discharged a firearm at Ruiz.

Whether a defendant personally and intentionally discharged a firearm in the commission of an enumerated offense is a question for the trier of fact to decide. (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1007.) The standard of appellate review applicable to such a question is settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson, supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are

144

functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies to enhancements as well as convictions (*People v. Wilson* (2008) 44 Cal.4th 758, 806).

Viewed in accordance with the foregoing principles, the evidence showed that appellants were three of the four intruders Tatum saw in her home on the evening of March 3, 2002. All were armed. Although Tatum could not positively identify any of the guns, given where guns were found after the shooting and Tatum's testimony that they looked similar to the weapons she saw that night, a reasonable inference can be drawn that Trice had the .22-caliber rimfire revolver, Dean had the Lorcin .380 semiautomatic, and Nichols had a big black gun that was never found because he took it with him after the shooting.

Tatum's testimony established that appellants all had their guns in their hands prior to the shooting. There was no evidence their guns ever left their hands until after Ruiz was shot. Trice and Nichols forced Ruiz to the walk-in closet in the bedroom. Tatum saw Trice at the entrance of the closet door. She lost sight of Ruiz at the closet door. Trice and Nichols took Ruiz into the closet. Through the half-open door, Tatum could see the back of Nichols's shirt inside. Although she could not see whether there was anyone in the closet besides Ruiz and Nichols, since Tatum did not see Trice anywhere, it can reasonably be inferred he was inside the closet when the shooting started.

When the gunfire erupted, Tatum saw Dean go to the closet door and start shooting into the closet at a downward angle, using a gun that appeared similar to the Lorcin .380 that was subsequently found. She witnessed, she estimated, at least four shots going into the closet door. When Dean paused after firing a few shots, Tatum could hear other shots going off behind the door. It can reasonably be inferred that Trice was inside the closet, shooting, as four .22-caliber bullets from rimfire cartridges were recovered from Ruiz's body, and Ruiz's blood was on the cylinder of the .22-caliber revolver. Ruiz was shot many more times than the number of bullets recovered, however.

145

1

2

3

4

5

6

7

8

9

> In light of the foregoing, there is ample evidence to support the subdivision (d) enhancements as to Dean and Trice, even without the gang findings. Although appellants attack Tatum's and Collins's testimony, their credibility was for the jury to determine. There being substantial evidence to support a conclusion Dean and Trice, in the commission of robbery and murder, personally and intentionally discharged a firearm, proximately causing great bodily injury or death to a person who was not an accomplice, it necessarily follows the trial court did not err in sentencing accordingly, notwithstanding the fact the subdivision (e)(1) allegations and gang enhancements were stricken. As to Dean and Trice, then, the subdivision (d) enhancements stand.

10

(LD 3, 112-18.)  The CCA concluded that substantial evidence

11

did not support the enhancement as to Petitioner Nichols

12

because nothing in the record demonstrated that he had actually

13

fired his gun.  (Id. at 118-19.)

14

15

> B.  <u>Analysis</u>

16

To determine whether a conviction violates the constitutional

17

guarantee of due process of law because of insufficient evidence, a

18

federal court ruling on a petition for writ of habeas corpus must

19

determine whether any rational trier of fact could have found the

20

essential elements of the crime beyond a reasonable doubt.  <u>Jackson</u>

21

<u>v. Virginia</u>, 443 U.S. 307, 319, 20-21 (1979); <u>Windham v. Merkle</u>, 163

22

F.3d 1092, 1101 (9th Cir. 1998); <u>Jones v. Wood</u>, 114 F.3d 1002, 1008

23

24

(9th Cir. 1997).

25

All evidence must be considered in the light most favorable to

26

the prosecution.  <u>Jackson</u>, 443 U.S. at 319; <u>Jones</u>, 114 F.3d at 1008.

27

It is the trier of fact's responsibility to resolve conflicting

28

testimony, weigh evidence, and draw reasonable inferences from the facts; thus, it must be assumed that the trier resolved all conflicts in a manner that supports the verdict.  Jackson v. Virginia, 443 U.S. at 319; Jones, 114 F.3d at 1008.  The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but rather whether the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991). Circumstantial evidence and the inferences reasonably drawn therefrom can be sufficient to prove any fact and to sustain a conviction, although mere suspicion or speculation does not rise to the level of sufficient evidence.  United States v. Lennick, 18 F.3d 814, 820 (9th Cir. 1994); United States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990); see Jones v. Wood, 207 F.3d at 563.  The court must base its determination of the sufficiency of the evidence from a review of the record.  Jackson at 324.

    The Jackson standard must be applied with reference to the substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Windham, 163 F.3d at 1101. However, the minimum amount of evidence that the Due Process Clause requires to prove an offense is purely a matter of federal law. Coleman v. Johnson, - U.S. -, 132 S.Ct. 2060, 2064 (2012) (per curiam).  For example, under Jackson, juries have broad discretion to decide what inferences to draw and are required only to draw reasonable inferences from basic facts to ultimate facts.  Id.

147

Further, under the AEDPA, federal courts must apply the standards of <u>Jackson</u> with an additional layer of deference. <u>Coleman v. Johnson</u>, - U.S. -, 132 S.Ct. 2060, 2062 (2012); <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005). This Court thus asks whether the state court decision being reviewed reflected an objectively unreasonable application of the Jackson standard to the facts of the case. <u>Coleman v. Johnson</u>, 132 S.Ct. at 2062; <u>Juan H. v. Allen</u>, 408 F.3d at 1275. The determination of the state court of last review on a question of the sufficiency of the evidence is entitled to considerable deference under 28 U.S.C. § 2254(d). <u>Coleman v. Johnson</u>, 132 S.Ct. at 2065.

This Court is bound by the state court's interpretation of § 12022.53(d). Alleged errors in the application of state law are not cognizable in federal habeas corpus. <u>Souch v. Schaivo</u>, 289 F.3d 616, 623 (9th Cir. 2002). The Court accepts a state court's interpretation of state law. <u>Langford v. Day</u>, 110 F.3d 1180, 1389 (9th Cir. 1996). In a habeas corpus proceeding, this Court is bound by the California Supreme Court's interpretation of California law unless the interpretation is deemed untenable or a veiled attempt to avoid review of federal questions. <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 964 (9th Cir. 2001). Here, there is no indication that the state court's interpretation of state law was associated with an attempt to avoid review of federal questions. Thus, this Court is bound by the state court's interpretation and application of § 12022.53(d).

///

148

The state court articulated legal standards consistent with the Jackson standard. Further, the state court's decision was not contrary to, or an unreasonable application of, that standard. The state court reasoned that it was sufficient under state law that Petitioner's discharge of his weapon was a proximate, i.e., a substantial, factor contributing to the great bodily injury or death. The evidence supported a finding that Petitioner had shot his weapon. Further, the evidence also warranted an inference that Petitioner was one of multiple persons who at essentially the same time and place shot at the victim, and the evidence showed that the victim was struck by ammunition fired from more than one gun and that more than one wound was potentially fatal. The state court's decision that there was sufficient evidence that Petitioner's discharge of his weapon was a proximate cause of injury or death to the victim was an objectively reasonable application of the Jackson standard. Further, in light of the evidence before the state court, the state court's decision did not involve an unreasonable determination of fact.

Accordingly, it will be recommended that Petitioner's sufficiency of the evidence claim concerning the sentencing enhancement be denied.

XIV.  Cumulative Error

Petitioner argues that his rights to present a defense and to due process and a fundamentally fair trial protected by the Fifth,

149

Sixth, and Fourteenth Amendments were violated by the cumulative errors made at trial (excluding errors relating to the confidential informant and sentencing error). (Doc. 1 at 7, 14-15.)

Petitioner Nichols also argues that the failure to disclose documentation of Collins's gang status, in light of all the trial errors, resulted in a denial of the right to due process, to present a defense, and to a fundamentally fair trial. (Doc. 1, 39.)

### A. The State Court's Decision

The pertinent portion of the CCA's decision is as follows:

**CUMULATIVE PREJUDICE**

With respect to every issue not concerning disclosure of
the confidential informant or alleged sentencing error,
appellants contend that, even if not prejudicial by
itself, the error was prejudicial in the context of all
the trial errors. They say the trial errors cumulatively
denied them their rights to due process, to present an
effective defense, and to a fundamentally fair trial.FN71

> FN71. The briefing on this issue violates
> California Rules of Court, rule 8.204(a)(1)(B),
> which requires that each brief state each point
> under a separate heading or subheading, by
> simply adding a paragraph asserting cumulative
> prejudice where applicable. In two instances,
> Nichols's opening brief asserts the errors
> cumulatively denied appellant Lopez (sic) his
> constitutional rights. We will address the issue
> on the merits to forestall a claim of
> ineffective assistance of appellate counsel.

"Lengthy criminal trials are rarely perfect, and this
court will not reverse a judgment absent a clear showing
[of prejudice]. [Citations.] Nevertheless, a series of
trial errors, though independently harmless, may in some
circumstances rise by accretion to the level of reversible
and prejudicial error. [Citations.]" (*People v. Hill,
supra,* 17 Cal.4th at pp. 844-845.) We have examined the

150

entire record and are persuaded that what errors we have
identified were not prejudicial by themselves. We are also
persuaded that their combined effect was harmless, and
that appellants received a fair trial. (See *People v.
Boyette* (2002) 29 Cal.4th 381, 467-468.) In so holding,
and given the nature and number of the charges and
enhancement allegations and the fact there were three
defendants, we expressly reject Nichols's oft-repeated
suggestion that juror deliberations of approximately seven
hours somehow indicates a close case such that any error
was prejudicial. (See, e.g., *People v. Taylor* (1990) 52
Cal.3d 719, 732 [rejecting notion, in light of number of
charges and allegations, that deliberations of 10 hours
showed case was close]; *People v. Walker* (1995) 31
Cal.App.4th 432, 437 [same re: deliberations of six and
one-half hours].)

We reach this conclusion despite the fact jurors were
exposed to behavior, from both the prosecutor and defense
counsel, that cannot have given them a good picture of the
legal profession or the criminal justice system. The
prosecutor often seemed incapable of restraining himself
from including gratuitous remarks with virtually every
objection he made or to which he responded. Defense
counsel—some more than others—were frequently rude and
sarcastic toward the prosecutor and, worse, toward
witnesses. "[I]t is the right of counsel for every
litigant to press his claim, even if it appears farfetched
and untenable, to obtain the court's considered ruling.
Full enjoyment of that right, with due allowance for the
heat of controversy, will be protected by appellate
courts.... But if the ruling is adverse, it is not
counsel's right to resist it or to insult the judge—his
right is only respectfully to preserve his point for
appeal. During a trial, lawyers must speak, each in his
own time and within his allowed time, and with relevance
and moderation. These are such obvious matters that we
should not remind the bar of them were it not for the
misconceptions manifest in this case." (*Sacher v. United
States* (1952) 343 U.S. 1, 9.) Despite counsel's behavior,
however, we remain convinced appellants were not denied a
fair trial or any other constitutional rights.

(LD 3, 120-22.)

///

B.  <u>Analysis</u>

The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair, even though no single error rises to the level of a constitutional violation or would independently warrant reversal.  <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007) (citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 298, 302-03 (1973)).  Traditional principles of due process provide that cumulative errors warrant habeas relief only where the errors have so infected the trial with unfairness that the resulting conviction denies due process, such as where the combined effect of the errors had a substantial and injurious effect or influence on the jury's verdict, <u>id.</u> (citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) and <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)), and where the combined effect of individually harmless errors renders a criminal defense far less persuasive than it might otherwise have been, <u>id.</u> (citing <u>Chambers</u>, 410 U.S. at 294, 302-03).

In evaluating a due process challenge based on the cumulative effect of multiple trial errors, a reviewing court must determine the relative harm caused by the errors considering the overall strength of the prosecution's case; if the evidence of guilt is otherwise overwhelming, the errors are considered harmless, and the conviction will generally be affirmed.  <u>Parle v. Runnels</u>, 505 F.3d

152

at 927-28.

Here, after reviewing all Petitioners' claims separately, the state court expressly addressed the claim of fundamental unfairness based on cumulative error and set forth legal standards consistent with the governing federal standards.  The state court reviewed the entire record and reasonably concluded that although there were errors, whether those errors were examined singly or in combination, they were not prejudicial to the extent that they rendered the trial unfair.  This conclusion was not contrary to, or an unreasonable application of, clearly established federal law, and it was not based on unreasonable factual findings.

The weight of the evidence against Petitioners was great; the errors in testimony and various representations concerning the evidence were challenged on cross-examination and in argument; improprieties were the subject of curative processes, including instructions; and the prejudicial effect of the gang evidence was limited or mitigated by various factors, including instructions, the inflammatory and extreme facts of the charged offenses, the victim's status as a notorious gang member and drug dealer, Petitioner's own history of criminal conduct and association with others in the gang culture, and the ever-present context of the drug trade and the culture of violence that inhered in the identity of the participants and the conduct and events involved not only in preparing and committing the offenses, but also in undertaking to subvert the

administration of justice by engaging in an attempt to conceal guilt after the fact by means of deceit and threats.  Any limitation on confrontation was harmless in view of the lack of any material dispute about the physical evidence or the autopsy.  Defense counsel engaged in extensive impeachment and argument with respect to Brocchini and Collins, and defense counsel overall participated actively in the examination and cross-examination of the witnesses as well as in lengthy and complex closing arguments.

Considering all the circumstances, it cannot be said that the state court's decision was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  Accordingly, it will be recommended that Petitioner's cumulative error claim be denied.

XV.   Evidentiary Hearing

Petitioner requests an evidentiary hearing.

The decision to grant an evidentiary hearing is generally a matter left to the sound discretion of the district courts.  28 U.S.C. § 2254; Habeas Rule 8(a); Schriro v. Landrigan, 550 U.S. 465, 473 (2007).  To obtain an evidentiary hearing in federal court under the AEDPA, a petitioner must allege a colorable claim by alleging disputed facts which, if proved, would entitle him to relief. Schriro v. Landrigan, 550 U.S. at 474.

The determination of entitlement to relief, in turn, is limited by 28 U.S.C. § 2254(d)(1) and (2), which require that to obtain relief with respect to a claim adjudicated on the merits in state

court, the adjudication must result in a decision that was either contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of facts based on the evidence before the state court.  Schriro v. Landrigan, 550 U.S. at 474; Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005).  Further, in analyzing a claim pursuant to § 2254(d)(1), a federal court is limited to the record that was before the state court that adjudicated the claim on the merits.  Cullen v. Pinholster, 131 S.Ct. at 1398.

Here, Petitioner has not shown entitlement to relief under § 2254(d).  Thus, the Court is not required to hold an evidentiary hearing.  Cullen v. Pinholster, 131 S.Ct. at 1399 (citing Schriro v. Landrigan, 550 U.S. 465, 474 (2007)).  Accordingly, it will be recommended that Petitioner's request for an evidentiary hearing be denied.

XVI.  Certificate of Appealability

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court.  28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).  A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Rule 11(a) of the Rules Governing Section 2254 Cases.

A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right. § 2253(c)(2).  Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have

155

been resolved in a different manner or that the issues presented
were adequate to deserve encouragement to proceed further. Miller-
El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S.
473, 484 (2000)). A certificate should issue if the Petitioner
shows that jurists of reason would find it debatable whether: (1)
the petition states a valid claim of the denial of a constitutional
right, and (2) the district court was correct in any procedural
ruling. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the
claims in the habeas petition, generally assesses their merits, and
determines whether the resolution was debatable among jurists of
reason or wrong. Id. An applicant must show more than an absence
of frivolity or the existence of mere good faith; however, the
applicant need not show that the appeal will succeed. Miller-El v.
Cockrell, 537 U.S. at 338.

Here, it does not appear that reasonable jurists could debate
whether the petitions should have been resolved in a different
manner. Petitioners have not made a substantial showing of the
denial of a constitutional right. Thus, it will be recommended that
the Court decline to issue a certificate of appealability.

XVII. Recommendations

Accordingly, it is RECOMMENDED that:

1) Petitioner Trice's petition for writ of habeas corpus be
DENIED;

2) Petitioner Trice's 's request for an evidentiary hearing be
DENIED;

3) Petitioner Nichols's petition for writ of habeas corpus be
DENIED;

156

4)   Judgment be ENTERED for Respondent against Petitioner Trice and Petitioner Nichols; and

5)   The Court DECLINE to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **September 10, 2014**                     **/s/ Sheila K. Oberto**
                                                    UNITED STATES MAGISTRATE JUDGE